**Slip Op. 02-07**

**UNITED STATES COURT OF INTERNATIONAL TRADE**

**BEFORE: SENIOR JUDGE NICHOLAS TSOUCALAS**

_____
                                          :
NTN BEARING CORPORATION OF AMERICA,       :
AMERICAN NTN BEARING MANUFACTURING        :
CORPORATION and NTN CORPORATION;          :
NSK LTD. and NSK CORPORATION;             :
KOYO SEIKO CO., LTD. and KOYO             :
CORPORATION OF U.S.A.,                    :
                                          :
          Plaintiffs and                  :
          Defendant-Intervenors,          :
                                          :
     v.                                   :  Consol. Court No.
                                          :  98-01-00146
UNITED STATES,                            :
                                          :
          Defendant,                      :
                                          :
          and                             :
                                          :
THE TIMKEN COMPANY,                       :
                                          :
          Defendant-Intervenor            :
          and Plaintiff.                  :
_____ :


     Plaintiffs and defendant-intervenors, NTN Bearing Corporation of America, American NTN Bearing Manufacturing Corporation and NTN Corporation (collectively "NTN"), NSK Ltd. and NSK Corporation (collectively "NSK"), and Koyo Seiko Co., Ltd. and Koyo Corporation of U.S.A. (collectively "Koyo"), move pursuant to USCIT R. 56.2 for judgment upon the agency record challenging various aspects of the Department of Commerce, International Trade Administration's ("Commerce") final determination, entitled Final Results of Antidumping Duty Administrative Reviews of Tapered Roller Bearings and Parts Thereof, Finished and Unfinished, From Japan, and Tapered Roller Bearings, Four Inches or Less in Outside Diameter, and Components Thereof, From Japan ("Final Results"), 63 Fed. Reg. 2558 (Jan. 15, 1998), as amended, Amended Final Results of Antidumping Duty Administrative Reviews of Tapered Roller Bearings and Parts Thereof, Finished and Unfinished, From Japan, and Tapered Roller Bearings, Four Inches or Less in Outside Diameter, and Components Thereof, From Japan ("Amended Final Results"), 63 Fed. Reg. 13,391 (Mar. 19, 1998).  Defendant-intervenor and plaintiff, The Timken

Company ("Timken"), also moves pursuant to USCIT R. 56.2 for judgment upon the agency record challenging certain determinations of Commerce's <u>Final Results</u>.

Specifically, NTN contends that Commerce unlawfully: (1) conducted a duty absorption inquiry under 19 U.S.C. § 1675(a)(4) (1994) for the 1976 antidumping duty order; (2) denied a price-based level of trade ("LOT") adjustment for NTN's constructed export price ("CEP") sales; (3) rejected NTN's allocation of United States and home market selling expenses on an LOT-specific basis; (4) refused to calculate CEP profit on an LOT-specific basis; (5) included export price ("EP") sales in the calculation of CEP profit; (6) recalculated NTN's credit expenses on a transaction-specific basis; (7) denied a downward adjustment to NTN's reported United States indirect selling expenses for imputed interests incurred in financing cash deposits for antidumping duties; (8) adjusted NTN's cost of production ("COP") and constructed value ("CV") for affiliated party inputs; (9) applied a 99.5% test to determine whether sales to NTN's affiliated parties were made at arm's length; (10) double-counted NTN's depreciation of idle equipment; (11) included NTN's zero-priced United States transactions in the margin calculations and failed to exclude NTN's sample sales and other sales from its margin calculation; and (12) used facts available to adjust NTN's reported billing adjustment.

NSK contends that Commerce unlawfully: (1) conducted a duty absorption inquiry under 19 U.S.C. § 1675(a)(4) for the 1976 and 1987 antidumping duty orders; (2) used NSK's affiliated supplier cost data to run its model match methodology under 19 U.S.C. § 1677(16) (1994), to calculate the difmer adjustment under 19 U.S.C. § 1677b(a)(6) (1994) and to recalculate NSK's reported U.S. inventory carrying costs ("ICC") prior to deducting this expense from CEP pursuant to 19 U.S.C. § 1677a(d) (1994); and (3) denied a partial LOT adjustment.

Koyo contends that Commerce unlawfully: (1) conducted a duty absorption inquiry under 19 U.S.C. § 1675(a)(4) for the 1976 and 1987 antidumping duty orders; (2) applied adverse facts available to Koyo's sales of further manufactured tapered roller bearings ("TRBs"); (3) used entered value to calculate the assessment rate under 19 C.F.R. § 351.212(b) (1998); and (4) treated Koyo's imported forged rings as in-scope merchandise subject to the TRB antidumping duty order.

Timken contends that Commerce unlawfully: (1) applied adverse facts available to Koyo's entered value; (2) failed to adjust CEP for indirect selling expenses reported by NTN, NSK and Koyo; (3)

permitted NTN to exclude certain warehousing expenses attributable to non-scope merchandise from its reported United States indirect selling expenses; (4) accepted Koyo's home market support rebates; (5) accepted Koyo's home market "billing adjustment two"; (6) accepted NSK's home market lump-sum rebates; and (7) accepted Koyo's home market average short-term interest rate.

   **Held:**   NTN's 56.2 motion is granted in part and denied in part.   NSK's 56.2 motion is granted in part and denied in part. Koyo's 56.2 motion is granted in part and denied in part.   Timken's 56.2 motion is denied.   This case is remanded to Commerce to: (1) annul all findings and conclusions made pursuant to the duty-absorption inquiry conducted for the subject review in accordance with this opinion; and (2) exclude any transactions that were not supported by consideration from NTN's United States sales database and to adjust the dumping margins accordingly.

[NTN's, NSK's and Koyo's 56.2 motions are granted in part and denied in part.  Timken's 56.2 motion is denied.  Case remanded.]


                         Dated:    January 24, 2002


   Barnes, Richardson & Colburn (Donald J. Unger, Kazumune V. Kano, David G. Forgue and Clarice K. M. McCauley) for NTN.

   Lipstein, Jaffe & Lawson, L.L.P. (Robert A. Lipstein, Matthew P. Jaffe and Grace W. Lawson) for NSK.

   Powell, Goldstein, Frazer & Murphy LLP (Peter O. Suchman, Neil R. Ellis, Elizabeth C. Hafner and Ronald E. Minsk) for Koyo.

   Robert D. McCallum, Jr., Assistant Attorney General; David M. Cohen, Director, Commercial Litigation Branch, Civil Division, United States Department of Justice (Velta A. Melnbrencis, Assistant Director, and Michele D. Lynch); of counsel: Joan L. Mackenzie and Barbara Campbell Potter, Office of the Chief Counsel for Import Administration, United States Department of Commerce, for the United States.

   Stewart and Stewart (Terence P. Stewart, William A. Fennell and Patrick J. McDonough) for Timken.

**OPINION**

**TSOUCALAS, Senior Judge:** Plaintiffs and defendant-intervenors, NTN Bearing Corporation of America, American NTN Bearing Manufacturing Corporation and NTN Corporation (collectively "NTN"), NSK Ltd. and NSK Corporation (collectively "NSK"), and Koyo Seiko Co., Ltd. and Koyo Corporation of U.S.A. (collectively "Koyo"), move pursuant to USCIT R. 56.2 for judgment upon the agency record challenging various aspects of the Department of Commerce, International Trade Administration's ("Commerce") final determination, entitled Final Results of Antidumping Duty Administrative Reviews of Tapered Roller Bearings and Parts Thereof, Finished and Unfinished, From Japan, and Tapered Roller Bearings, Four Inches or Less in Outside Diameter, and Components Thereof, From Japan ("Final Results"), 63 Fed. Reg. 2558 (Jan. 15, 1998), as amended, Amended Final Results of Antidumping Duty Administrative Reviews of Tapered Roller Bearings and Parts Thereof, Finished and Unfinished, From Japan, and Tapered Roller Bearings, Four Inches or Less in Outside Diameter, and Components Thereof, From Japan ("Amended Final Results"), 63 Fed. Reg. 13,391 (Mar. 19, 1998). Defendant-intervenor and plaintiff, The Timken Company ("Timken"), also moves pursuant to USCIT R. 56.2 for judgment upon the agency record challenging certain determinations of Commerce's Final Results.

Specifically, NTN contends that Commerce unlawfully: (1) conducted a duty absorption inquiry under 19 U.S.C. § 1675(a)(4) (1994) for the 1976 antidumping duty order; (2) denied a price-based level of trade ("LOT") adjustment for NTN's constructed export price ("CEP") sales; (3) rejected NTN's allocation of United States and home market selling expenses on an LOT-specific basis; (4) refused to calculate CEP profit on an LOT-specific basis; (5) included export price ("EP") sales in the calculation of CEP profit; (6) recalculated NTN's credit expenses on a transaction-specific basis; (7) denied a downward adjustment to NTN's reported United States indirect selling expenses for imputed interests incurred in financing cash deposits for antidumping duties; (8) adjusted NTN's cost of production ("COP") and constructed value ("CV") for affiliated party inputs; (9) applied a 99.5% test to determine whether sales to NTN's affiliated parties were made at arm's length; (10) double-counted NTN's depreciation of idle equipment; (11) included its zero-priced United States transactions in the margin calculations and failed to exclude NTN's sample sales and other sales from its margin calculation; and (12) used facts available to adjust NTN's reported billing adjustment.

NSK contends that Commerce unlawfully: (1) conducted a duty absorption inquiry under 19 U.S.C. § 1675(a)(4) for the 1976 and 1987 antidumping duty orders; (2) used NSK's affiliated supplier

cost data to run its model match methodology under 19 U.S.C. § 1677(16) (1994), to calculate the difmer adjustment under 19 U.S.C. § 1677b(a)(6) (1994) and to recalculate NSK's reported U.S. inventory carrying costs ("ICC") prior to deducting this expense from CEP pursuant to 19 U.S.C. § 1677a(d) (1994); and (3) denied a partial LOT adjustment.

Koyo contends that Commerce unlawfully: (1) conducted a duty absorption inquiry under 19 U.S.C. § 1675(a)(4) for the 1976 and 1987 antidumping duty orders; (2) applied adverse facts available to Koyo's sales of further manufactured tapered roller bearings ("TRBs"); (3) used entered value to calculate the assessment rate under 19 C.F.R. § 351.212(b) (1998); and (4) treated Koyo's imported forged rings as in-scope merchandise subject to the TRB antidumping duty order.

Timken contends that Commerce unlawfully: (1) applied adverse facts available to Koyo's entered value; (2) failed to adjust CEP for indirect selling expenses reported by NTN, NSK and Koyo; (3) permitted NTN to exclude certain warehousing expenses attributable to non-scope merchandise from its reported United States indirect selling expenses; (4) accepted Koyo's home market support rebates; (5) accepted Koyo's home market "billing adjustment two"; (6) accepted NSK's home market lump-sum rebates; and (7)accepted Koyo's home market average short-term interest rate.

**BACKGROUND**

This case concerns the 1976 and 1987 antidumping duty orders on TRBs from Japan for the period of review ("POR") covering October 1, 1995, through September 30, 1996.  On September 9, 1997, Commerce published the preliminary results of administrative reviews of the 1976 and 1987 antidumping duty orders.  See Preliminary Results of Antidumping Duty Administrative Reviews of Tapered Roller Bearings and Parts Thereof, Finished and Unfinished, From Japan, and Tapered Roller Bearings, Four Inches or Less in Outside Diameter, and Components Thereof, From Japan, ("Preliminary Results") 62 Fed. Reg. 47,452.  Commerce published the Final Results on January 15, 1998, see 63 Fed. Reg. at 2558, and the Amended Final Results on March 19, 1998, see 63 Fed. Reg. 13,391.[1]

**JURISDICTION**

The Court has jurisdiction over this matter pursuant to 19 U.S.C. § 1516a(a) (1994) and 28 U.S.C. § 1581(c) (1994).

---

[1]  Since the administrative reviews at issue were initiated after December 31, 1994, the applicable law is the antidumping statute as amended by the Uruguay Round Agreements Act  ("URAA"), Pub. L. No. 103-465, 108 Stat. 4809 (1994) (effective January 1, 1995).  See Torrington Co. v. United States, 68 F.3d 1347, 1352 (Fed. Cir. 1995) (citing URAA § 291(a)(2), (b) (noting effective date of URAA amendments)).

**STANDARD OF REVIEW**

The Court will uphold Commerce's final determination in an antidumping administrative review unless it is "unsupported by substantial evidence on the record, or otherwise not in accordance with law."  19 U.S.C. § 1516a(b)(1)(B)(i) (1994); see NTN Bearing Corp. of Am. v. United States ("NTN Bearing"), 24 CIT ___, ___, 104 F. Supp. 2d 110, 115-16 (2000) (detailing Court's standard of review for antidumping proceedings).

**DISCUSSION**

**I.   Commerce's Duty Absorption Inquiry**

**A.  Background**

Title 19, United States Code, § 1675(a)(4) provides that during an administrative review initiated two or four years after the publication of an antidumping duty order, Commerce, if requested by a domestic interested party, "shall determine whether antidumping duties have been absorbed by a foreign producer or exporter subject to the order if the subject merchandise is sold in the United States through an importer who is affiliated with such foreign producer or exporter."  Section 1675(a)(4) further provides that Commerce shall notify the International Trade Commission ("ITC") of its findings regarding such duty absorption for the ITC to consider in conducting a five-year ("sunset") review under 19 U.S.C. § 1675(c) (1994), and the ITC will take such findings into

account in determining whether material injury is likely to continue or recur if an order were revoked under § 1675(c). See 19 U.S.C. § 1675a(a)(1)(D) (1994).

On December 11, 1996, Timken requested Commerce to conduct a duty absorption inquiry pursuant to § 1675(a)(4) with respect to various respondents, including NTN, NSK and Koyo, to ascertain whether antidumping duties had been absorbed during the administrative reviews of the 1976 and 1987 antidumping duty orders. See Final Results, 63 Fed. Reg. at 2558.

In the Final Results, Commerce found that duty absorption had occurred for the POR. See id. at 2559. In asserting authority to conduct a duty absorption inquiry under § 1675(a)(4), Commerce first explained that for "transition orders," as defined in 19 U.S.C. § 1675(c)(6)(C) (antidumping duty orders, inter alia, orders issued on or after January 1, 1995), regulation 19 C.F.R. § 351.213(j) (1998) provides that Commerce "will make a duty-absorption determination, if requested, for any administrative review initiated in 1996 or 1998." Final Results, 63 Fed. Reg. at 2558. Commerce concluded that: (1) because the antidumping duty orders on TRBs in this case have been in effect since 1976 and 1987, respectively, the orders are transition orders pursuant to § 1675(c)(6)(C); and (2) since these reviews were initiated in 1996 and a request was made, Commerce had the authority to make duty

absorption inquiries for the administrative reviews of the 1976 and 1987 antidumping duty orders.  See id. at 2558-59.


B.    **Contentions of the Parties**

NTN, NSK and Koyo contend that Commerce lacked authority under § 1675(a)(4) to conduct a duty absorption inquiry for the POR of the outstanding 1976 and 1987 antidumping duty orders.[2]  See NTN's Mem. Supp. Mot. J. Agency R. ("NTN's Mem.") at 27-32; NTN's Reply Br. Jan. 22, 1999 Resp. Brs. United States and Timken ("NTN's Reply") at 2; NSK's Mem. P. & A. Supp. Mot. J. Agency R. ("NSK's Mem.") at 12-16; NSK's Reply Mem. Supp. Mot. J. Agency R. ("NSK's Reply") at 6-8; Koyo's Mem. P. & A. Supp. Mot. J. Agency R. ("Koyo's Mem.") at 9-14; Koyo's Reply Br. Supp. Mot. J. Agency R. ("Koyo's Reply") at 2-18.  In the alternative, the parties assert that even if Commerce possessed the authority to conduct such an inquiry, Commerce's methodology for determining duty absorption was contrary to law and, accordingly, the case should be remanded to Commerce to annul its duty absorption findings and conclusions. See NTN's Mem. at 32-36; NSK's Mem. at 12-16; Koyo's Mem. at 15-16; Koyo's Reply at 16-18.

---

[2] The Court assumes that NTN only contests the POR of the 1976 antidumping duty order because that is the only POR that is mentioned in its brief and for which Commerce determined that duty absorption had occurred.  See Final Results, 63 Fed. Reg. 2559; NTN's Mem. Supp. Mot. J. Agency R. ("NTN's Mem.) at 27-28.

Commerce argues that it: (1) properly construed § 1675 subsections (a)(4) and (c) as authorizing it to make a duty absorption inquiry for antidumping duty orders that were issued and published prior to January 1, 1995; and (2) devised and applied a reasonable methodology for determining duty absorption. See Def.'s Mem. Opp'n Pls.' Mots. J. Agency R. ("Def.'s Mem.") at 13-31. Timken supports Commerce's contentions. See Timken's Resp. Pls.' Mots. J. Agency R. ("Timken's Resp.") at 34-47.

### C.   Analysis

In SKF USA Inc. v. United States ("SKF USA Inc."), 24 CIT ___, 94 F. Supp. 2d 1351 (2000), this Court determined that Commerce lacked statutory authority under § 1675(a)(4) to conduct a duty absorption inquiry for antidumping duty orders issued prior to the January 1, 1995 effective date of the URAA. See id. 24 CIT at ___, 94 F. Supp. 2d at 1357-59. The Court noted that Congress expressly prescribed in the URAA that § 1675(a)(4) "must be applied prospectively on or after January 1, 1995 for 19 U.S.C. § 1675 reviews." Id. 24 CIT at ___, 94 F. Supp. 2d at 1359 (citing § 291 of the URAA).

Because Commerce's duty absorption inquiry, its methodology and the parties' arguments are practically identical to those presented in SKF USA Inc., the Court adheres to its reasoning in

SKF USA Inc. The statutory scheme clearly provides that the inquiry must occur in the second or fourth administrative review after the publication of the antidumping duty order, not in any other review, and upon the request of a domestic interested party. Accordingly, the Court finds that Commerce did not have statutory authority to undertake a duty absorption investigation for the antidumping duty orders in dispute here. The Court remands this case to Commerce with instructions to annul all findings and conclusions made pursuant to the duty absorption inquiry conducted for the subject review in accordance with this opinion.

## II.  Denial of Price-Based LOT Adjustment for CEP Sales

NTN contends that Commerce improperly denied a price-based LOT adjustment for CEP sales made in the United States market at an LOT different from the home market sales.[3]  See NTN's Mem. at 37-39; NTN's Reply at 3. In particular, NTN argues, inter alia, that Commerce incorrectly determined NTN's CEP LOT because Commerce failed to use the sale to the first unaffiliated purchaser in the United States to determine NTN's CEP LOT. See NTN's Mem. at 38; NTN's Reply at 4. NTN requests that the Court remand the LOT issue to Commerce to grant NTN a price-based LOT adjustment for its CEP

---

[3]  For a complete discussion of background information and the statutory provisions at issue, the reader is referred to this Court's decision in NTN Bearing, 24 CIT at ___, 104 F. Supp. 2d at 125-128.

sales.  <u>See</u> NTN's Mem. at 39; NTN's Reply at 4.

Commerce, in turn, argues that it properly determined the LOT for NTN's CEP sales based upon the CEP.  <u>See</u> Def.'s Mem. at 37. Commerce deducted expenses and profit from the price to the first unaffiliated purchaser in the United States pursuant to § 1677a(d) since § 1677b(a)(7)(A) (1994) provides for an LOT adjustment and requires Commerce to compare normal value ("NV") to CEP rather than to the unadjusted starting price of CEP.  <u>See id.</u> (citing <u>Final Results</u>, 63 Fed. Reg. at 2577).  Commerce points out that CEP is defined in § 1677a(b) (1994) as the price to the "unaffiliated purchaser in the United States as adjusted" under § 1677a(d). Def.'s Mem. at 40.  According to Commerce, the adjusted CEP price is to be compared to prices in the home market based on the same LOT whenever it is practicable; when it is not practicable and the LOT difference affects price comparability, Commerce makes an LOT adjustment.  <u>See id.</u> at 34, 36.  Commerce makes a CEP offset when Commerce is not able to quantify price differences between the CEP LOT and the LOT of the comparison sales, and if NV is established at a more advanced state of distribution than the CEP LOT.  <u>See id.</u> at 36.

Therefore, Commerce claims that it properly denied an LOT adjustment for NTN's CEP sales because NTN did not have a home-market LOT equivalent to the CEP LOT, making it impossible for

Commerce to quantify the difference in price between the CEP LOT

and the home market LOT.  See id.  Because the home market LOT was

at a more advanced stage of distribution than the CEP LOT, Commerce

made a CEP offset pursuant to 19 U.S.C. § 1677b(a)(7)(B).  See id.

Timken generally agrees with Commerce's positions.  See

Timken's Resp. at 67-69.

In Micron Tech., Inc. v. United States ("Micron"), 243 F.3d

1301 (Fed. Cir. 2001), the Court of Appeals for the Federal Circuit

("CAFC") held that the plain text of the antidumping statute and

the Statement of Administrative Action ("SAA")[4] require Commerce to

deduct the expenses enumerated under § 1677a(d) before making the

LOT comparison.[5]  The court examined § 1677b(a)(1)(B)(i) (1994),

which provides that Commerce must establish NV "to the extent

---

[4]   The SAA represents "an authoritative expression by the Administration concerning its views regarding the interpretation and application of the Uruguay Round agreements."  H.R. Doc. 103-316, at 656 (1994), reprinted in 1994 U.S.C.C.A.N. 4040.  "It is the expectation of the Congress that future Administrations will observe and apply the interpretations and commitments set out in this Statement."  Id.; see also 19 U.S.C. § 3512(d) (1994) ("The statement of administrative action approved by the Congress . . . shall be regarded as an authoritative expression by the United States concerning the interpretation and application of the Uruguay Round Agreements and this Act in any judicial proceeding in which a question arises concerning such interpretation or application").

[5]   The CAFC's decision effectively overturned the Court of International Trade's determination with respect to this issue in Borden, Inc. v. United States ("Borden"), 22 CIT 233, 4 F. Supp. 2d 1221 (1998), rev'd 2001 WL 312232 (Fed. Cir. Mar. 12, 2001), a case discussed by the parties in the instant matter.

practicable, at the same level of trade as the export price or [CEP]," and § 1677a(b), which defines CEP as "the price at which the subject merchandise is first sold (or agreed to be sold) in the United States . . . <u>as adjusted under subsections (c) and (d) of this section</u>." (Emphasis supplied). The court concluded that, "[as] [r]ead together, these two provisions show that Commerce is required to deduct the subsection (d) expenses from the starting price in the United States before making the level of trade comparison." <u>Micron</u>, 243 F.3d at 1315. The court further stated that this conclusion is mandated by the SAA, which states that "'to the extent practicable, [Commerce should] establish normal value based on home market (or third country) sales at the same level of trade as the constructed export price or the starting price for the export price.'" <u>Id.</u> (citing SAA at 829).

Thus, the Court finds that Commerce properly made § 1677a(d) adjustments to NTN's starting price in order to arrive at CEP and make its LOT determination. The Court also finds that Commerce's decision to deny NTN an LOT adjustment is supported by substantial evidence. Section 1677b(a)(7)(A) permits Commerce to make an LOT adjustment "if the difference in level of trade . . . involves the performance of different selling activities[] and . . . is demonstrated to affect price comparability, based on a pattern of consistent price differences between sales at different levels of

trade in the country in which normal value is determined." With respect to CEP sales, Commerce found that the same LOT as that of the CEP for merchandise under review did not exist for any respondent in the home market; therefore, Commerce was unable to "determine whether there was a pattern of consistent price differences between the LOTs based upon the respondent's home market sales of merchandise under review." See Def.'s Mem. at 36.

Commerce recognized that the SAA provides alternative methods for calculating LOT adjustments, but it determined "that it would have been inappropriate to apply a LOT adjustment to any respondent." See id. Consequently, with respect to the CEP sales where Commerce was unable to quantify an LOT adjustment, Commerce, in accordance with § 1677b(a)(7)(B) granted a CEP offset to respondents, including NTN, because the home market sales were at a more advanced LOT than the sales to the United States. See id. The Court finds that Commerce acted within the directive of the statute in denying the LOT adjustment and granting a CEP offset instead. See 19 U.S.C. § 1677b(a)(7).

## III. Commerce's Reallocation of NTN's Home Market and United States Selling Expenses Without Regard to LOT

### A. Background

In its preliminary calculations, Commerce calculated NTN's United States and home market selling expenses without regard to

LOT.  See Final Results, 63 Fed. Reg. at 2579.  NTN argued that Commerce should have relied on NTN's reported United States and home market selling expenses based on LOT instead of recalculating these selling expenses without regard to LOT.  See id.  Timken, in turn, contended that Commerce should reject NTN's selling expense allocations based on LOT because such allocations bear no relationship to the way in which NTN incurs the expenses.  See id.

Commerce responded that for a majority of the expenses under this POR, it determined that NTN's methodology for allocating its selling expenses based on LOTs did not bear any relationship to the manner in which NTN incurred these United States and home- market selling expenses and its methodology led to distorted allocations. See id.  Commerce asserts that in Timken Co. v. United States ("Timken I"), 20 CIT 645, 930 F. Supp. 621 (1996), Commerce was to accept "NTN's LOT-specific allocations and per-unit LOT expense adjustment amounts only if NTN's expenses demonstrably varied according to LOT."  Id. (citing Timken I, 20 CIT at 653, 930 F. Supp. at 629).  Acting in accordance with Timken I, Commerce in its remand results did not allow NTN's LOT-specific allocations "due to the lack of quantitative and narrative evidence on the record demonstrating that the expenses in question demonstrably varied according to LOT."  Final Resutls, 63 Fed. Reg. at 2579.  Since Commerce found during this POR that except for certain United

States and home market packing material and packing labor expenses
NTN did not provide "quantitative and narrative evidence" that its
selling expenses are attributable to levels of trade, Commerce
recalculated NTN's United States and home market selling expenses
without regard to LOT.[6]  See id. at 2579-80.


**B.    Contentions of the Parties**

NTN contends that Commerce's decision to reallocate NTN's
selling expenses violates Commerce's mandate to administer the
antidumping laws.  See NTN's Mem. at 40.  NTN notes that Commerce:
(1) has accepted NTN's methodology of allocating its selling
expenses based on LOT in previous reviews; and (2) even stated that
NTN's "detailed and often complex U.S. expense reporting
methodologies result in reasonable allocations."  Id. at 40-41
(quoting Final Results of Antidumping Duty Administrative Reviews
and Revocation in Part of an Antidumping Finding on Tapered Roller
Bearings and Parts Thereof, Finished and Unfinished, From Japan and
Tapered Roller Bearings, Four Inches or Less in Outside Diameter,

---

[6] In support of its methodology, Commerce points out that the
Court in NTN Bearing Corp. of Am. v. United States ("NTN"), 19 CIT
1221, 905 F. Supp. 1083 (1995), stated that "'[a]lthough NTN
purports to show that it incurred different selling expenses at
different trade levels, the record demonstrates that NTN's
allocation methodology does not reasonably quantify the expenses
incurred at each level of trade.'"  See Def.'s Mem. at 46 (quoting
NTN, 19 CIT at 1234, 905 F. Supp. at 1094-95).

and Components Thereof, From Japan, 61 Fed. Reg. 57,629, 57,636 (Nov. 7, 1996)).  Moreover, NTN argues that Commerce's rejection of NTN's reporting methodology on the basis of complexity is not a reasonable rationale for reallocating NTN's selling expenses.[7] NTN's Mem. at 39, 40.  NTN contends that such reallocation has the effect of voiding Commerce's LOT determination that different LOTs exist in the United States and Japan.  See id. at 41.

Commerce responds that there is no evidence of narrative or quantitative analysis tying the allocation method to the expenses. See Def.'s Mem. at 45.  Commerce asserts that NTN only quantified the allocation itself and, therefore, the Court should sustain the agency's recalculation of NTN's United States and home market selling expenses.  See id. at 46.

Timken supports Commerce and argues that Commerce was correct in rejecting NTN's allocation of United States and home- market selling expenses on an LOT-specific basis because "the record did not contain 'quantitative and narrative evidence demonstrating' that sales at different levels incurred different amounts of the expenses."  See Timken's Resp. at 69 (quoting Final Results, 63 Fed. Reg. at 2580).

---

[7]    The Court does not entertain NTN's argument regarding Commerce's rejection of NTN's reporting methodology on the basis of complexity.  Commerce corrected this statement in a memorandum to the file.  See Def.'s Mem. at 46 (citing Def.'s Mem. Ex. 2).

   **C.    Analysis**

   The Court disagrees with NTN that it adequately supported its LOT adjustment claim for its reported United States and home-market selling expenses.  Although NTN purports to show that it incurred different selling expenses at different trade levels, the evidence to which it points does not show that its allocation methodology reasonably quantifies the United States and home-market selling expenses incurred at different LOTs.  See NTN Bearing, 24 CIT at ___, 104 F. Supp. 2d at 131-33; NTN, 19 CIT at 1234, 905 F. Supp. at 1095.  Given that NTN had the burden before Commerce to establish its entitlement to an LOT adjustment, its failure to provide the requisite evidence compels the Court to conclude that it has not met its burden of demonstrating that Commerce's denial of the LOT adjustment was not supported by substantial evidence and was not in accordance with law.  See NSK Ltd. v. United States ("NSK Ltd."), 21 CIT 617, 635-36, 969 F. Supp. 34, 55 (1997), aff'd, NSK Ltd. v. Koyo Seiko Co., Ltd. ("NSK"), 190 F.3d 1321, 1330 (Fed. Cir. 1999).

   Accordingly, the Court sustains Commerce's recalculation of NTN's United States and home market selling expenses without regard to levels of trade.

## IV.  NTN's Constructed Export Price Calculation

### A.  NTN's Constructed Export Price Calculation Without Regard to LOT

#### 1.    Background

In calculating CEP, Commerce must reduce the starting price used to establish CEP by "the profit allocated to the expenses described in paragraphs (1) and (2)" of § 1677a(d).  19 U.S.C. § 1677a(d)(3).  Under 19 U.S.C. § 1677a(f) (1994), the "profit" that is deducted from this starting price is "determined by multiplying the total actual profit by [a] percentage" calculated "by dividing the total United States expenses by the total expenses."  19 U.S.C. § 1677a(f)(1) and (2)(A).  Section 1677a(f)(2)(B) defines "total United States expenses" as the total expenses deducted under § 1677a(d)(1) and (2), that is, commissions, direct and indirect selling expenses, assumptions, and the cost of any further manufacture or assembly in the United States.  Section 1677a(f)(2)(C) establishes a tripartite hierarchy of methods for calculating "total expenses."  First, "total expenses" could be the "expenses incurred with respect to the subject merchandise sold in the United States and the foreign like product sold in the exporting country" if Commerce requested such expenses for the purpose of determining NV and CEP.  Id. § 1677a(f)(2)(C)(i).  If Commerce did not request these expenses, then "total expenses" are the "expenses incurred with respect to the narrowest category of

merchandise sold in the United States and the exporting country which includes the subject merchandise." 19 U.S.C. § 1677a(f)(2)(C)(ii). If the data necessary to determine "total expenses" under either of these methods is not available, then "total expenses" are the "expenses incurred with respect to the narrowest category of merchandise sold in all countries which includes the subject merchandise." 19 U.S.C. § 1677a(f)(2)(C)(iii). "Total actual profit" is based on whichever category of merchandise is used to calculate "total expenses" under § 1677a(f)(2)(C). See 19 U.S.C. § 1677a(f)(2)(D).

During this POR, NTN argued that profit levels differed by LOT and had an effect on prices and CEP profit and, therefore, Commerce should calculate CEP profit on an LOT-specific basis rather than for each class or kind of merchandise. See Final Results, 63 Fed. Reg. at 2570. NTN reasoned that § 1677a(f)(2)(C) "expresses a preference for the [CEP] profit calculations to be performed as specifically as possible and on the narrowest basis as possible." Id.

Commerce rejected NTN's argument, concluding that: (1) "[n]either the statute nor the SAA require[s] [Commerce] to calculate CEP profit on a basis more specific than the subject merchandise as a whole"; (2) basing the CEP-profit calculation on an LOT-specific basis would "add a layer of complexity to an

already complicated exercise with no increase in accuracy"; and (3)
a subdivision "of the CEP-profit calculation would be more
susceptible to manipulation." Id. (Commerce also relied on its
detailed explanation made in the sixth review of the antifriction
bearings ("AFBs").[8]


## 2. Contention of the Parties

NTN contends that Commerce erred by refusing to calculate CEP
profit on an LOT-specific basis. See NTN's Mem. at 16.
Highlighting the "narrowest category of merchandise" language of §

---

[8] In the sixth AFB review, Commerce reasoned as follows:

> Neither the statute nor the SAA require[s] [Commerce] to
> calculate CEP profit on bases more specific than the
> subject merchandise as a whole. Indeed, while [Commerce]
> cannot at this time rule out the possibility that the
> facts of a particular case may require division of CEP
> profit, the statute and SAA, by referring to "the"
> profit, "total actual profit," and "total expenses" imply
> that [Commerce] should prefer calculating a single profit
> figure. NTN's suggested approach would also add a layer
> of complexity to an already complicated exercise with no
> guarantee that the result will provide any increase in
> accuracy. [Commerce] need not undertake such a
> calculation[.] [S]ee Daewoo Elecs. Co. v. International
> Union, 6 F.3d 1511, 1518-19 (Fed. Cir. 1993)[]. Finally,
> subdivision of the CEP-profit calculation would be more
> susceptible to manipulation. Congress has specifically
> warned us to be wary of such manipulation of the profit
> allocation[.] [S]ee S. Rep. 103-412, 103d Cong., 2d Sess
> at 66-67).

Final Results of Antidumping Duty Administrative Reviews of
Antifriction Bearings (Other Than Tapered Roller Bearings) and
Parts Thereof From France, Germany, Italy, Japan, Singapore, and
the United Kingdom, 62 Fed. Reg. 2081, 2125 (Jan. 15, 1997).

1677a(f)(2)(C)(ii) and (iii), NTN argues that there is a clear statutory preference that profit be calculated on the narrowest possible basis. See id. at 17. Moreover, NTN claims that since CV profit is calculated by LOT and matching is by LOT, CEP profit should be calculated to account for differences in LOT. See id. NTN asserts that the mere fact that a calculation is difficult is not a valid reason to sacrifice accuracy. See id. NTN further asserts that Commerce's speculation that an adjustment is susceptible to manipulation provides no grounds for rejecting an adjustment. See id. at 16.

Commerce responds that it properly determined CEP profit without regard to LOT. See Def.'s Mem. at 50. Commerce notes that § 1677a(f) does not refer to LOT, that is, the statute does not require that CEP profit be calculated on an LOT-specific basis. See id. at 51. In addition, Commerce asserts that even assuming that a narrower basis for the CEP-profit calculation is warranted in some circumstances, NTN has not provided any factual support for such a deviation from Commerce's standard methodology for calculating CEP profit. See id. at 52. Timken generally agrees with Commerce's CEP-profit calculation. See Timken's Resp. at 59-60.

### 3.  Analysis

Section 1677a(f), as Commerce correctly notes, does not make any reference to LOT.  Accordingly, the Court's duty under Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc. ("Chevron"), 467 U.S. 837 (1984), is to review the reasonableness of Commerce's statutory interpretation.  See IPSCO, Inc. v. United States ("IPSCO"), 965 F.2d 1056, 1061 (Fed. Cir. 1992) (citing Chevron, 467 U.S. at 844).

Commerce's refusal to calculate CEP profit on an LOT-specific basis is reasonable and in accordance with law.  See NTN Bearing, 24 CIT at ___, 104 F. Supp. 2d at 133-35.  The language of the statute clearly contemplates that, in general, the "narrowest category" will include the class or kind of merchandise that is within the scope of an investigation or review.  See id. Subsections (ii) and (iii) of § 1677a(f)(C)'s "total expense" definition lead to such conclusion because both subsections refer to "expenses incurred with respect to the narrowest category of merchandise . . . which includes the subject merchandise." See id. at 135.  The term "subject merchandise" is defined as "the class or kind of merchandise that is within the scope of an investigation, a review, a suspension agreement, an order under this subtitle or section 1303 of this title, or a finding under the Antidumping Act, 1921." 19 U.S.C. § 1677(25) (1994).  Accordingly, the Court finds

that Commerce reasonably interpreted § 1677a(f) in refusing to apply a narrower subcategory of merchandise such as one based on LOT. The Court, moreover, agrees with Commerce's conclusion that a subdivision of the "CEP-profit calculation would be more susceptible to manipulation," a result that Congress specifically warned Commerce to prevent. Final Results, 63 Fed. Reg. at 2570. Finally, the Court agrees with Commerce that NTN failed to provide adequate factual support of how the CEP-profit calculation was distorted by Commerce's standard methodology.

### B. Inclusion of EP Sales in Calculation of NTN's Constructed Export Price Profit

#### 1. Background

Under 19 U.S.C. § 1677a(d)(3), Commerce must, in order to calculate CEP, deduct "the profit allocated to the expenses described in" 19 U.S.C. § 1677a(d)(l) and (2) from the price charged to the first unaffiliated purchaser in the United States. "Profit" is defined as "an amount determined by multiplying the total actual profit by the applicable percentage," 19 U.S.C. § 1677a(f)(1), and "actual profit" is defined as the "total profit earned . . . with respect to the sale of the same merchandise for which total expenses are determined . . . ." 19 U.S.C. § 1677a(f)(2)(D). The term "total expenses" means "all expenses in the first of [three] categories which applies and which are

incurred by or on behalf of the foreign producer and foreign exporter of the subject merchandise and by or on behalf of the United States seller affiliated with the producer or exporter with respect to the production and sale of such merchandise . . . ." 19 U.S.C. § 1677a(f)(2)(C). The first category covers "expenses incurred with respect to the subject merchandise sold in the United States and the foreign like product sold in the exporting country . . . ." 19 U.S.C. 1677a(f)(2)(C)(i). "Subject merchandise," in turn, is defined as "the class or kind of merchandise that is within the scope of . . . a review . . . ." 19 U.S.C. § 1677(25).

In the Final Results, Commerce included EP sales in the calculation of CEP profit. See generally, 63 Fed. Reg. at 2570.

### 2. Contentions of the Parties

NTN contends that the statute clearly states that the adjustment of profit to the CEP is to be based on expenses incurred in the United States as a percentage of total expenses and that there is no provision in the statute for the inclusion of EP expenses or profit in this calculation. See NTN's Mem. at 17-19. NTN deduces, therefore, that Commerce erred by including EP sales in the calculation of CEP profit. Id. at 19.

Specifically, NTN relies on the definition of the term "total expenses." See 19 U.S.C. § 1677a(f)(2)(C). NTN

maintains that the specific reference to CEP within the definition precludes Commerce from the inclusion of EP expenses in the calculation of CEP profit. See NTN's Mem. at 17-18. NTN further states that "just as EP expenses cannot be considered, it follows logically that sales revenue for EP sales also cannot be included [in the calculation of CEP profit]" since the definition of "total actual profit," 19 U.S.C. § 1677a(f)(2)(D), "directly references the definition of 'total expenses.'" Id. at 19. NTN, therefore, requests that EP sales be removed from NTN's CEP profit adjustment calculation. See id.

Commerce contends that the inclusion of revenues and expenses resulting from NTN's EP sales in the calculation of CEP profit was in accordance with the law because it was a reasonable interpretation of the statutory mandates of sections 1677a(f)(2)(C) and (D) and 1677(25) of Title 19. See Def.'s Mem. at 49. Specifically, Commerce points out that the term "subject merchandise" is defined as "'the class or kind of merchandise that is within the scope of . . . a review . . . .'" Id. (quoting 19 U.S.C. § 1677(25)). Commerce notes that the term "subject merchandise" is referred to in the statute that defines "total expenses," see 19 U.S.C. § 1677a(f)(2)(C)(i), and therefore, "total expenses" encompasses NTN's EP and CEP sales. See Def.'s Mem. at 49. Commerce further articulates that:

[t]he basis for total actual profit is the same as the basis for total expenses . . . [see 19 U.S.C. § 1677a(f)(2)(C)(1994)]. The first alternative under [19 U.S.C. § 1677a(f)(2)(C)] states that, for purposes of determining profit, the term "total expenses" refers to all expenses incurred with respect to the subject merchandise sold in the United States (as well as home market expenses). Thus, where the respondent makes both EP and CEP sales to the United States, sales of the subject merchandise would encompass all such transactions. Therefore, because NTN had EP sales, [Commerce] . . . included these sales in the calculation of CEP profit.

Final Results, 63 Fed. Reg. at 2570.

Commerce also points out that its September 4, 1997 policy bulletin explains that 19 U.S.C. § 1677a(f)(2)(D) "provides that the calculation of 'total actual profit' is to include all revenues and expenses resulting from the respondent's EP sales as well as from its CEP and home market sales." Def.'s Mem. at 49 (citing Commerce's Policy Bulletin 97.1 of September 4, 1997).

Timken agrees with Commerce and contends that Commerce reasonably calculated CEP profit on the basis of all United States sales, including EP sales. See Timken's Resp. at 60-61. In addition, Timken argues that the Court lacks jurisdiction over the issue of the inclusion of EP sales in the calculation of NTN's CEP profit because Commerce did not ultimately make a CEP profit adjustment.[9] See Timken's Resp. at 59 (proprietary version).

---

[9] The Court is bewildered by Timken's argument that the Court would be rendering an opinion on a moot issue had the Court decided

### 3. Analysis

Based upon the above-defined statutory scheme, Commerce concluded that where a respondent made both EP and CEP sales, "sales of the subject merchandise" encompassed all such transactions and, therefore, Commerce could reasonably interpret the statutory scheme as providing that the calculation of total actual profit is to include all revenues and expenses resulting from the respondent's EP sales as well as from its CEP and home-market sales. <u>See</u> Def.'s Mem. at 49. Commerce's September 4, 1997 policy bulletin provides:

> The calculation of total actual profit under [19 U.S.C. § 1677a(f)(2)(D)] includes all revenues and expenses resulting from the respondent's [EP] sales as well as from its constructed export price and home market sales . . . . The basis for total actual profit is the same as the basis for total expenses under [19 U.S.C. § 1677a(f)(2)(C)]. The first alternative under this section . . . states that, for purposes of determining profit, the term "total expenses" refers to all expenses

---

to rule on the inclusion of EP sales in the calculation of NTN's CEP profit. <u>See</u> Timken's Resp. at 59 (proprietary version). Timken's reliance on <u>Rose Bearings Ltd. v. United States</u> ("<u>Rose Bearings</u>"), 14 CIT 801, 751 F. Supp. 1545 (1990), is misplaced since in that case, the Court held that it lacked jurisdiction after determining that the plaintiff did not have standing, that is, that the plaintiff was not a party to a "live case or controversy" since the plaintiff "was not subject to the antidumping duty order that it ha[d] appealed . . . ." <u>Rose Bearings</u>, 14 CIT at 802, 751 F. Supp. at 1546. Unlike the plaintiff in <u>Rose Bearings</u>, NTN could be affected by the challenge to Commerce's inclusion of EP sales in Commerce's calculation of CEP profit. <u>See</u> <u>Final Results</u>, 63 Fed. Reg. 2570. Therefore, this Court is correct in rendering a decision over the issue of Commerce's inclusion of EP sales in the calculation of NTN's CEP profit since NTN is a party to a live case or controversy.

incurred with respect to the subject merchandise sold in the United States (as well as home market expenses). Thus, where the respondent makes both EP and CEP [sales], sales of the subject merchandise would encompass all such transactions.

Def.'s Mem. at 49.

The SAA further clarifies the point and states the following:

The total expenses are all expenses incurred by or on behalf of the foreign producer and exporter and the affiliated seller in the United States with respect to the production and sale of the first of the following alternatives which applies: (1) the subject merchandise sold in the United States and the foreign like product sold in the exporting country (if Commerce requested this information in order to determine the normal value and the constructed export price) . . . .

H.R. Doc. 103-316 at 824.

Based upon its interpretation of the statutory language and upon the SAA's reference to CEP, NTN claims that there are only two categories of expenses that Commerce could use in calculating CEP profit: those used to calculate NV and those used to calculate CEP. See NTN's Mem. at 18. Additionally, NTN states that just as EP expenses cannot be used in calculating CEP profit, neither can sales revenue be used for EP sales since the definition of "total actual profit" under 19 U.S.C. § 1677a(f)(2)(D) refers to the definition of "total expenses" in 19 U.S.C. § 1677a(f)(2)(C). See id.

NTN, however, ignores two issues. To start, the first

category of total expenses under § 1677a(f)(2)(C) is not limited to expenses incurred with respect to CEP sales made in the United States and the foreign like product sold in the exporting country. It also covers expenses incurred with respect to EP sales because it refers to "expenses incurred with respect to the subject merchandise sold in the United States"; the term "subject merchandise" is defined in 19 U.S.C. § 1677(25) as the class or kind of merchandise that is within the scope of a review; and the class or kind of merchandise in this review includes both CEP and EP sales.

Second, as the SAA explains, the total expenses are all expenses incurred with respect to the production and sale of the first of the three alternatives. In referring to the first category of expenses, the SAA specifically refers to "the subject merchandise sold in the United States," which by definition means the class or kind of merchandise which is within the scope of a review and, in this review, includes both CEP and EP sales. H.R. Doc. 103-316 at 824.

For these reasons the Court is not convinced by NTN's argument that Commerce's interpretation of the statutory scheme is unreasonable and sustains Commerce's inclusion of EP sales in the calculation of CEP profit. See Chevron, 467 U.S. 837.

## V.   Commerce's Recalculation of Credit Expenses for Constructed Export Price Sales

### A.   Background

During the POR, NTN calculated its United States credit expense for CEP sales on a customer-specific basis.  See NTN's Mem. at 23-24 and Ex. "U.S. Verification Report."  "NTN calculated the average days of payment for each customer, and multiplied the average number of days by the interest rate to arrive at a credit expense."  Def.'s Mem. at 53.

During the review, Timken contended that Commerce "should recalculate NTN's U.S. credit expense because NTN reported a customer-specific average credit expense rather than a transaction-specific credit expense" thereby producing distortive results.  Final Results, 63 Fed. Reg. at 2571.  Timken noted that NTN "provided the necessary information on record to recalculate a credit expense on a transaction-specific" basis.  Id.

NTN responded that its credit expense should not be recalculated because Commerce had accepted NTN's methodology of reporting a customer-specific credit expense in previous AFB reviews and "verified the accuracy of NTN's data" for this and other reviews.[10]  See id. at 2572; see also NTN's Mem. at 23 (citing

---

[10]   NTN cites to a past administrative review for NTN's proposition that Commerce has previously accepted NTN's methodology of reporting a customer-specific credit expense.  See

1997 Final Results, 62 Fed. Reg. 54,043, 54,066-54,067 [sic].[11]

Commerce agreed with Timken with regards to CEP sales, finding:

> We have data on the record which allows us to calculate a transaction-specific credit expense for CEP sales. Therefore, we have recalculated NTN's credit expense using the dates of payment which NTN reported.

Final Results, 63 Fed. Reg. at 2572.

### B.    Contentions of the Parties

NTN notes that Commerce has accepted NTN's calculation of credit expenses on a customer-specific basis for previous antidumping duty orders on AFBs from Japan. See NTN's Mem. at 23. NTN contends that since "NTN has not modified its reporting

---

NTN's Mem. at 23 (citing Final Results of Antidumping Duty Administrative Reviews of Antifriction Bearings (Other Than Tapered Roller Bearings) and Parts Thereof From France, Germany, Italy, Japan, Romania, Singapore, Sweden and the United Kingdom ("1997 Final Results"), 62 Fed. Reg. 54,043, 54,066-54,067 [sic] (October 17, 1997).  In that review, Commerce allowed NTN to calculate its United States credit expense for EP sales on a customer-specific basis since NTN could not report its credit expenses on a transaction basis.  See 1997 Final Results at 54,053.  However, with regards to CEP sales, Commerce recalculated NTN's credit expense on a transaction-specific basis since NTN provided transaction-specific information to Commerce.  See id.  Therefore, the Court holds that Commerce's prior methodology does not require Commerce to use NTN's customer-specific reported and verified data when NTN provides transaction-specific information allowing for the calculation of credit expense on a transaction-specific basis.

[11]    The Court assumes that the correct citation is 1997 Final Results, 62 Fed. Reg. 54,043, 54,053.

methodology, and [Commerce] verified NTN's reported expenses, it is inappropriate and contrary to law for [Commerce] to modify NTN's reported data."   Id.   Moreover, NTN asserts that Commerce's recalculation of NTN's credit expense on a transaction-specific basis, rather than the use of NTN's reported customer-specific credit expense, constitutes unlawful use of facts available under 19 U.S.C. § 1677e (1994).   See id. at 23-25.

Commerce asserts that its "questionnaire instructed [NTN] as to the proper method for calculating and reporting credit expenses." Def.'s Mem. at 52 and Ex. 3.  In particular, Commerce's preference for the reporting of credit expenses is that they be reported on a transaction-specific basis rather than on an average or allocated basis.   See Def.'s Mem. at 52-53. However, Commerce claims that when a company's records do not permit transaction-specific reporting, Commerce has permitted use of average or allocated expenses, that is, customer-specific reporting.  See id. at 53.   Commerce argues that since NTN provided the necessary information on record which permitted a transaction-specific calculation of NTN's United States credit expenses for CEP sales, Commerce properly exercised its preference and recalculated the expenses on such a basis.   See id. at 53-54.   Additionally, Commerce contends that NTN's argument declaring Commerce's recalculation of credit expense on a transaction-specific basis as

"impermissible use of facts available" under 19 U.S.C. § 1677e has no merit since Commerce did not resort to any data other than that reported by NTN.  See id. at 54.

Timken agrees with Commerce, noting that, consistent with the antidumping statute, Commerce has a preference for transaction-specific reporting of credit expenses since actual costs allow Commerce to determine "the most accurate dumping margins possible." Timken's Resp. at 65.  Timken notes that Commerce's questionnaire requesting information indicated a strong preference for reporting credit expenses on a transaction-specific basis.  See id.  Since the record contained information reported by NTN that permitted more precise credit expense calculations, that is, transaction-specific payment dates for NTN's CEP sales, Timken contends that Commerce properly recalculated NTN's United States credit expenses on a transaction-specific basis.  See id.  Also, Timken asserts that Commerce's use of NTN's reported verified sale and payment dates to recalculate NTN's credit expense on a transaction-specific basis does not constitute the unlawful "use of facts available." See id.

### C.  Analysis

The Court disagrees with NTN that Commerce is now prohibited from using transaction-specific reporting of NTN's United States

credit expense merely because Commerce had accepted NTN's customer-specific reporting of such expenses in previous AFB reviews and verified the accuracy of NTN's data for this and other reviews. Commerce does not have to adhere to its customer-specific reporting methodology for calculating credit expenses when a respondent provides the necessary information on record for calculating such expenses on a more accurate and preferred basis, that is, a transaction-specific basis. See generally NSK Ltd. v. United States ("NSK 1995"), 19 CIT 1013, 1027, 896 F. Supp. 1263, 1275 (1995), rev'd on other grounds, 115 F.3d 965 (Fed. Cir. 1997), (noting that Commerce does not have to "adhere to its prior reporting methodology, especially where Commerce is striving for more accuracy" and explaining that "[d]irect selling expenses are incurred with respect to specific transactions. Credit, for example, is a selling expense which is only incurred when credit is extended under the terms of sale. Because credit expense is a direct expense, it should be tied to the transaction for which it was incurred").

The Court also finds that NTN's argument that Commerce's recalculation of NTN'S United States credit expense on a transaction-specific basis constitutes the unlawful "use of facts available" under 19 U.S.C. § 1677e has no merit since NTN clearly misreads the clear language of that statute. The antidumping

statute mandates that Commerce use "facts otherwise available" (commonly referred to as "facts available") if "necessary information is not available on the record" of an antidumping proceeding. 19 U.S.C. § 1677e(a)(1). In addition, Commerce may use facts available where an interested party or any other person: (1) withholds information that has been requested by Commerce; (2) fails to provide the requested information by the requested date or in the form and manner requested, subject to 19 U.S.C. § 1677m(c)(1), (e) (1994); (3) significantly impedes an antidumping proceeding; and (4) provides information that cannot be verified as provided in 19 U.S.C. § 1677m(i) (1994). See 19 U.S.C. § 1677e(a)(2)(A)-(D). Section 1677e(a) provides, however, that the use of facts available shall be subject to the limitations set forth in 19 U.S.C. § 1677m(d)(1994).

The legislative goal behind Commerce's right to use facts available is to "induce respondents to provide Commerce with requested information in a timely, complete, and accurate manner . . . ." National Steel Corp. v. United States, 18 CIT 1126, 1129, 870 F. Supp. 1130, 1134 (1994). Consequently, Commerce enjoys very broad, although not unlimited, discretion with regard to the propriety of its use of facts available. See generally, Olympic Adhesives, Inc. v. United States, 899 F.2d 1565 (Fed. Cir. 1990) (acknowledging Commerce's broad discretion with regard to the use

of facts available but pointing out that Commerce's resort to facts available is an abuse of discretion where the information Commerce requests does not and could not exist).

During the review at issue, NTN complied with Commerce's request for data by providing the necessary information on record which permitted a transaction-specific calculation of NTN's United States credit expenses for CEP sales. See Final Results at 2572. Since Commerce did not resort to any data other than that reported by NTN, Commerce's recalculation of NTN's United States credit expense on a transaction-specific basis did not constitute the unlawful use of "facts available" under 19 U.S.C. § 1677e.

Accordingly, the Court finds that Commerce's recalculation of NTN's United States credit expense on a transaction-specific basis was supported by substantial evidence and in accordance with law.

## VI. Denial of an Adjustment to United States Indirect Selling Expenses for Interest Allegedly Incurred in Financing Cash Deposits for Antidumping Duties

### A.   Background

During the review, NTN claimed a downward adjustment to its reported United States indirect selling expenses for imputed interest expenses allegedly incurred in financing cash deposits for antidumping duties. See Final Results, 63 Fed. Reg. at 2570-71. Commerce denied the adjustment and determined that such an interest

offset to NTN's indirect selling expenses is inappropriate, whether based on actual interest expenses or an imputed amount allegedly associated with financing cash deposits.  See id. at 2571. Commerce thereby deducted the entire amount of NTN's reported indirect selling expenses, including all interest, from the CEP. See Def.'s Mem. at 55-56.

Commerce noted that 19 U.S.C. § 1677a(d)(1), which provides for the deduction of certain selling expenses from CEP that were "incurred by or for the account of the producer or exporter, or the affiliated seller in the United States, in selling the subject merchandise," does not precisely define what constitutes a selling expense; instead, Congress has given Commerce discretionary authority to determine what such an expense encompasses. See Final Results, 63 Fed. Reg. at 2571.  Commerce acknowledged that in past reviews of the applicable antidumping duty orders, it determined that interest expenses incurred in financing antidumping duty cash deposits were not considered selling expenses and thereby allowed an offsetting, financing-cost adjustment to United States indirect selling expenses.  See id.  For this review, however, Commerce reconsidered its position and concluded that this offsetting financing-cost adjustment is inappropriate.  See id.

Commerce found that while under the statute it may allow a limited exemption from deductions from United States price for

antidumping duty cash deposits and legal fees associated with participation in an antidumping case, it found no basis for extending this exemption to interest expenses allegedly incurred in financing the cash deposits. See id. The agency reasoned that there is a distinction "between business expenses that arise from economic activities in the United States and business expenses that are direct, inevitable consequences of an antidumping duty order." Id. Commerce determined that while cash deposits and legal fees are incurred solely as a result of the existence of an antidumping order, "[f]inancial expenses allegedly associated with cash deposits are not a direct, inevitable consequence of an antidumping duty order." Id. In particular, Commerce explained that although it may be true that some importers sometimes incur a cost if they borrow money in order to pay for cash deposits of antidumping duties, it is a fundamental principle that:

> "[m]oney is fungible. If an importer acquires a loan to cover one operating cost, that may simply mean that it will not be necessary to borrow money to cover a different operating cost." Companies may choose to meet obligations for cash deposits in a variety of ways that rely on existing capital resources or that require raising new resources through debt or equity. For example, companies may choose to pay deposits by using cash on hand, obtaining loans, increasing sales revenues, or raising capital through the sale of equity shares. In fact, companies face these choices every day regarding all their expenses and financial obligations. There is nothing inevitable about a company having to finance cash deposits and there is no way for [Commerce] to trace the motivation or use of such funds even if it were.

Id. (quoting Preliminary Results, 62 Fed. Reg. at 47,455). Commerce

also noted that "the calculation of the dumping margins should not
vary depending on whether a party has funds available to pay cash
deposits or requires additional funds in the form of loans."
Preliminary Results, 62 Fed. Reg. at 47,455.

Moreover, Commerce determined that it should not impute an
amount for any interest costs that would theoretically be
associated with financing actual cash deposits of antidumping
duties.  Final Results, 63 Fed. Reg. at 2571.  Commerce reasoned
that

> [t]here is no real opportunity cost associated with cash
> deposits when the paying of such deposits is a
> precondition for doing business in the United States.  .
> . . Companies cannot choose not to pay cash deposits if
> they want to import nor can they dictate the terms,
> conditions, or timing of such payments.

Id.

_____

B.    Contentions of the Parties

NTN claims that Commerce's rationale for denying NTN's
adjustment for interest expenses is flawed because irrespective of
how a company opts to finance the cash deposits for antidumping
duties, the amount of cash deposited will have to be made up by
financing something else, a result that is a direct inevitable
consequence of the antidumping duty order.  See NTN's Mem. at 20.
NTN also asserts that if Commerce were to allow the interest
expenses from cash deposits from prior reviews to affect the

dumping margin calculations of present reviews, a never-ending cycle would follow that would prevent Commerce from ever revoking the antidumping duty order. See id. at 21.

Further, NTN notes that Commerce has repeatedly taken the position that interest expenses incurred in financing cash deposits of antidumping duties cannot be properly treated as indirect selling expenses and, therefore, has allowed for an interest-expense adjustment on antidumping duty cash deposits. See id. at 20-22 (citations omitted). NTN asserts that Commerce's decision to alter its prior methodology is "unreasonable and internally-contradictory." NTN's Reply at 7.

NTN also asserts that this Court has consistently upheld the interest-expense adjustment to indirect selling expenses when Commerce has granted it and has remanded to Commerce to allow the adjustment when the agency has denied it. See NTN's Mem. at 22-23 (citations omitted). In particular, NTN argues that Federal-Mogul Corp. v. United States ("Federal-Mogul"), 20 CIT 1438, 1440-41, 950 F. Supp. 1179, 1182-83 (1996), clearly refutes Commerce's decision to deny NTN's interest-expense adjustment. See id. at 22. In particular, NTN notes the court in Federal-Mogul found that there was no support for a domestic party's "assertion that any expense related to antidumping proceedings is automatically a selling expense related to the sale of the subject merchandise. Indeed,

pursuant to the rationale of [Daewoo Elecs. Co. v. United States ("Daewoo"), 13 CIT 253, 270, 712 F. Supp. 931, 947 (1989)], such expenses are not necessarily selling expenses." Id. at 22 (quoting Federal-Mogul, 20 CIT at 1440-41, 950 F. Supp. at 1183). NTN points out that the court in Federal-Mogul found that, similar to the Daewoo court's holding that legal expenses related to antidumping proceedings are not selling expenses, the interest expenses at issue did not qualify as selling expenses because they were not related to the sale of merchandise, but to NTN's participation in the antidumping proceeding. See id. NTN also notes that in NSK Ltd., 21 CIT at 637, 969 F. Supp. at 55, the Court reaffirmed its decision in Federal-Mogul to allow NTN's adjustment for interest expenses on antidumping duty cash deposits. See id. at 23. NTN contends that Commerce's decision to alter its policy is unreasonable and there is no danger that an interest-expense adjustment to indirect selling expenses would be used to "mask dumping." See id.; NTN's Reply at 7.

Commerce argues that its decision to deny the offset was within its discretion. See Def.'s Mem. at 57. Commerce also argues that it may change its methodology if it presents a reasonable basis for departing from its previous practice. See id. at 57-59. Further, Commerce contends that the interest expenses allegedly incurred with financing antidumping duty cash deposits

are ordinary interest expenses and, therefore, not deductible from United States indirect selling expenses. See id. at 59.

Timken asserts that Commerce reasonably denied the offset, because allowing United States selling expenses to be reduced in the manner claimed by NTN encourages dumping. See Timken's Resp. at 63. Specifically, Timken argues that an adjustment for NTN's interest expenses on antidumping duty cash deposits would "allow NTN to mask present dumping through alleged interest used to finance past cash deposits." Id. Timken contends for example that:

> the interest might be equal to five percent of the value of U.S. sales in the present review. Under NTN's approach, the Commerce Department would be required to offset expenses attributable to sales made during the present administrative review with interest imputed to past cash deposits. Thus, the importer may sell at prices five percent less than fair value without being found to have dumped. The Commerce Department would offset reductions amounting to five percent of U.S. sales prices with the five percent imputed interest. The offset would mask the importer's dumping, and the importer would escape the coverage of the antidumping duty law.

Id. Timken also argues that other than NTN's reported "amount of imputed interest attributable to its cash antidumping duty deposits," there is no evidence that NTN actually obtained loans for the purpose of posting cash deposits. Id. at 64. Therefore, there is no factual basis for the adjustment. See id.

C.    Analysis

Although NTN correctly points out that interest expenses incurred on financing antidumping cash deposits are not "selling expenses," see Federal-Mogul, 20 CIT at 1441, 950 F. Supp. at 1183, the Court disagrees that Commerce in this review is prevented from altering its methodology of making adjustments to United States indirect selling expenses.  This Court has noted that "Commerce may, in certain circumstances, reasonably change its methodology from review to review."  Timken Co. v. United States ("Timken"), 21 CIT 1313, 1332, 989 F. Supp. 234, 250 (1997), vacated in part on other grounds, 1 F. Supp. 2d 1390, 1393 (1998) (allowing Commerce to alter its methodology with respect to interest expenses incurred for financing cash deposits).

Consequently, since 19 U.S.C. § 1677a(d) does not provide clear guidance with respect to the adjustment, the issue for the Court is whether Commerce's interpretation of the statute was reasonable.  The Court finds that Commerce reasonably interpreted the statute by concluding that financing expenses incurred on antidumping duty cash deposits are not an inevitable consequence of the antidumping duty order and that, with respect to imputed interest costs, there is no real opportunity cost associated with cash deposits when the paying of such deposits is a precondition for doing business in the United States.  Further, the Court finds

that NTN failed to provide any evidence on record that supports the fact that NTN actually or approximately incurred the alleged interest expenses on antidumping duty cash deposits. Commerce acted rationally in denying NTN's claimed interest-expense adjustment and, therefore, Commerce's determination is sustained.

## VII.  Valuation of Major Inputs From Affiliated Suppliers

### A.  Statutory Background

The NV of the subject merchandise is, in pertinent part, "the price at which the foreign like product is first sold . . . for consumption in the exporting country." 19 U.S.C. § 1677b(a)(1)(B)(i). However, whenever Commerce has "reasonable grounds to believe or suspect" that sales of the foreign like product under consideration for the determination of NV have been made at prices which represent less than the COP of that product, Commerce shall determine whether, in fact, such sales were made at less than the COP. See 19 U.S.C. § 1677b(b)(1) (1994). A "reasonable ground" exists if Commerce disregarded below-cost sales of a particular exporter or producer from the determination of NV in the most recently completed administrative review. See 19 U.S.C. § 1677b(b)(2)(A)(ii). If Commerce determines that there are sales below the COP and certain conditions are present under § 1677b(b)(1)(A)-(B), it may disregard such below-cost sales in the determination of NV. See id.

Additionally, the special rules for the calculation of COP or CV contained in 19 U.S.C. § 1677b(f)(2)-(3) (1994), provide that, in a transaction between affiliated persons as defined in 19 U.S.C. § 1677(33) (1994), Commerce may disregard either the transaction or the value of a major input.

Section 1677b(f)(2) provides that Commerce may disregard an affiliated-party transaction when "the amount representing [the transaction or transfer price] does not fairly reflect the amount usually reflected in sales of merchandise under consideration in the market under consideration [that is, an arms-length or market price]." If such "a transaction is disregarded . . . and no other transactions are available for consideration," Commerce shall value the cost of an affiliated-party input "based on the information available as to what the amount would have been if the transaction had occurred between persons who are not affiliated," that is, based on an arms-length or market value. 19 U.S.C. § 1677b(f)(2) ("fair-value" provision).

Section 1677b(f)(3)'s "major input rule" directs that if (1) a transaction between affiliated companies involves the production by one of such companies of a "major input" to the merchandise produced by the other, and (2) Commerce has "reasonable grounds to believe or suspect" that the amount reported as the value of such

input is below the COP, then Commerce may calculate the value of the major input on the basis of the data available regarding such COP, if such COP exceeds the market value of the input, as determined under § 1677b(f)(2). For purposes of § 1677b(f)(3), regulation 19 C.F.R. § 351.407(b) (1998) provides that Commerce will value a major input supplied by an affiliated party based on the highest of (1) the actual transfer price for the input, (2) the market value of the input, or (3) the COP of the input.

### B. Factual Background

Because Commerce disregarded sales that failed the below-cost sales test pursuant to § 1677b(b)(1) in the prior review with respect to NTN's TRBs from Japan, Commerce determined pursuant to § 1677b(b)(2)(A)(ii) that it had "reasonable grounds to believe or suspect" that sales of NTN's foreign like product under consideration for the determination of NV in this POR might have been made at prices below the COP. See Preliminary Results, 62 Fed. Reg. at 47,457. Consequently, pursuant to § 1677b(b)(1), Commerce initiated COP investigations of NTN's sales in the home market and, thereby, requested information relating to the COP and CV. See id.

In its questionnaire for this POR, Commerce requested that NTN provide certain data regarding the valuation of major inputs

received from affiliated suppliers and used to produce the
merchandise under review during the cost calculation period.  See
Def.'s Mem. at 60; see also Def.'s Ex. 4.  In particular, Commerce
instructed NTN as follows:

> List the major inputs received from affiliated parties
> and used to produce the merchandise under review during
> the cost calculation period. . . .  For each major input
> identified, provide the following information:
>
> a.   the total volume and value of the input purchased
>      from all sources by your company during the cost
>      calculation period, and the total volume and value
>      purchased from each affiliated party during the
>      same period;
>
> b.   the per-unit transfer price charged for the input
>      by the affiliated party (if the affiliated party
>      sells the identical input to other, unaffiliated
>      purchasers, provide documentation showing the price
>      paid for the input by the unaffiliated purchaser;
>      if your company purchases the identical input from
>      unaffiliated suppliers, provide documentation
>      showing the unaffiliated party's sales price for
>      the input); and
>
> c.   if you are responding to this section of the
>      questionnaire in connection with an investigation
>      of sales below cost, provide the per-unit cost of
>      production incurred by the affiliated party in
>      producing the major input. . . .

Def.'s Ex. 4.


     In addition, Commerce requested that NTN "specify the basis
used by [NTN] to value each major input for purposes of computing
the submitted COP and CV amounts (e.g., transfer price, cost of
production)."  Id.

In its response to Commerce's questionnaire, NTN: (1) identified NTN's major inputs; (2) "submitted tables that identified its affiliated and unaffiliated suppliers for a sample of the different major inputs used to produce TRBs" and compared transfer prices to the unaffiliated supplier's prices which demonstrated that certain "transfer prices were lower than [what] NTN's unaffiliated supplier charged for the same model"; (3) submitted tables containing COP data for a sample of certain major inputs used to produce TRBs that NTN purchased from an affiliated supplier; and (4) "specified that [NTN] calculated COP and CV using transfer prices to value the identified major inputs" and "created a variable in its COP and CV database, 'RELPTY,' that identified for each control number, the total percentage of affiliated party inputs used in producing a particular TRB model." Def.'s Mem. at 60-61 (citing Def.'s Confidential Ex. 5).

Subsequently, NTN "submitted revised exhibits that compared the weighted average transfer price, the weighted average COP, and, in limited instances, the market value for major inputs purchased from affiliated suppliers." Def.'s Mem. at 61; Def.'s Confidential Ex. 6. Commerce verified NTN's COP and transfer price responses regarding the inputs but did not verify the market values for most of the major inputs because, except for one affiliated supplier's inputs, "there were no unaffiliated suppliers of the identical

components or services" that would allow NTN to provide market values for most major inputs. Def.'s Mem. at 62; Def.'s Confidential Ex. 7 at 24. Commerce also verified that for the affiliated supplier's inputs, that is, the one affiliated supplier for whom there were unaffiliated suppliers of identical components or services, "the market value was greater than the reported transfer price and . . . COP." Def.'s Mem. at 62. In the Preliminary Results, Commerce determined that the appropriate value for the affiliated supplier's major inputs was market value since it was higher in amount than NTN's transfer price or the affiliated supplier's COP. See id.; Def.'s Confidential Ex. 8 at 1. However, "Commerce was unable to identify the particular TRB models that contained [the major inputs at issue] because NTN's 'RELPTY' variables did not isolate these items." Def.'s Mem. at 62. Commerce, therefore, used "available information on the record" to increase the transfer prices, that is, the prices of affiliated supplier's inputs that NTN used to calculate COP and CV, in order to reflect market value. Id. at 62-63.

Commerce articulated its methodology of increasing the transfer prices of major inputs as reported by NTN in order to reflect market value:

> To account for the difference between the fair value and the reported transfer price, we have increased NTN's reported COP and CV by first calculating a weighted average percentage difference between the fair value

and the transfer price.  We calculated this weighted average percentage difference . . . [by:]

[1]   determin[ing] the percentage of affiliated party purchases represented by [the affiliated supplier] . . .[;]

[2]   appl[ying] . . . this difference between fair value and transfer price for sampled purchases from [the affiliated supplier] . . .[;]

[3]   appl[ying] this difference to each control number's Relpty variable that NTN provided in its cost files[] (NTN's Relpty variable provides the percentage of the value of the affiliated party transfer price to the total cost of production or constructed value for each model).

--    The resulting value was then included in each model's COP or CV.

NTN's Ex. "COP/CV Memorandum"; see also Final Results, 63 Fed. Reg. at 2573 and NTN's Mem. at 25.


### C.   Contentions of the Parties

NTN contends that Commerce's "adjustment to COP and CV for affiliated-party inputs is distortive and should be eliminated." Final Results, 63 Fed. Reg. at 2572.  Specifically, NTN asserts that Commerce erred when it used the results that it obtained from testing affiliated-party inputs on a sample basis to adjust COP and CV by using the highest of transfer price, market price or the COP of the input for "all of NTN's affiliated party inputs regardless of the fact that not all of these inputs contained [the particular affiliated supplier's] retainers" at issue.  NTN's Reply at 8; see NTN's Mem. at 25.  NTN notes that Commerce's application of the adjustment to all of NTN's affiliated party inputs resulted in

double-counting of profit because--even if the price of a TRB's input from the particular affiliated supplier at issue was above COP--an adjustment would still be made to the same input thereby adding "profit to the input that already includes a profit." NTN's Mem. at 27; NTN's Reply at 9.

Additionally, NTN contends that 19 U.S.C. §§ 1677b(f)(2) and (3) neither mandate nor imply Commerce's methodology of valuing a major input purchased from an affiliated party at the highest of the COP, transfer price or market price. See NTN's Mem. at 26. NTN alternatively asserts that if Commerce's adjustment was correct, Commerce could have used a more reasonable method by calculating "the weighted average difference between COP and transfer price for all [the major inputs at issue] sold to NTN." Id.

NTN also argues that Commerce's single adjustment constituted an unwarranted use of adverse facts available because Commerce "used the sales of [a few major inputs at issue] which were sold [below] COP, while disregarding those sales [of major inputs at issue which were sold above COP], to make a single adjustment." [12]

_____

[12] The Court is unconvinced that Commerce used adverse facts available in making its single adjustment to NTN's COP and CV. Rather, Commerce, in order to value major inputs on a market value basis, only resorted to facts available since it used information on the record to increase the affiliated supplier's transfer prices that NTN used to calculate COP and CV. See Def.'s Mem. at 62-63;

NTN's Reply at 9; see NTN's Mem. at 26.  Additionally, NTN
maintains that "NTN fully responded to [Commerce's] request for
information on related party inputs, including information such as
COP data, pricing data for affiliated inputs and pricing data for
non-affiliated inputs . . . [;] . . . NTN's variable 'RELPTY,'
identified for each control number, the total percentage of
affiliated party inputs used in producing a particular TRB model."
NTN's Reply at 7-8.

NTN, therefore, requests that the Court remand the matter and
instruct Commerce "to accept NTN's reported COP and CV for
affiliated party inputs."  NTN's Mem. at 27.

Commerce argues that it reasonably interpreted §§ 1677b(f)(2)
and (f)(3) as requiring it to value a major input purchased from an
affiliated person at the highest of the COP, transfer price or
market price.  See Def.'s Mem. at 63-70.  Consequently, Commerce
asserts that based on its reasonable interpretation of 19 U.S.C. §§

---

Final Results, 63 Fed. Reg. 2572; cf. Ferro Union, Inc. v. United
States ("Ferro"), 23 CIT ___, ___, 44 F. Supp. 2d 1310, 1329 (1999)
(stating that "[o]nce Commerce has determined under 19 U.S.C. §
1677e(a) that it may resort to facts available, it must make
additional findings prior to applying 19 U.S.C. § 1677e(b) and
drawing an adverse inference") and (setting forth that Commerce
must clearly articulate: (1) "why it concluded that a party failed
to comply to the best of its ability prior to applying adverse
facts," and (2) "why the absence of this information is of
significance to the progress of [its] investigation").  Ferro, 23
CIT at ___, 44 F. Supp. 2d at 1331.

1677b(f)(2) and (f)(3) and "upon the record evidence . . . [,] Commerce determined that [the affiliated supplier's inputs at issue] should be valued using market prices . . . [given that] NTN's submitted information revealed that 'the market price of a retainer generally exceeded [the affiliated supplier's] COP and NTN's submitted transfer price.'" Id. at 66 (citing Def.'s Confidential Ex. 7 at 24). Commerce further maintains that since "'NTN could not explain the difference between the transfer price and the market price[,]' . . . Commerce properly rejected NTN's submitted transfer price for [the affiliated supplier's inputs] as the appropriate valuation for calculating COP and CV." Def.'s Mem. at 66-67 (quoting Final Results, 63 Fed. Reg. at 2573).

Commerce also argues that it properly used information on the record to increase the transfer prices of the affiliated supplier's inputs that NTN used to calculate COP and CV in order to reflect market value since "from the record evidence, Commerce was unable to identify the particular TRB models that contained [the major inputs at issue]." Def.'s Mem. at 62. Commerce further contends that its method of applying sample results to all of NTN's affiliated party transactions was reasonable because (1) NTN "did not identify by control numbers the TRB models that contained" the affiliated supplier's major inputs in its COP and CV database; and (2) "Commerce's adjustment factor was based upon only the portion

of affiliated party inputs represented by [the affiliated supplier
at issue and therefore] . . . had a limited impact on NTN's overall
COP and CV calculations."  Id. at 68.

Commerce further notes that NTN's assertion that Commerce's
application of the adjustment to all of NTN's affiliated party
inputs resulted in "double-counted profit . . . is irrelevant."
Id. at 69.  In particular, Commerce asserts that "[f]air market
value and not the affiliated supplier's profit is the only
pertinent issue for valuation purposes under 19 U.S.C. §§
1677b(b)(f)(2) and (3) . . . [;] [p]rofitable sales do not
determine whether prices charged between affiliated parties reflect
fair market value."  Id.  Commerce also notes that even if profit
were relevant, NTN does not provide record evidence that (1) the
affiliated supplier's inputs made profits on sales to NTN;  and (2)
Commerce double-counted profits in Commerce's adjustment.  See
Def.'s Mem. at 69.

Commerce also argues that, contrary to NTN's assertion that
Commerce could have used a more reasonable method if Commerce's
adjustment was correct, Commerce used NTN's reported information
during the administrative review to adjust NTN's COP and CV.  See
id. at 70.  Relying on PPG Indus., Inc. v. United States ("PPG"),
14 CIT 522, 532, 746 F. Supp. 119, 129 (1990), Commerce maintains
that "there is no basis for reversing Commerce's" chosen

methodology in this instance.  Id. (citing PPG, 14 CIT at 532, 746
F. Supp. at 129).  Moreover, Commerce asserts that NTN's argument
that Commerce distorted NTN's dumping margin is not supported by
record evidence.  See id.

Timken agrees with Commerce, noting that Commerce's adjustment
to NTN's COP and CV was reasonable and, contrary to NTN's
assertions, did not result in a distorted antidumping margin.  See
Timken's Resp. at 66.  Timken asserts that Commerce's use of
information available was authorized pursuant to §§ 1677b(f)(2) and
(3) and was within the agency's discretion since "the statute does
not specify any specific method for selecting information
available."  Id.  Moreover, Timken maintains that Commerce's
application of information available to all sales with related
party inputs . . . [was] reasonably determined . . . [because] the
problem [Commerce] had identified was likely to affect all models
with related party inputs."  Id. at 67.

Timken also asserts that, contrary to NTN's assertions that §
1677b(f)(3) does not support Commerce's methodology because many of
NTN's inputs were not sold below cost and Commerce should have used
an alternative methodology, the language of the statute requires
"Commerce to act when 'it has reasonable grounds to believe or
suspect that an amount represented as the value of such input is
less than the cost of such input.'"  Id. (quoting 19 U.S.C. §

1677b(f)(3)).


        **D.    Analysis**

        The Court disagrees with NTN that Commerce erred in valuing each major input based on the highest of the input's transfer price, market price or COP.    This Court has consistently articulated that the plain language of § 1677b(f)(2) and (f)(3), as well as the legislative history of § 1677b(f)(3), supports Commerce's use of the highest of transfer price, market price or COP in valuing a major input supplied by an affiliated party.  See Viraj Group, Ltd. v. United States, 25 CIT __, 162 F. Supp. 2d 656 (2001); SKF USA, Inc. v. United States, 24 CIT __, __, 116 F. Supp. 2d 1257, 1267 (2000); Mannesmannrohren-Werke AG v. United States ("Mannesmannrohren-Werke"), 23 CIT __, __, 77 F. Supp. 2d 1302, 1310-12 (1999).

        Further, the Court finds that Commerce's decision to resort to "facts otherwise available" in valuing NTN's major inputs was in accordance with law.    The antidumping statute mandates that Commerce use "facts otherwise available" if "necessary information is not available on the record" of an antidumping proceeding.  19 U.S.C. § 1677e(a)(1).    In addition, Commerce may use facts available where "an interested party or any other person: (A) witholds information that has been requested by [Commerce;] (B)

fails to provide such information by the deadlines for submission of the information or in the form and manner requested, subject to [19 U.S.C. §§ 1677m(c)(1), (e);] (C) significantly impedes a proceeding . . . [; and] (D) provides such information . . . [that] cannot be verified as provided in section 1677m(i) . . . ." Id. § 1677e(a)(2)(A)-(D).[13] Section 1677e(a) provides, however, that the use of facts available shall be subject to the limitations set forth in 19 U.S.C. § 1677m(d).

Section 1677m (1994), which was enacted as part of the URAA, is "designed to prevent the unrestrained use of facts available as to a firm which makes its best effort to cooperate with [Commerce]." Borden, 22 CIT at 262, 4 F. Supp. 2d at 1245, rev'd on other grounds, 2001 WL 312232 (Mar. 12, 2001). Section 1677m(d), entitled "deficient submissions," provides that if Commerce "determines that a response to a request for information . . . does not comply with the request, the [agency] . . . shall promptly inform the person submitting the response of . . . the deficiency and . . . [provide] that person with an opportunity to remedy or explain the deficiency." If the remedial response or explanation provided by the party is found to be not satisfactory

---

[13] Commerce does not indicate whether it relies on subsection (1) or (2) of § 1677e(a), the facts available provision. Based on the parties' submitted papers, the Court assumes that Commerce used facts available since "necessary information [was] not available on the record." 19 U.S.C. § 1677e(a)(1).

or is untimely, Commerce may, subject to § 1677m(e), disregard "all or part of the original and subsequent responses" in favor of facts available.  19 U.S.C. § 1677m(d).

As noted earlier, Commerce's initial questionnaire, among other things, specifically requested that NTN provide (1) "the per-unit transfer price charged for the input by the affiliated party (if the affiliated party sells the identical input to other, unaffiliated purchasers, provide documentation showing the price paid for the input by the unaffiliated purchaser; if [NTN] purchases the identical input from unaffiliated suppliers, provide documentation showing the unaffiliated party's sales price for the input)"; and (2) "the basis used by [NTN] to value each major input for purposes of computing the submitted COP and CV amounts (e.g., transfer price, cost of production)."  Def.'s Ex. 4.

In response to Commerce's questionnaire, NTN did: (1) "submit[] tables that identified its affiliated and unaffiliated suppliers for a sample of the different major inputs used to produce TRBs[]" and compared transfer prices to the unaffiliated supplier's prices which demonstrated that certain "transfer prices were lower than [what] NTN's unaffiliated supplier [charged] for the same model"; and (2) "specified that [NTN] calculated COP and CV using transfer prices to value the identified major inputs" and "created a variable in its COP and CV database, 'RELPTY,' that

identified for each control number, the total percentage of affiliated party inputs used in producing a particular TRB model." Def.'s Mem. at 60-61. According to NTN, "there were no unaffiliated suppliers of the identical components or services" that would allow NTN to provide market values for most major inputs. Id. at 62. However, in its supplemental response, NTN revised its exhibits and compared "the weighted average transfer price, the weighted average COP, and, in limited instances, the market value for major inputs purchased from affiliated suppliers." Id. at 61.

Commerce verified NTN's COP and transfer price responses regarding the major inputs and for one affiliated supplier's inputs, that is, the one affiliated supplier for whom there were unaffiliated suppliers of identical components or service, Commerce verified that "the market value was greater than the reported transfer price and . . . COP." Id. at 62. Therefore, in the Preliminary Results, Commerce determined that the appropriate value for the affiliated supplier's major inputs was market value since it was higher in amount than NTN's transfer price or the affiliated supplier's COP. "As noted on page 24 of the June 13, 1997 [C]ost [V]erification [R]eport, NTN could not explain the difference between the transfer price and the market price." Final Results, 63 Fed. Reg. at 2573. Because Commerce was unable to identify from

the record evidence the particular TRB models that contained the major inputs at issue, and NTN argues that it fully responded to Commerce's request for information on related party inputs, Commerce's resort to facts available in order to increase the transfer prices of the affiliated supplier's inputs to reflect market value was appropriate.

NTN's argument that Commerce could have used a more reasonable method by calculating "the weighted-average difference between COP and transfer price for all [the major inputs at issue] sold to NTN" is without merit. <u>Id.</u> "[Commerce] is given discretion in its choice of methodology as long as the chosen methodology is reasonable and [Commerce's] conclusions are supported by substantial evidence in the record." <u>Federal-Mogul Corp. v. United States</u>, 18 CIT 785, 807-08, 862 F. Supp. 384, 405 (1994) (citing <u>Ceramica Regiomontana, S.A. v. United States</u>, 10 CIT 399, 404-05, 636 F. Supp. 961, 966 (1986), <u>aff'd</u>, 810 F.2d 1137 (Fed. Cir. 1987)); <u>see also</u> <u>Matsushita Elec. Indus. Co. v. United States</u>, 750 F.2d 927, 936 (Fed. Cir. 1984) (stating that "[the Court's] role is limited to deciding whether [Commerce's] decision is unsupported by substantial evidence on the record, or otherwise not in accordance with law"). After careful examination of the record of this case and NTN's assertion that Commerce's chosen methodology distorted NTN's dumping margin, the Court determines that Commerce's

methodology of adjusting NTN's COP and CV was in accordance with

law.  Accordingly, the Court finds that Commerce properly resorted

to facts available in adjusting NTN's COP and CV.


**VIII.  Commerce's Exclusion of Certain Home Market Sales
        to Affiliated Parties From the Normal Value Calculation**

### A.  Background

During the POR, NTN made home market sales to affiliated and

unaffiliated parties.   In order to determine whether NTN's

affiliated-party sales could be used for purposes of calculating

NV, Commerce conducted its standard arm's-length test. See Final

Results, 63 Fed. Reg. at 2580-81.  Specifically, Commerce compared

NTN's home market selling prices to NTN's affiliated and

unaffiliated parties by using Commerce's 99.5% arm's-length test in

which:

> [Commerce] calculated, for each model, the percentage
> difference between the weighted-average prices to the
> affiliated customer and all unaffiliated customers and
> then calculated, for each affiliated customer, the
> overall weighted-average percentage difference in prices
> for all models purchased by the customer. If the overall
> weighted-average price ratio for the affiliated customer
> was equal to or greater than 99.5 percent, [Commerce]
> determined that all sales to this affiliated customer
> were at arm's-length.  Conversely, if the ratio for a
> customer was less than 99.5percent, [Commerce] determined
> that all sales to the affiliated customer were not at
> arm's-length because, on average, the affiliated customer
> paid less than unaffiliated customers for the same
> merchandise.

Preliminary Results, 62 Fed. Reg.  at 47,457.   Commerce, in

accordance with 19 U.S.C. § 1677b(a)(5)(1994) and 19 C.F.R. § 353.45(a) (1996), disregarded all of NTN's sales to affiliated parties in its computation of NV because Commerce found that sales to NTN's affiliated customers, on average, were lower than NTN's prices to unaffiliated customers, that is, sales made to affiliated parties were not at arm's length.  See id.; see also Final Results, 63 Fed. Reg. at 2580-81.

### B.   Contentions of the Parties

NTN contends that Commerce erred in applying the arm's-length test when it "compare[d] the weighted average price for unrelated sales to the price for individual related sales."  NTN's Mem. at 42.  To illustrate its contention, NTN provides a hypothetical example attempting to demonstrate that Commerce's arm's-length test is distortive since it does not compare average price for affiliated sales to average price for unaffiliated sales or individual price for affiliated sales to individual price for unaffiliated sales.[14]  See id.  Alternatively, NTN asserts that,

---

[14]  Relying on its hypothetical example, NTN asserts that "NTN need not use evidence on the record to illustrate that [Commerce's] methodology is flawed."  See NTN's Reply at 11.  The Court finds this argument to be without merit since it is well settled that record evidence is required to prove distortion of Commerce's methodology.  See Usinor Sacilor v. United States ("Usinor"), 18 CIT 1155, 1159, 872 F. Supp. 1000, 1004 (1994)(upholding Commerce's arm's-length test as reasonable given the lack of evidence showing a distortion of price comparability); Torrington Co. v. United States ("Torrington Co."), 21 CIT 251, 261, 960 F. Supp. 339, 348

should Commerce choose to retain its methodology of comparing
individual sales to a weighted average margin, Commerce should
lower the percentage of the arm's-length test to "95% to reflect
the true range of arm's-length prices in these transactions and
compensate for the distortive nature of the test."  NTN's Reply at
11.

NTN also argues that Commerce's arm's-length test was
unreasonable since Commerce should have examined factors other than
price in determining whether to include affiliated party sales when
calculating NV.  See NTN's Mem. at 43.  Specifically, NTN contends
that Commerce erred in failing to examine: (1) "quantity of goods";
and (2) "payment terms of specific sales."  Id.  According to NTN,
all of these factors influence the price of an affiliated party
transaction and Commerce cannot make meaningful price comparisons
without examining them.  See id.

Commerce responds that 19 U.S.C. § 1677b (1994) provides that:

---

(1997) (stating that the respondent "must do more than indicate a
possible correlation between price and quantity" to support its
argument that Commerce should consider quantity in Commerce's
arm's-length test); NTN, 19 CIT at 1241, 905 F. Supp. at 1100
(upholding Commerce's arm's-length test as reasonable given the
lack of "record evidence tending to show that, in application,
Commerce's test was unreasonable"); NSK, 190 F.3d at 1328
(affirming the judgment of the CIT that Commerce's arm's-length
methodology was reasonable given respondent's mere reference to a
hypothetical and lack of record evidence that Commerce's
methodology was unreasonable).

> [i]f the foreign like product is sold or, in the absence
> of sales, offered for sale through an affiliated party,
> the prices at which the foreign like product is sold (or
> offered for sale) by such affiliated party <u>may</u> be used in
> determining normal value.

Def.'s Mem. at 71 (quoting 19 U.S.C. § 1677b(a)(3) [sic] (emphasis

supplied).[15]

Relying on the language of 19 U.S.C. § 1677b(a)(5), Commerce

argues that it has broad discretion to determine whether sales to

affiliated parties could be used in the calculation of NV since the

language of the statute indicates that Commerce "may, but need not,

base NV upon the price paid by an affiliated party."[16]  Def.'s Mem.

at 71.   In addition, Commerce points out that the regulation

provides the following:

> If a producer or reseller sold such or similar
> merchandise to [an affiliated party], [Commerce]
> ordinarily will calculate foreign market value based on
> that sale only if satisfied that the price is comparable
> to the price at which the producer or reseller sold such
> or similar merchandise to [an affiliated] person not
> related to the seller.

19 C.F.R. § 353.45(a).

---

[15]  The Court assumes that Commerce is relying on the language
of 19 U.S.C. § 1677b(a)(5) and not § 1677b(a)(3).

[16] Commerce also relies on this Court's decisions in <u>Usinor</u>, 18
CIT at 1159, 872 F. Supp. at 1004; <u>NTN</u>, 19 CIT at 1241, 905 F.
Supp. at 1100; and <u>NSK Ltd.</u>, 21 CIT at 637, 969 F. Supp. at 54, for
the proposition that 19 U.S.C. § 1677b(a)(3) [sic] (1994) "granted
to Commerce broad discretion to determine whether home market sales
to related parties could be used to determine foreign market
value."  <u>See</u> Def.'s Mem. at 71.

Relying on both the statute and regulation, Commerce used its price-based arm's-length test to examine the price comparability of NTN's home market sales of affiliated and unaffiliated parties. Def.'s Mem. at 72. Commerce argues that, since: (1) NTN has "failed to provide record evidence demonstrating that Commerce's arm's-length test distorted the price comparability analysis"; and (2) NTN failed to prove that Commerce's arm's-length test was unreasonable, Commerce's use of it's arm's-length test was in accordance with law. Id. at 73-74. Timken supports Commerce's contentions. See Timken's Resp. at 70-71.

### C.    Analysis

The Court disagrees with NTN that Commerce's arm's-length test is unreasonable. Under the applicable statute, 19 U.S.C. § 1677b(a)(5), Commerce is allowed considerable discretion in deciding whether to include affiliated party sales when calculating NV. See Usinor, 18 CIT at 1158, 872 F. Supp. at 1004. This Court has repeatedly upheld Commerce's arm's-length test on the basis that respondents have failed to present "record evidence tending to show that . . . Commerce's test was unreasonable." NTN, 19 CIT at 1241, 905 F. Supp. at 1100; See Torrington Co., 21 CIT at 261, 960 F. Supp. at 348 (stating that the respondent "must do more than indicate a possible correlation between price and quantity" to

support its argument that Commerce should consider quantity in Commerce's arm's-length test); NSK, 190 F.3d at 1328 (affirming the judgment of the CIT that Commerce's arm's-length methodology was reasonable given respondent's mere reference to a hypothetical and lack of record evidence that Commerce's methodology was unreasonable). Commerce's arm's-length method is reasonable. In addition, in this case, NTN's hypothetical example supporting its assertion that Commerce's arm's-length method is distortive and Commerce should lower the percentage of the arm's-length test to 95% in determining comparability fails to prove that Commerce's test is unreasonable, since it does not constitute record evidence demonstrating that NTN's affiliated party prices were comparable to NTN's unaffiliated party prices.

The Court has also repeatedly rejected the argument that Commerce should consider additional factors, that is, factors other than price, when determining whether sales prices to affiliated and unaffiliated parties are comparable. The Court finds no basis under the circumstances of this case to depart from its prior holdings in NTN Bearing, 24 CIT at ___, 104 F. Supp. 2d at 148, and NTN, 19 CIT at 1241, 905 F. Supp. at 1099 (disagreeing "with NTN that Commerce's arm[']s-length test is flawed because Commerce did not take into account certain factors proposed by NTN").

Accordingly, the Court upholds Commerce's application of the

arm's-length test to exclude certain home market sales to affiliated parties from the NV calculation as reasonable, in accordance with law and supported by substantial evidence.

## IX. Depreciation of Idle Equipment and Write-Off of Production Equipment

NTN contends that on line 297[17] [sic] of Commerce's margin program, Commerce "created a calculation for the depreciation of idle equipment . . . [that] was previously accounted for in [Commerce's] calculation of GNA [sic]"[18] expense ratio. NTN's Mem. at 46 (citing Ex. "Preliminary Analysis Memorandum"). NTN asserts that Commerce double-counted NTN's depreciation of idle equipment and, thus, distorted NTN's margin. See id.; see NTN's Reply at 12. Therefore, NTN requests to remove the depreciation of idle equipment calculation from line 297 [sic] of Commerce's margin program. See NTN's Mem. at 46 (citing Ex. "NTN Margin Program").

Commerce, in turn, argues that it did not double-count NTN's depreciation of idle equipment. See Def.'s Mem. at 74. In particular, Commerce maintains that the depreciation of idle

---

[17] The Court assumes that NTN is disputing line 298 of NTN's margin program and not line 297, since line 297 does not contain any information regarding depreciation of idle equipment. See NTN's Mem. at 46 (citing Ex. "NTN Margin Program").

[18] The Court assumes that NTN means the calculation of G&A and not the calculation of GNA.

equipment and the write-off of production equipment and fixed property are not the same. See id. at 75. According to Commerce, although NTN properly included the depreciation of idle equipment in its G&A ratio, NTN excluded the write-off of production equipment and fixed property from its calculation of COP and CV. See id. at 74-75 (citing Confidential Ex. 7 at 26); see also Def.'s Confidential Ex. 5. Therefore, Commerce argues that its adjustment to COP and CV to include the write-off of production equipment and fixed property did not result in double-counting that would distort NTN's margin. See Def.'s Mem. at 75.

Timken supports Commerce's conclusion that NTN's claim is without merit. See Timken's Resp. at 72.[19]

The Court disagrees with NTN that Commerce double-counted when it made an adjustment to COP and CV to include the write-off of production equipment and fixed property. Although NTN included the depreciation of idle equipment in its G&A expense ratio, it failed to include the write-off of production equipment and fixed property

---

[19] Timken's version of NTN's argument is somewhat different from Commerce's. Timken reads NTN's argument as asserting that Commerce double-counted when it "adjusted for the depreciation in its preliminary results analysis memorandum and in the computer program used to calculate NTN's margins." Timken's Resp. at 72. Timken misreads NTN's argument because NTN contends that, on line 297 [sic] of Commerce's margin program, Commerce "created a calculation for the depreciation of idle equipment . . . [that] was previously accounted for in [Commerce's] calculation of GNA [sic]." NTN's Mem. at 46.

in its calculation of COP and CV.  Depreciation of idle equipment and write-off, that is, loss on disposal, of production equipment and fixed property are not the same.  See OXFORD ENGLISH DICTIONARY ONLINE (2nd ed. 1989) (stating that depreciation means to "lower in value, lessen the value of" whereas write-off means "worthless asset"); see also NTN Bearing Corp. v. United States, 74 F.3d 1204, 1206 (Fed. Cir. 1995) (holding that Commerce's "inclu[sion] [of] depreciation expenses and disposal losses [that is, write-offs] in calculating  cost of production and constructed value . . . is supported by substantial evidence and in accordance with law").  Therefore, this Court sustains Commerce's adjustment to COP and CV to include the write-off of production equipment and fixed assets.

**X.   NTN's Zero-Priced United States Transactions and NTN's Home-Market Sample Sales in NTN's Margin Calculation**

   **A.   NTN's Zero-Priced United States Transactions**

NTN argues that in light of NSK Ltd. v. United States ("NSK 1997"), 115 F.3d 965 (Fed. Cir. 1997), the Court should remand the matter to Commerce to exclude NTN's zero-priced samples from its margin calculations.  See NTN's Mem. at 44; NTN's Reply at 12.  NTN maintains that United States transactions at zero value, such as "samples . . .  provided for testing, evaluating, and to determine whether or not to buy a particular product[,]" do not constitute true sales and, therefore, should be excluded from the margin

calculations pursuant to NSK 1997.  NTN's Reply at 12.

Commerce and Timken assert that Commerce properly included NTN's zero-priced United States sales when calculating NTN's dumping margin because NTN failed to demonstrate that the transactions in question lacked "consideration" as defined by NSK 1997, and that further factual inquiry was necessary. See Def.'s Mem. at 75-81; Timken's Resp. at 71.  Therefore, Commerce and Timken assert that, since NTN did not meet its burden of providing information necessary to prove that "sales were outside of the ordinary course of trade," the Court should affirm Commerce's inclusion of NTN's zero-priced sales in NTN's dumping margin. Def.'s Mem. at 81; see Timken's Resp. at 71.

Pursuant to 19 U.S.C. § 1673(1) (1994), Commerce is required to impose antidumping duties upon merchandise that "is being, or is likely to be, sold in the United States at less than its fair value."  A zero-priced transaction does not qualify as a "sale" and, therefore, by definition cannot be included in Commerce's NV calculation.  See NSK 1997, 115 F.3d at 975 (holding "that the term 'sold' . . . requires both a transfer of ownership to an unrelated party and consideration").  Thus, the distribution of TRBs for no consideration falls outside the purview of 19 U.S.C. § 1673 (1994).  Consequently, the Court remands to Commerce to exclude any transactions that were not supported by consideration from NTN's

United States sales database and to adjust the dumping margins accordingly.

## B.    NTN's Home Market Sample Sales

### 1.    Background

Commerce is required to base its NV calculation upon "the price at which the foreign like product is first sold . . . in the ordinary course of trade . . . ."  19 U.S.C. § 1677b(a)(1)(B)(i). In NSK 1997, 115 F.3d 965, the CAFC concluded that "the term 'sold' . . . requires both a transfer of ownership to an unrelated party and consideration."   NSK 1997, 115 F.3d at 975.   The CAFC specifically determined that the samples NSK had given to potential customers at no charge and with no obligation lacked consideration. See id.   Moreover, the CAFC found that "[b]ecause NSK's [free] samples did not constitute 'sales,' they should not have been included in calculating United States price."  Id.

During this review, Commerce sent a questionnaire "requir[ing] all respondents to identify any transactions . . . which they claimed involved sample or prototype sales" and further requested, that respondents:

> [d]escribe [their] agreement(s) for sales in the United
> States and the foreign market (e.g., long-term purchase
> contract, short-term purchase contract, purchase order,
> order confirmation).  Provide a copy of each type of
> agreement and all sales-related documentation generated
> in the sales process (including the purchase order,
> internal and external order confirmation, invoice, and

shipping and export documentation) for a sample sale in
the foreign market and U.S. market during the POR.

Def.'s Mem. at 77 (quoting Section A of NTN's Questionnaire at 5-
6).

Commerce further provided NTN with a questionnaire "relating
to reporting data on sales outside the ordinary course of trade,"
and explained that:

> [i]f [NTN] consider[s] a sale to be outside the ordinary
> course of trade, report "YES" in this field.  If the sale
> was in the ordinary course of trade, report a "NO."  If
> [NTN] claim[s] that any of its home market sales are
> outside the ordinary course of trade [NTN] must provide
> a detailed explanation why.  Please note that the burden
> of proof is on respondents to demonstrate, through
> narrative explanation of the circumstances surrounding
> such sales and supporting documentation or other
> evidence, that sales claimed to be outside the ordinary
> course of trade are in fact outside the ordinary course
> of trade. [Commerce] will not consider only one factor in
> isolation (i.e., the fact that certain sales are labeled
> as samples, or that a transaction involved small
> quantities or high prices) as sufficient proof that a
> sale is not in the ordinary course of trade.

Def.'s Mem. at 77-78 (quoting Section B of NTN's Questionnaire at
B-14).

NTN responded to Commerce's questionnaires by marking sample
sale transactions with an "S" and providing a chart of profit
levels to demonstrate that sales were outside of the ordinary
course of trade.  See Def.'s Mem. at 78.  In turn, Commerce sent a
supplemental questionnaire to NTN requesting clarification as to
NTN's original response, that is, "what [NTN] was attempting to

establish in [a particular NTN exhibit], and to provide a detailed explanation of . . . [the] exhibit." Id. NTN responded to Commerce's supplemental questionnaire by explaining the profit charts it provided in its original response. Commerce stated that "NTN's response relying upon profit levels to demonstrate that sales were outside of the ordinary course of trade does not address the factors considered important in NSK 1997, i.e., whether there was any transfer of ownership or consideration given for the samples." Id. at 81. Moreover, Commerce determined that NTN failed to provide "information demonstrating that [NTN's] alleged home market sample sales were outside the ordinary course of trade." Final Results, 63 Fed. Reg. at 2582. Therefore, for the final results, Commerce included NTN's home market sample sales in NTN's final dumping margin calculation. See Def.'s Mem. at 82.

### 2. Contentions of the Parties

NTN argues that Commerce erred when it failed to exclude NTN's sample sales and other sales from Commerce's margin calculations, despite what NTN considers to be sufficient evidence on record indicating that these transactions were outside of the ordinary course of trade. See NTN's Mem. at 44-46; NTN's Reply at 13-14. In particular, NTN asserts that the evidence on the record includes: (1) NTN's questionnaire response stating that "'[s]amples are provided to customers for the purpose of allowing the customer

to determine whether a particular product is suited to the customer's needs[;]'" (2)  NTN's sample sales tracking system in which sample sales are identified by placing "SS" "in the prefix to the order number[;]" and (3) an NTN submitted exhibit which provides a profit chart and identifies sample sales with unusual profits that NTN considers outside of the ordinary course of trade. NTN's Reply at 13-14.  Therefore, NTN claims that it provided Commerce with "'the greatest profit level in the range of profits at which the most quantity of the subject merchandise [was] sold'" (hereinafter "X") and requested that Commerce "treat any sale with a profit level greater than [X] as not being in the ordinary course of trade."  NTN's Reply at 14.  Moreover, NTN maintains that 19 U.S.C. § 1677b(a)(1)(B), the SAA, regulation 19 C.F.R. § 351.102(b) (1998) and NSK 1997, 115 F.3d 965, clearly instruct Commerce to exclude NTN's sample sales or other sales from the margin calculations.  See NTN's Mem. at 45-46; NTN's Reply at 13-14.

Commerce alleges that it properly exercised its discretion in rejecting NTN's argument that Commerce must exclude NTN's home market sample sales or other sales because NTN failed to adequately show that home market sample sales and other sales lacked consideration or were otherwise outside of the ordinary course of trade.  See Final Results, 63 Fed. Reg. at 2582.  Commerce asserts that "only NTN possessed the information regarding the purchase

history of its alleged samples, including the price and quantity for any prior or subsequent purchases of these products by the same or other customers" and since NTN withheld that information, NTN failed to meet its burden to show that it received no consideration for the alleged sample sales at issue. Def.'s Mem. at 81. Further, Commerce contends that NTN cannot be excused from responding to the agency's questions because NTN considers certain information irrelevant. See id. Commerce claims that it, not NTN, determines the relevancy of Commerce's questions. See id. Therefore, Commerce argues that its decision to include NTN's alleged sample sales in calculating NTN's dumping margin is based upon substantial evidence and in accordance with law. See id. at 81-82.

Timken supports Commerce's decision to include NTN's sample sales in calculating NTN's dumping margin because Commerce found that: (1) "there [was] no record evidence demonstrating that any of NTN's home market sales, samples, or otherwise [were] outside the ordinary course of trade[;] and (2) consideration was paid for all of [NTN's] sample sales." Timken Resp. at 72.

### 3. Analysis

An NV calculation has to be based upon "the price at which the foreign like product is first sold . . . in the ordinary course of trade . . . ." 19 U.S.C. § 1677b(a)(1)(B)(i). The term "ordinary

course of trade" is defined as:

> the conditions and practices which, for a reasonable time prior to the exportation of the subject merchandise, have been normal in the trade under consideration with respect to merchandise of the same class or kind.  [Commerce] shall consider the following sales and transactions, <u>among others</u>, to be outside the ordinary course of trade:
>
> (A) Sales disregarded under section 1677b(b)(1) of this title.
>
> (B)  Transactions  disregarded  under  section 1677b(f)(2) of this title.

19 U.S.C. § 1677(15) (1994) (emphasis supplied).


Section 1677b(b)(1) deals with sales below cost of production. Section  1677b(f)(2)  deals  with  sales  to  affiliated  parties. Therefore, Commerce must consider below cost sales and sales between related parties as sales outside the ordinary course of trade.  Although § 1677b(b)(1)'s sales below cost of production and § 1677b(f)(2)'s affiliated party transactions are specifically designated as outside the ordinary course of trade, the "among others" language of § 1677(15) clearly indicates that other types of sales could be excluded as being outside the ordinary course of trade.[20]  Commerce "<u>may</u> consider sales or transactions to be outside

---

[20] The SAA, accompanying the URAA provides that aside from §§ 1677b(b)(1) and (f)(2) transactions:

> Commerce <u>may</u> consider other types of sales or transactions to be outside the ordinary course of trade <u>when such sales or transactions have characteristics that are not ordinary</u> as compared to sales or transactions generally made in the same market. Examples

the ordinary course of trade if [Commerce] determines, based on an

evaluation of all of the circumstances particular to the sales in

question, that such sales or transactions have characteristics that

are extraordinary for the market in question." 19 C.F.R. §

351.102(b) (emphasis supplied). Examples of what could be

considered outside the ordinary course of trade include: (1) off-

quality merchandise; (2) merchandise produced according to unusual

product specifications; (3) merchandise sold at aberrational prices

or with abnormally high profits; (4) merchandise sold pursuant to

unusual terms of sale; or (5) merchandise sold to an affiliated

party not at an arm's-length transaction. See 19 C.F.R. §

351.102(b).

     In determining whether a sale is outside the ordinary course

───────────────────────

          of such sales or transactions include merchandise
          produced according to unusual product specifications,
          merchandise sold at aberrational prices, or merchandise
          sold pursuant to unusual terms of sale. As under
          existing law, amended section 771(15) does not establish
          an exhaustive list, but the Administration intends that
          Commerce will interpret section 771(15) in a manner which
          will avoid basing normal value on sales which are
          extraordinary for the market in question, particularly
          when the use of such sales would lead to irrational or
          unrepresentative results.

     H.R. Doc. 103-316, at 834 (emphasis supplied).

          The SAA also provides that "[o]ther examples of sales that
     Commerce could consider to be outside the ordinary course of trade
     include sales of off-quality merchandise, sales to related parties
     at non-arm's length prices, and sales with abnormally high
     profits." Id. at 839-40.

of trade, Commerce must consider not just "one factor taken in isolation but rather . . . all the circumstances particular to the sales in question." Murata Mfg. Co. v. United States, 17 CIT 259, 264, 820 F. Supp. 603, 607 (1993). Commerce's methodology for making this determination is codified in section 351.102(b) of Commerce's regulations. See 19 C.F.R. § 351.102(b); see also Torrington Co. v. United States ("Torrington"), 25 CIT ___, ___, 146 F. Supp. 2d 845, 861-64 (2001) (detailing Commerce's methodology for deciding when sales are outside the "ordinary course of trade" and finding both Commerce's interpretation of 19 U.S.C. § 1677(15) and Commerce's methodology reasonable). In addition, plaintiff has the burden of proving whether the sales used in Commerce's calculations are outside the ordinary course of trade. See, e.g., Nachi-Fujikoshi Corp. v. United States, 16 CIT 606, 608, 798 F. Supp. 716, 718 (1992) (citing Koyo Seiko Co. v. United States ("Koyo"), 16 CIT 539, 543, 796 F. Supp. 1526, 1530 (1992), vacated in part on other grounds, ("Koyo 1992"), 806 F. Supp. 1008 (1992).

Adhering to the explanation provided by this Court in Torrington, 25 CIT __, 146 F. Supp. 2d 845, the Court finds that in light of 19 U.S.C. § 1677(15)'s legislative purpose, Commerce's interpretation of 19 U.S.C. § 1677(15) and exercise of its discretion by requiring additional evidence besides NTN's response

relying upon profit levels to demonstrate that sales were outside of the ordinary course of trade, that is, whether there was any transfer of ownership or consideration given for the samples, was reasonable. NTN was or should have been aware of such a requirement. See NTN Bearing, 24 CIT ___, 104 F. Supp. 2d 110 (holding that Commerce's request to NTN for additional evidence demonstrating that sales were outside of the ordinary course of trade was not an unreasonable exercise of Commerce's discretion); see also NTN, 19 CIT at 1229, 905 F. Supp. at 1091 (finding that "[w]ithout a complete explanation of the facts which establish the extraordinary circumstances rendering particular sales outside the ordinary course of trade, Commerce cannot exclude those sales from [NV]").

In the case at bar, NTN failed to meet its burden of providing Commerce with requested additional detailed information regarding sales that NTN claimed were outside the ordinary course of trade. NTN merely relied on: (1) its questionnaire response in which NTN stated that "'[s]amples are provided to customers for the purpose of allowing the customer to determine whether a particular product is suited to the customer's needs[;][21]'" and (2) its submitted exhibit in which NTN provides a profit chart and identifies sample

---

[21] NTN identified its sample sales by placing "SS" "in the prefix to the order number." NTN's Reply at 13.

sales with unusual profits that it considers are outside of the ordinary course of trade in order to support NTN's argument that its sample sales should be excluded from Commerce's margin calculation.  NTN's Reply at 13-14.  NTN's identification of its sales as samples does not necessarily render those sales as being outside of the ordinary course of trade.  See NTN, 19 CIT at 1229, 905 F. Supp. at 1091.  In addition, "[t]he presence of profits higher than those of other sales[,] [that is, sales with unusual profits,] is, however, merely an element which does not necessarily place the sales outside the ordinary course of trade under Commerce's requirement for additional evidence."  Torrington, 25 CIT at __, 146 F. Supp. 2d at 863.  Therefore, because Commerce's interpretation and application of the statute was reasonable and the record reflects that NTN did not provide sufficient additional evidence requested by Commerce to support NTN's claim that the disputed sales were outside the ordinary course of trade, Commerce was justified in its decision to include NTN's sample and other sales in Commerce's margin calculation.

## XI.  Commerce's Adjustment to NTN's Total Billing Adjustment in the Home Market

### A.    Background

For the POR at issue, NTN reported home market billing adjustments in its questionnaire response submitted to Commerce.

See Def.'s Mem. at 82.  In the final results, Commerce stated:

> [Commerce] thoroughly verified NTN's reported home market
> volume and value for the POR.  As [Commerce's]
> verification report indicates, it was necessary for
> [Commerce] to reconcile the volume and value NTN reported
> in its response to its Ministry of Finance (MOF) reports.
> As part of this reconciliation [Commerce] examined an
> adjustment NTN made for its total HM billing adjustments
> for the POR (see Department's Home Market Verification
> Report for NTN, July 9, 1997, exhibit [3])(NTN HM
> Report).[22]  Not only did [Commerce] successfully trace
> this total to the computer program NTN used to calculate
> it, but [Commerce] also traced NTN's reported volume and
> value for the POR for its home market sales directly to
> the MOF report with no discrepancies (see NTN HM Report
> at 6).  [Commerce] also verified NTN's reported,
> transaction-specific home market billing adjustments by
> examining a variety of sales documentation in the sales
> trace portion of [Commerce's] verification (see NTN HM
> Report at 17).  Again [Commerce] found no discrepancies.
> As a result of both verification exercises, one would
> assume that NTN's reported home market billing
> adjustments were accurate and that the total of its
> transaction-specific billing adjustments for the POR
> would equal the total reported on exhibit [3] of
> [Commerce's] [V]erification [R]eport.

Final Results, 63 Fed. Reg. at 2563.

After verification, however, "Timken identified a discrepancy
between the billing adjustment NTN reported in its questionnaire
response and the amount Commerce determined through verification."
Def.'s Mem. at 82.  Commerce, therefore, in its review of NTN's
questionnaire responses, calculated the overall total of NTN's

---

[22]    NTN's Home Market Verification Report is partially in
Commerce's Confidential Exhibit 10.  Although Commerce indicates in
that exhibit that it will supplement the Home Market Verification
Report, no such supplement has been made.

reported home market billing adjustment and found that it was significantly different from the total billing adjustment Commerce determined at verification in exhibit 3 of NTN's HM Report. See Final Results, 63 Fed. Reg. at 2563; Def.'s Mem. at 82. Commerce then proceeded to determine a more accurate total billing adjustment and discovered that "the total billing adjustment amount that [Commerce] had verified as part of the reconciliation for quantity and value reflected the accurate total adjustment" because exhibit 3's total was more traceable to NTN's Ministry of Finance ("MOF") reports. Def.'s Mem. at 83; see Final Results, 63 Fed. Reg. 2563. While Commerce had verified NTN's reported transaction-specific billing adjustment, Commerce considered the verification to be merely a "spot check," that is, Commerce's examination of selected billing adjustments that left a possibility that many of NTN's other transaction-specific billing adjustments were inaccurate. See Final Results, 63 Fed. Reg. 2563. Commerce, therefore, explained its methodology stating:

> having determined that the exhibit [3] total billing adjustment amount is the accurate figure, [Commerce] ha[s] adjusted NTN's reported transaction-specific billing adjustments to reflect this total. . . . [B]ecause the record provides no information as to which transaction-specific billing adjustments are accurate, and because NTN has neither explained this discrepancy nor provided [Commerce] with any information with respect to the correction of this discrepancy in its reported data, [Commerce] ha[s] relied on facts available to correct NTN's reported home market billing adjustments. Because [Commerce] [is] unable to identify which billing adjustments are inaccurate, as facts available,

[Commerce] systematically sorted through NTN's raw home market database and totaled the reported per-sale billing adjustments until [Commerce] arrived at a total equal to [Commerce's] calculated adjustment. [Commerce] then adjusted these sales' billing adjustments such that they reflected the total in exhibit [3] and disallowed the rest of NTN's reported billing adjustments.

Id.


B.    Contentions of the Parties

NTN argues that Commerce erred when it used facts available to: (1) correct NTN's reported billing adjustment data; and (2) "substitut[e] [Commerce's] adjusted figures for verified, accurate data presented by [NTN]." NTN's Reply at 15; see NTN's Mem. at 13-14. In particular, NTN maintains that since Commerce verified NTN's reported transaction-specific billing adjustments and found no discrepancies, there is no basis under 19 U.S.C. § 1677e for Commerce to use facts available. See NTN's Mem. at 14. NTN also contends that "substituting [Commerce's] adjusted figures for verified, accurate data presented by a party is [not only] contrary to . . . 19 U.S.C. § 1677e, [but also contrary] to 19 C.F.R. § 351.308 [1998] [and] . . . the express language of the SAA." NTN's Reply at 15. Therefore, NTN requests that this Court remand to Commerce to use NTN's reported and verified data for the total billing adjustment in the home market. See id.; NTN's Mem. at 15.

Commerce responds that although it verified NTN's reported transaction-specific home market billing adjustments and found no

discrepancies, Commerce only "spot-checked," that is, examined a sample of NTN's reported billing adjustments, and it is therefore possible that many of NTN's other transaction-specific billing adjustments that Commerce did not select during verification are inaccurate. See Def.'s Mem. at 83. Commerce maintains that this is particularly true considering that the total of all of NTN's billing adjustments do not match the total from exhibit 3, that is, the total billing adjustment Commerce determined at verification. See id.

Commerce also asserts that, despite the errors contained in NTN's questionnaire response, Commerce had to use questionnaire response data, that is, "[Commerce] had to make adjustments in the data so that the data from the questionnaire response would not exceed the total billing adjustment determined at verification," to calculate NTN's dumping margin. Id. at 83-84. In particular, Commerce argues, that since it could not identify the inaccurate billing adjustments, "as facts available, Commerce systematically sorted through NTN's raw home market data base and totaled the reported per-sale billing adjustments until Commerce arrived at a total equal to the verified total adjustment[] . . . [and] then adjusted the billing adjustments for the examined sales to reflect the total determined at verification and disallowed the rest of NTN's reported billing adjustments." Id. at 84. Therefore,

Commerce requests that since it relied upon verified figures, that is, Commerce relied upon its verified total billing expense in exhibit 3, the Court should sustain its adjustment to NTN's reported billing adjustment as supported by the record and in accordance with law.

Timken agrees with Commerce and argues that since Commerce determined that NTN's transaction-specific billing adjustments were inaccurate, NTN's assertion that Commerce wrongfully rejected verified data is without merit. See Timken Resp. at 58. Timken also asserts that Commerce acted in accordance with 19 U.S.C. § 1677e(a)(2)(D) when it used facts available in place of unverifiable data to make an adjustment to NTN's reported billing adjustment. See id.

## C.   Analysis

The antidumping statute mandates that Commerce use facts available if "an interested party or any other person . . . provides . . . information but the information cannot be verified as provided in section 1677m(i) . . . ." 19 U.S.C. § 1677e(a)(2)(D)(1998).[23]  Section 1677e(a) provides that the use of

---

[23]  Section 1677m(i) provides that:
[Commerce] shall verify all information relied upon in making--
    (1) a final determination in an investigation,
    (2) a revocation under section 1675(d) of this title,

facts available shall be subject to the limitations set forth in 19
U.S.C. § 1677m(d).

Commerce's decision to use facts available to adjust NTN's
reported billing adjustments to reflect the total billing
adjustment determined by Commerce at verification was supported by
substantial evidence and in accordance with law.   According to
Micron Tech., Inc. v. United States ("Micron Tech."), 117 F.3d
1386, 1395 (Fed. Cir. 1997) (citing Antifriction Bearings (Other
than Tapered Roller Bearings) and Parts Thereof from the Federal
Republic of Germany, 56 Fed. Reg. 31,692, 31,707 (July 11, 1991)),

> [v]erification depends precisely on tying amounts
> reported in questionnaire responses to the company's
> internal accounting records and financial statements.
> Failure to demonstrate such a relationship results in a
> failed verification.

"'[A] verification is a spot check and is not intended to be an
exhaustive examination of the respondent's business.   [Commerce]
has considerable latitude in picking and choosing which items it
will examine in detail.'"   PMC Specialties Group, Inc. v. United

---

and
     (3) a final determination in a review under section
1675(a) of this title, if--
          (A) verification is timely requested by an
     interested party as defined in section 1677(9)(C), (D),
     (E), (F), or (G) of this title, and
          (B) no verification was made under this subparagraph
     during the 2 immediately preceding reviews and
     determinations under section 1675(a) of this title of the
     same order, finding, or notice, except that this clause
     shall not apply if good cause for verification is shown.

States ("PMC"), 20 CIT 1130, 1134 (1996) (quoting Monsanto Co. v. United States ("Monsanto"), 12 CIT 937, 944, 698 F. Supp. 275, 281 (1988)). In fact, "Commerce enjoys 'wide latitude' in its verification procedures." Pohang Iron and Steel Co. v. United States ("Pohang"), 1999 Ct. Intl. Trade LEXIS 105, *1, Slip. Op. 99-112 (October 20, 1999); see also American Alloys, Inc. v. United States ("American Alloys"), 30 F.3d 1469, 1475 (Fed. Cir. 1994); Carlisle Tire and Rubber Co. v. United States ("Carlisle"), 9 CIT 520, 532, 622 F. Supp. 1071, 1082 (1985) ("It is within the discretion of Commerce to determine how to verify" and "due deference will be given to the expertise of the agency"). NTN may not usurp Commerce's role as fact finder and substitute their analysis of the data for the result reached by Commerce. The Court "will not supersede Commerce's conclusions so long as it 'applies a reasonable standard to verify material submitted and the verification is supported by such relevant evidence as a reasonable mind might accept.'" Pohang, 1999 Ct. Intl. Trade LEXIS 105, *55, Slip. Op. 99-112 (quoting AK Steel Corp. v. United States, 22 CIT 1070, 1091, 34 F. Supp. 2d 756, 772-73 (1998)).

In this case, NTN reported home market billing adjustments in its questionnaire response submitted to Commerce. Commerce, in turn, acting within the "wide latitude" of discretion allowed to Commerce, performed two verifications: (1) "reconcil[ing] the

volume and value NTN reported in its response to [NTN's] MOF reports" to arrive at a total billing adjustment which Commerce refers to as exhibit 3 of NTN's HM Report; and (2) "verified NTN's reported, transaction-specific home market billing adjustments by examining a variety of sales documentation," that is, Commerce "spot checked" a select few of NTN's reported transaction-specific billing adjustments. Final Results, 63 Fed. Reg. 2563. After the verifications, Commerce, acting upon Timken's identification of a discrepancy, reviewed NTN's questionnaire response by taking the overall total of NTN's reported home market billing adjustment and compared it to the total billing adjustment Commerce determined at verification in exhibit 3 of NTN's HM Report. See id. Commerce found that NTN's total reported home market billing adjustment was significantly different from Commerce's verified total billing adjustment in exhibit 3 of NTN's HM Report. See id. Since Commerce determined that its verified total billing adjustment in exhibit 3 was more traceable to NTN's MOF reports than NTN's reported transfer-specific total billing adjustment, Commerce concluded that NTN's other transaction-specific billing adjustments that Commerce did not select during verification were inaccurate. See id. In addition, the record did not provide any information as to which transaction-specific billing adjustments were inaccurate and NTN never explained the discrepancy nor provided Commerce with information as to the correction of this discrepancy at issue.

Therefore, since: (1) NTN's transaction-specific billing adjustments (that were not selected during Commerce's verification) were inaccurate; and (2) Commerce cannot identify which transaction-specific billing adjustments are inaccurate, this Court finds that Commerce's use of facts available is in accordance with 19 U.S.C. § 1677e(a)(2)(D).[24]

Accordingly, the Court sustains Commerce's adjustment to NTN's reported billing adjustment as reasonable, in accordance with law and supported by substantial evidence.

## XII. Use of Affiliated Supplier Cost Data for Inputs Obtained From the Affiliated Supplier for All Purposes

### A.    Statutory Background

Normal value of the subject merchandise is defined, in

---

[24]   The Court does not agree with NTN's assertion that the substitution of Commerce's adjustment to NTN's billing adjustment "for verified, accurate data presented by [NTN] . . . is contrary to . . . 19 U.S.C. § 1677e, . . . 19 C.F.R. § 351.308 . . . [and] the express language of the SAA." NTN's Reply at 15. Commerce verified: (1) a few samples of NTN's reported transaction-specific billing adjustments; and (2) a total billing adjustment that Commerce arrived at while reconciling the volume and value NTN reported in its response to its MOF, that is, what Commerce refers to as the total in exhibit 3 of NTN's HM Report. After verification, Commerce found that the other transaction-specific billing adjustments that Commerce did not select during verification were inaccurate. Moreover, Commerce could not identify which of these transaction-specific billing adjustments were inaccurate. Therefore, Commerce properly resorted to facts available since NTN provided information, that is, NTN's reported transaction-specific billing adjustments, that could not be verified.

pertinent part, as "the price at which the foreign like product is first sold . . . for consumption in the exporting country . . . ." 19 U.S.C. § 1677b(a)(1)(B)(i). However, whenever Commerce has "reasonable grounds to believe or suspect" that sales of the foreign like product under consideration for the determination of NV have been made at prices which represent less than the COP of that product, Commerce shall determine whether such sales were made at less than the COP. See 19 U.S.C. § 1677b(b)(1). If Commerce determines that there are sales below the COP and certain conditions are present under § 1677b(b)(1)(A)-(B), it may disregard such below-cost sales in the determination of NV. See 19 U.S.C. § 1677b(b)(1).

Additionally, the special rules for the calculation of COP or CV contained in 19 U.S.C. § 1677b(f)(2)-(3) provide that, in a transaction between affiliated parties, as defined in 19 U.S.C. § 1677(33), Commerce may disregard either the transaction or the value of a major input.

Section 1677b(f)(2) provides that Commerce may disregard an affiliated party transaction when "the amount representing [the transaction or transfer price] does not fairly reflect the amount usually reflected in sales of merchandise under consideration in the market under consideration," that is, an arms-length or market price. 19 U.S.C. § 1677b(f)(2) ("fair-value" provision). If such

"a transaction is disregarded . . . and no other transactions are available for consideration," Commerce shall value the cost of an affiliated-party input "based on the information available as to what the amount would have been if the transaction had occurred between persons who are not affiliated," that is, based on arm's-length or market value. Id.

One of the elements of value to be considered in the calculation of COP, which is referred to in section 1677b(f)(2), is the cost of manufacturing and fabrication. See 19 U.S.C. § 1677b(b)(3)(A).

Section 1677b(f)(3)'s "major input rule" states that Commerce may calculate the value of the major input on the basis of the data available regarding COP, if such COP exceeds the market value of the input calculated under § 1677b(f)(2). See 19 U.S.C. § 1677b(f)(3). Commerce, however, may rely on the data available only if: (1) a transaction between affiliated parties involves the production by one of such parties of a "major input" to the merchandise produced by the other, and, in addition, (2) Commerce has "reasonable grounds to believe or suspect" that the amount reported as the value of such input is below the COP. 19 U.S.C. § 1677b(f)(3). For purposes of § 1677b(f)(3), regulation 19 C.F.R. § 351.407(b) (1998) provides that Commerce will value a major input supplied by an affiliated party based on the highest of (1) the

actual transfer price for the input; (2) the market value of the input; or (3) the COP of the input. See also Mannesmannrohren-Werke, 23 CIT at ___, 77 F. Supp. 2d at 1312 (holding that 19 U.S.C. §§ 1677b(f)(2) and (3), as well as the legislative history of the major input rule, support Commerce's decision to use the highest of transfer price, cost of production, or market value to value the major inputs that the producer purchased from the affiliated supplier).

Thus, paragraphs (2) and (3) of 19 U.S.C. § 1677b(f) authorize Commerce, in calculating COP and CV, to do the following: (1) disregard a transaction between affiliated parties if, in the case of any element of value that is required to be considered, the amount representing that element does not fairly reflect the amount usually reflected in sales of merchandise under consideration in the market under consideration; and (2) determine the value of the major input on the basis of the information available regarding COP if Commerce has reasonable grounds to believe or suspect that an amount represented as the value of the input is less than its COP. See Timken, 21 CIT at 1327-28, 989 F. Supp. at 246 (holding that Commerce may disregard transfer price for inputs purchased from related suppliers pursuant to 19 U.S.C. § 1677b(e)(2), the predecessor to 19 U.S.C. § 1677b(f)(2), if the transfer price or any element of value does not reflect its normal value and citing

NSK Ltd. v. United States, 19 CIT 1319, 1323-26, 910 F. Supp. 663, 668-70 (1995), aff'd, 119 F.3d 16 (Fed. Cir. 1997)).


    B.    Factual Background

    During the POR at issue, Commerce, "pursuant to 19 U.S.C. § 1677b(f), . . . requested [that] NSK . . . submit affiliated supplier cost data for inputs [NSK] obtained from the affiliated supplier."  Def.'s Mem. at 88.  Commerce, as the statute directs, then proceeded to use the affiliated supplier cost data to calculate NSK's COP and CV.  See id.  However, during the administrative review, Commerce also:

> substituted affiliated-party cost data [for NTN's reported transfer prices] when it determined whether the foreign like product was commercially comparable to each U.S. model, when it calculated a difference-in merchandise (difmer) adjustment for non-identical U.S. and home market matches, and when it recalculated NSK's reported U.S. inventory carrying costs prior to deducting this expense from CEP.

Final Results, 63 Fed. Reg. 2573.


    Explaining its methodology, Commerce stated that:

> in accordance with section [1677b(f)] of the Act, [Commerce] recalculated NSK's reported TRB-specific COP and CV to include the COP of an affiliated-party input if the transfer price NSK reported for that input was less than the COP for that input. [Commerce] note[s] that COP and CV are composed of several components.  The adjustment [Commerce] made for NSK's affiliated-party inputs is actually an adjustment to its reported material costs.  Because material costs are a component of the variable cost of manufacture (VCOM) and the total cost of manufacture (TCOM), and these in turn are components of

COP and CV, when [Commerce] adjusted NSK's reported material costs [Commerce] not only recalculated its COP and CV, but [Commerce] effectively recalculated VCOM and TCOM components of COP and CV as well.

Id. at 2574.

Therefore, as a result, Commerce resorted to using affiliated supplier cost data for purposes other than calculating COP and CV and explained:

[Commerce] does not rely on a respondent's reported costs solely for the calculation of COP and CV. [Commerce] also use[s] cost information in a variety of other aspects of [Commerce's] margin calculations. For example, when determining the commercial comparability of the foreign like product in accordance with section [1677(16)] of the Act, it has been [Commerce's] long-standing practice to rely on the product-specific VCOMs and TCOMs for U.S. and home market merchandise. Likewise, when calculating a difmer adjustment to NV in accordance with section [1677b(a)(6)] of the Act, it has been [Commerce's] consistent policy to calculate the adjustment as the difference between the product-specific VCOMs for the U.S. and home market merchandise compared . . . . Furthermore, [Commerce] has permitted respondents to calculate their reported [inventory carrying costs] on the basis of TCOM.

Id.

### C. Contentions of the Parties

NSK asserts that the plain language of 19 U.S.C. § 1677b(f) and legislative history restrict Commerce's use of affiliated supplier cost data in that "Commerce may substitute . . . affiliated supplier cost data[] for affiliated supplier price data," that is, transfer prices between affiliates, only "'[f]or purposes of subsections (b)

and (e)'" of § 1677b(f). NSK's Mem. at 7 (quoting 19 U.S.C. § 1677b(f)). In particular, NSK argues that Commerce violated the law when it used NSK's affiliated supplier cost data to: (1) run its model match methodology under 19 U.S.C. § 1677(16); (2) calculate the difmer adjustment under 19 U.S.C. § 1677b(a)(6); and (3) recalculate NSK's reported United States inventory carrying costs prior to deducting this expense from CEP pursuant to 19 U.S.C. § 1677a(d). See NSK's Mem. at 8-12; NSK's Reply at 2-6.

NSK also argues that, pursuant to Ad Hoc Comm. of AZ-NM-TX-FL Producers of Gray Portland Cement v. United States, 13 F.3d 398, 401 (Fed. Cir. 1994),

> the Court must presume [that 19 U.S.C. § 1677b(f)] means that Commerce may use data gathered pursuant to subsection [§ 1677b(f)] for calculations involving subsections [§§ 1677b(b) and (e)] only. That other sections of the statute - specifically subsections [1677(16), 1677b(a)(6), 1677a(d)] - are silent about the use of affiliated supplier cost data does not nullify the precise language of subsection [1677b(f)].

NSK's Mem. at 8-9.

NSK further asserts that § 1677b(f)'s restriction on the use of affiliated supplier cost data applies to all of the provisions of the antidumping law that is, especially, §§ 1677(16), 1677b(a)(6) and 1677a(d) because there are no statements to the contrary. See id. at 9-10 (citing Yankee Atomic Elec. Co. v. United States ("Yankee"), 112 F.3d 1569, 1576 (Fed. Cir. 1997)). Therefore, NSK

requests Commerce "to rerun the model match methodology, and recalculate the difmer adjustment and U.S. inventory carrying costs, without regard to affiliated supplier cost data collected" pursuant to subsections § 1677b(f)(2) and § 1677b(f)(3). NSK's Mem. at 11-12.

Commerce alleges that 19 U.S.C. § 1677b(f) does not restrict the use of affiliated supplier cost data to calculating COP and CV since Commerce requires cost data for other purposes.[25] See Def.'s Mem. at 86-91. Commerce argues that §§ 1677(16), 1677a(a)(6)[26] [sic] and 1677a(d) do not prohibit Commerce from using affiliated supplier cost data. See id. at 89. Moreover, Commerce alleges that §§ 1677(16), 1677b(a)(6) and 1677a(d) grant Commerce discretion. See id. at 90. In particular, Commerce points out that:

Section [1677(16)] does not specify a particular

_____

[25] As stated above, in the Final Results, Commerce explains how material costs are a component of VCOM and TCOM which in turn, are both components of COP and CV. See Final Results, 63 Fed. Reg. at 2574. Therefore, when Commerce adjusted NSK's reported material costs, it not only calculated COP and CV, but also recalculated VCOM and TCOM. See id. In turn, since Commerce relies upon VCOM and/or TCOM in running its model match, calculating the difmer adjustment and inventory carrying costs, Commerce asserts that its use of affiliated supplier cost data for purposes other than the calculation of COP and CV was reasonable and in accordance with law. See id.

[26] The Court assumes that Commerce is referring to 19 U.S.C. § 1677b(a)(6) and not 19 U.S.C. § 1677a(a)(6).

methodology for determining appropriate matches.  Rather, the statute implicitly delegates the selection of an appropriate methodology to [Commerce].

. . . Likewise, section [1677b(a)(6)] grants [Commerce] the same discretion to determine a suitable method to calculate a difmer adjustment and does not restrict [Commerce's] selection of an appropriate methodology to any particular approach.  In addition, with respect to [Commerce's] recalculation of NSK's U.S. [inventory carrying costs], section [1677a(d)] only specifies what adjustments are to be made to determine CEP and does not provide details regarding the precise calculations for each particular adjustment.

Final Results, 63 Fed. Reg. at 2574-75.


[I]f [Commerce] determine[s] a component of a respondent's COP and CV is distortive for one aspect of [Commerce's] analysis, it is reasonable to make the same determination with respect to those other aspects of [Commerce's] margin calculations where [Commerce] relied on identical cost data.  To do otherwise would not only produce distortive results but would be contrary to [Commerce's] mandate to administer the dumping laws as accurately as possible.

Id. at 2574.


Commerce further argues that the plain language of § 1677b(f) does not prohibit the use of affiliated supplier cost data for purposes other than the calculation of COP and CV because "Congress has [not] directly spoken on the precise question at issue."  Def.'s Mem. at 89.  In sum, Commerce maintains that the use of affiliated supplier cost data is not restricted only to the calculation of COP and CV.  Rather, Commerce asserts that it has been afforded discretion to use cost data for other purposes.  See id. at 89-90.

Commerce, in response to NSK argues that its use of affiliated supplier cost data for purposes other than the calculation of COP and CV not only produced a harmonious whole but also indicated Commerce's observing and understanding of the statute as a whole. Therefore, Commerce requests that the Court sustain its use of affiliated supplier cost data for purposes other than calculating COP and CV as in accordance with law.

Timken agrees with Commerce and asserts that NSK's arguments are not supported by the statute. See Timken's Resp. at 53. In particular, Timken argues that the term: (1) "for purposes of this part" in § 1677b(b)(3) means "[t]he part of the statute referred to [a]s 'Part IV General Provisions' and includes 19 U.S.C. § 1677 through § 1677n [(1994)]" and, therefore "[t]he three provisions for which Commerce has used NSK's modified costs are all contained within this part;" and (2) "this subtitle" in § 1677b(e) "includes § 1671 [(1994)] through § 1677n . . . [and] the three provisions for which Commerce has used modified costs are included within these." Id. Timken also maintains that the respective statues for running the model match, calculating the difmer adjustment and inventory carrying costs do not contain any language on how Commerce is to calculate costs.[27] See id. at 54. Pointing out that Commerce has

_____

[27] NSK argues that "[w]hile the statute views affiliated supplier transactions with caution as regards COP and CV

discretion to "employ cost information obtained from [NSK] to make all of these determinations," Timken asserts that Commerce's use of affiliated supplier cost data for purposes other than the calculation of COP and CV was in accordance with law.  Id.


   D.  Analysis

   In resolving questions of statutory interpretation, the Chevron test requires this Court first to determine whether "Congress has directly spoken to the precise question at issue," that is, whether the plain meaning of the statute's text answers the question.  Chevron, 467 U.S. at 842.  If the language of the statute is clear, then this Court must defer to Congressional intent.  See id. at 842-43.  If the statute is silent or ambiguous with respect to the specific issue and the legislative history of the statute doesn't clarify the issue, the question for the Court is whether Commerce's construction of the statute is permissible.  See id. at 843.  Essentially, this is an inquiry into the reasonableness of Commerce's interpretation.  See Fujitsu Gen. Ltd. v. United States,

calculations, this does not mean these transactions should be replaced whenever Commerce uses cost to assist in the measurement of non-cost variables. For example, . . . the difmer adjustment measures differences between merchandise, not differences in cost." NSK's Reply at 4-5.  NSK further argues that Congress knew '[t]he question of affiliation is relevant to a number of price and cost issues in an antidumping investigation or review,' but nevertheless confined Commerce's ability to collect and use affiliated supplier cost data just to COP and CV calculations."  Id. (quoting H.R. Doc. 103-316, at 838).

88 F.3d 1034, 1038 (Fed. Cir. 1996). Provided Commerce has acted rationally, the Court may not substitute its judgment for the agency's. See IPSCO, 965 F.2d at 1061; see also Koyo Seiko Co. v. United States ("Koyo CAFC"), 36 F.3d 1565, 1570 (Fed. Cir. 1994) (holding that "a court must defer to an agency's reasonable interpretation of a statute even if the court might have preferred another"). "In determining whether Commerce's interpretation is reasonable, the Court considers, among other factors, the express terms of the provisions at issue, the objectives of those provisions and the objectives of the antidumping scheme as a whole." Mitsubishi Heavy Indus., Ltd. v. United States, 22 CIT 541, 545, 15 F. Supp. 2d 807, 813 (1998).

In the case at bar, the issue before the Court is whether Commerce can use affiliated supplier cost data obtained pursuant to 19 U.S.C. § 1677b(f) for purposes other than the calculation of COP and CV. In particular, the Court must determine whether Commerce's use of affiliated supplier cost data to: (1) run its model match methodology under 19 U.S.C. § 1677(16); (2) calculate the difmer adjustment under 19 U.S.C. § 1677b(a)(6); and (3) recalculate NSK's reported United States inventory carrying costs prior to deducting this expense from CEP pursuant to 19 U.S.C. § 1677a(d) was in accordance with law. Because the plain language of §§ 1677(16), 1677b(a)(6) and 1677a(d) is silent with respect to the specifics of

Commerce's use of affiliated supplier cost data obtained from §
1677b(f), see §§ 1677(16), 1677b(a)(6) and 1677a(d), and because
neither the statutory language nor the legislative history of §
1677(16), § 1677b(a)(6) and § 1677a(d) explicitly establish that
Commerce cannot use affiliated supplier cost data when running the
model-match methodology, calculating the difmer adjustment and
recalculating inventory carrying costs prior to deducting this
expense from CEP, the Court must proceed to determine whether
Commerce's interpretation of the statute is reasonable and in
accordance with its legislative purpose. See Chevron, 467 U.S. at
843.

Congress has: (1) implicitly delegated authority to Commerce
to select an appropriate methodology for determining appropriate
matches under § 1677(16); (2) granted Commerce discretion to
determine a suitable method to calculate a difmer adjustment
pursuant to § 1677b(a)(6); and (3) omitted to provide details
regarding the precise calculations for each particular adjustment
that Commerce makes with respect to the recalculation of inventory
carrying costs under § 1677a(d). See §§ 1677(16), 1677b(a)(6) and
1677a(d); see also Final Results, 63 Fed. Reg. at 2574; Koyo Seiko
Co. v. United States, 66 F.3d 1204, 1209 (Fed. Cir. 1995),
("Congress has implicitly delegated authority to Commerce to
determine and apply a model-match methodology necessary to yield

'such or similar' merchandise [that is, what is now referred to as "foreign like product"] under [§ 1677(16)]").

In the Final Results, Commerce explained its use of affiliated supplier cost data for running its model match methodology, calculating the difmer adjustment and recalculating NSK's inventory carrying costs as follows:

> [t]he adjustment [Commerce] made for NSK's affiliated-party inputs is actually an adjustment to its reported material costs. Because material costs are a component of . . . VCOM and . . . TCOM, and these in turn are components of COP and CV, when [Commerce] adjusted NSK's reported material costs [Commerce] not only recalculated [NSK's] COP and CV, but [Commerce] effectively recalculated VCOM and TCOM components of COP and CV as well.
>
>    . . . [Commerce] does not rely on a respondent's reported costs solely for the calculation of COP and CV. [Commerce] also use[s] cost information in a variety of other aspects of [Commerce's] margin calculations. For example, when determining the commercial comparability of the foreign like product in accordance with section [1677(16)] . . . , it has been our long-standing practice to rely on the product-specific VCOMs and TCOMs for U.S. and home market merchandise. Likewise, when calculating a difmer adjustment to NV in accordance with section [1677b(a)(6)] . . . , it has been [Commerce's] consistent policy to calculate the adjustment as the difference between the product-specific VCOMs for the U.S. and home market merchandise compared . . . . Furthermore, [Commerce] ha[s] permitted respondents to calculate their reported [inventory carrying costs] on the basis of TCOM.

Final Results, 63 Fed. Reg. at 2574.

Commerce further states:

> [I]f [Commerce] determine[s] a component of a respondent's COP and CV is distortive for one aspect of

> [Commerce's] analysis, it is reasonable to make the same
> determination with respect to those other aspects of
> [Commerce's] margin calculations where [Commerce] relied
> on the identical cost data.  To do otherwise would not
> only produce distortive results but would be contrary to
> [Commerce's] mandate to administer the dumping laws as
> accurately as possible.

Id.

The Court also holds that § 1677b(f) does not restrict the use of affiliated supplier cost data to purposes other than calculating COP and CV.  Although the SAA provides in relevant part that "[u]nder the existing statute [that is, §§ 1677b(f)(2) and (3)], these provisions literally apply only to the calculation of constructed value . . . [and] cost of production[,] . . ." the Court finds that it would be anamolous to interpret this language as implying that Congress' intention was to prohibit Commerce from using affiliated supplier cost data for other purposes.  H.R. Doc. 103-316, at 838-39.  "When construing an act of Congress, and especially when determining the essential characteristic of a particular statute, we must observe and understand the statute as a whole."  Yankee,  112 F.3d at 1576 (quoting Richards v. United States, 369 U.S. 1, 11, 82 S.Ct. 585, 7 L.Ed. 2d. 492 (1962), that states that a Court "believe[s] it fundamental that a section of a statute should not be read in isolation from the context of the whole Act"; In re Nantucket, Inc., 677 F.2d 95, 98 (CCPA 1982), that states that "[e]ach part or section of a statute should be construed

in connection with every other part or section so as to produce a harmonious whole, and it is not proper to confine interpretation to the one section to be construed"). The statute, read as a whole, does not show Congressional intent to restrict the use of affiliated supplier cost data solely to COP and CV calculations and in effect, tie the hands of Commerce while parties could distort dumping margins with impunity. Commerce has an overriding mandate to calculate accurate dumping margins. See Bowe-Passat v. United States ("Bowe"), 17 CIT 335, 340 (1993). Based on the foregoing, the Court finds that Commerce's use of affiliated supplier cost data for purposes other than the calculation of COP and CV is reasonable and in accordance with law.

## XIII. Commerce's Denial of a Partial Price-Based LOT Adjustment to NV for CEP Sales

### A. Background

During this review, Commerce applied a CEP offset under 19 U.S.C. § 1677b(a)(7)(B) to NV for all of NSK's CEP sales. See Def.'s Mem. at 91. In reaching this result, "Commerce first determined that for NSK there was one CEP LOT and two home market LOTs, [that is,] original equipment manufacturer ("OEM") and aftermarket ("AM"), and that the CEP LOT was not the same as either home market LOT." See id. Commerce found that "because NSK lacked home market sales at a LOT equal to NSK's CEP sales, there was no

information on the record that would enable Commerce to quantify the price differences between the CEP LOT and either of the two NV levels, i.e., OEM and AM." Id. Commerce also determined it lacked the information that provides an appropriate basis for determining a level-of-trade adjustment. Id. For NSK's CEP sales, Commerce "determined that a CEP offset adjustment [pursuant to § 1677b(a)(7)(B)] was appropriate for all of the NV transactions that were matched to CEP, because these NV transactions were at a more advanced stage of distribution than the CEP transactions."[28] Id. Contrary to NSK's contentions, Commerce concluded that no provision of the antidumping statute provides for a "partial" LOT adjustment "between two home market LOTs where neither level is equivalent to the LOT of the U.S. sale." Final Results, 63 Fed. Reg. at 2578.

### B.   Contentions of the Parties

NSK agrees with the manner in which Commerce determined the LOT of its CEP for NV transactions. See NSK's Mem. at 18. In particular, NSK agrees that Commerce properly used the CEP as adjusted for § 1677a(d) expenses prior to its LOT analysis. NSK, however, argues that Commerce should have granted it a "partial"

---

[28] According to Commerce, "[a] CEP offset is made only when the LOT of the home market sale is more advanced than the LOT of the CEP sale and there is not an appropriate basis for determining whether there is an effect on price comparability." Final Results, 63 Fed. Reg. at 2577.

price-based LOT adjustment.  See id. at 19.

NSK first notes that Commerce found two LOTs in the home market, one corresponding to OEM sales and the other to AM sales. See id.  NSK also agrees that when Commerce matched CEP sales to home market OEM sales, Commerce correctly applied a CEP offset because there was no basis for quantifying a price-based LOT adjustment for CEP to OEM NV matches.  See id.  Further, NSK notes that "Commerce correctly concluded that there was no record information that would allow Commerce to quantify the downward price adjustment to adjust fully the AM NV [LOT] to the CEP [LOT]." Id. NSK however disagrees with Commerce's decision to apply a CEP offset when Commerce matched CEP sales to home market AM sales.  See id. In these situations, NSK argues, § 1677b(a)(7)(A) and the SAA direct Commerce to calculate a partial price-based LOT adjustment to NV for CEP sales measured by the price differences between OEM and AM LOTs. See id. at 19-20.

NSK notes that the statute directs Commerce to adjust NV for any difference between CEP and NV "wholly or partly" due to a difference in LOT between CEP and NV.  Id. at 19 (citing § 1677b(a)(7)(A)).   NSK also points out that § 1677b(a)(7)(B) indicates that a CEP offset should only be used in the total absence of price-based LOT adjustments.  See NSK's Mem. at 19.  Accordingly, NSK claims that since there was evidence for quantifying price

differences between OEM and AM LOTs, Commerce's failure to calculate a price-based LOT adjustment that partly accounted for such LOT differences violated the plain language of § 1677b(a)(7)(A). <u>See</u> NSK's Reply at 10.

Commerce argues that it properly denied a partial LOT adjustment and applied a CEP offset to NV for all of NSK's CEP transactions. <u>See</u> Def.'s Mem. at 91-101. Contrary to NSK's reading of § 1677b(a)(7)(A), Commerce asserts that the statute only provides for an LOT price-based adjustment to NV based upon price differences in the home market between the CEP LOT and NV LOT when the differences can be quantified. <u>See id.</u> at 98-99. Commerce claims that the statute does not authorize an LOT price-based adjustment based upon different LOTs in the home market when the price difference between the CEP LOT sales and the home market LOT sales cannot be quantified. <u>See id.</u> at 91, 96-99; <u>see also</u> <u>Final Results</u>, 63 Fed. Reg. at 2578 (explaining that Commerce does not read into § 1677b(a)(7)(A)'s "wholly or partly" language the authority to make an LOT adjustment based on differences between two home market LOTs where neither level is equivalent to the level of the United States sale).

Timken agrees with Commerce's positions, emphasizing that Commerce: (1) properly denied an LOT adjustment for NSK's CEP sales; and (2) reasonably interpreted § 1677b(a)(7)(A) as not providing for

a "partial" LOT adjustment as contended by NSK.  See Timken's Resp.
at 55-56.


###    C.    Analysis

This issue has already been decided in NTN Bearing, 24 CIT at
___, 104 F. Supp. 2d at 127-31.  As this Court explained in NTN
Bearing, Commerce's decision to deny NSK a partial price-based LOT
adjustment measured by price differences between home market OEM and
AM sales was in accordance with law.  There is no indication in §
1677b(a)(7)(A) that the pattern of price differences between two
LOTs in the home market, absent a CEP LOT in the home market,
justifies an LOT adjustment.  Rather, Commerce's interpretation of
§ 1677b(a)(7)(A) as only providing an LOT adjustment based upon
price differences in the home market between the CEP LOT and the NV
LOT was reasonable, especially in light of the existence of the CEP
offset to cover situations such as those at issue here.


**XIV. Commerce's Calculation of CEP for Further-Manufactured
     Merchandise and Its Application of Facts Available**

###    A.    Background

An antidumping duty is imposed upon imported merchandise when:
(1) Commerce determines such merchandise is being dumped, that is,
sold or likely to be sold in the United States at less than fair
value; and (2) the International Trade Commission determines that

an industry in the United States is materially injured or is threatened with material injury. See 19 U.S.C. § 1673; 19 U.S.C. § 1677(34) (1994). To determine whether there is dumping, Commerce compares the price of the imported merchandise in the United States to the NV for the same or similar merchandise in the home market. See 19 U.S.C. § 1677b (1994). The price in the United States is calculated using either an export price or constructed export price. See 19 U.S.C. § 1677a(a), (b); see also, H.R. Doc. No. 103-316, at 822 (Commerce will classify the price of a United States sales transaction as a CEP "[i]f, before or after the time of importation, the first sale to an unaffiliated person is made by (or for the account of) the producer or exporter or by a seller in the United States who is affiliated with the producer or exporter"); AK Steel Corp. v. United States, 226 F.3d 1361 (Fed. Cir. 2000) (discussing when to apply EP or CEP methodology).

Commerce must reduce the price used to establish CEP by any of the following amounts associated with economic activities occurring in the United States: (1) commissions paid in "selling the subject merchandise in the United States"; (2) direct selling expenses, that is, "expenses that result from, and bear a direct relationship to, the sale, such as credit expenses, guarantees and warranties"; (3) "any selling expenses that the seller pays on behalf of the purchaser" (assumptions); (4) indirect selling expenses, that is,

any selling expenses not deducted under any of the first three categories of deductions; (5) certain expenses resulting from further manufacture or assembly (including additional material and labor) performed on the merchandise after its importation into the United States; and (6) profit allocated to the expenses described in categories (1) through (5).  19 U.S.C. § 1677a(d)(1)-(3); see H.R. Doc. 103-316, at 823-24.

Commerce calculates the expenses resulting from further manufacture or assembly using one of two statutory methods.  See 19 U.S.C. § 1677a(d), (e).  The first method provides that Commerce shall reduce "the price used to establish constructed export price [by] . . . the cost of any further manufacture or assembly (including additional material and labor), except in [certain] circumstances."  19 U.S.C. § 1677a(d)(2).  When the first method does not apply, Commerce applies a special rule for merchandise with value added after importation ("Special Rule").  See 19 U.S.C. § 1677a(e) (1994).  The Special Rule provides that:

> [w]here the subject merchandise is imported by a person affiliated with the exporter or producer, and the value added in the United States by the affiliated person is likely to exceed substantially the value of the subject merchandise, [Commerce] shall determine the constructed export price for such merchandise by using one of the following prices if there is a sufficient quantity of sales to provide a reasonable basis for comparison and [Commerce] determines that the use of such sales is appropriate:
>
>     (1) The price of identical subject merchandise sold by

the exporter or producer to an unaffiliated person.

    (2) The price of other subject merchandise sold by
the exporter or producer to an unaffiliated person.

If there is not a sufficient quantity of sales to provide
a reasonable basis for comparison under paragraph (1) or
(2), or [Commerce] determines that neither of the prices
described in such paragraphs is appropriate, then the
constructed export price may be determined on any other
reasonable basis.

19 U.S.C. § 1677a(e).

On January 29, 1997, Koyo requested that Commerce apply the

Special Rule pursuant to 19 U.S.C. § 1677a(e) for certain of Koyo's

imported bearings and bearing parts further manufactured in the

United States prior to being sold to an unaffiliated customer. See

Koyo's Mem. Ex. 1. Moreover, Koyo requested that Commerce exempt

it from completing a certain section of Commerce's questionnaire

that required Koyo to report sales and cost data information for its

further manufactured sales. See id. Although Commerce notified

Koyo on February 18, 1997, that Koyo was not currently required to

respond to the particular section of the questionnaire, Commerce

also cautioned Koyo by stating "this information is subject to

verification and may be required for future submission." Koyo's

Mem. Ex. 2. Commerce then, in the Final Results, determined that:

    the record does not lead [Commerce] to conclude that the
    use of either of the two alternative methods described in
    section [1677a(e)(1) and (2)] with respect to Koyo's
    further-manufactured subject merchandise is appropriate.
    The record indicates that Koyo's U.S. sales of further-
    manufactured subject merchandise represented a large

portion of its total U.S. sales of subject merchandise
during the POR.  Therefore, the use of either of the
proxy methods in this case--where the proportion of
further-manufactured sales is relatively high--would have
a relatively high potential for inaccuracy.  In addition,
as noted in [Commerce's] preliminary results, the
finished merchandise sold by Koyo to the first unrelated
U.S. customer was still in the same class or kind as
merchandise within the scope of the TRB order and finding
(i.e., imported TRB components were processed into TRBs).
As a result, the calculation of the precise amount of
cost of further manufacturing would not be nearly as
burdensome as it would be for . . . another respondent
who imported TRBs for incorporation in automobiles.
Furthermore, in prior reviews [Commerce has] calculated
margins for Koyo's further-processed sales and ha[s]
extensive experience with and knowledge of Koyo's
further-manufactured sales and the calculation of the
cost of further manufacturing in the United States with
respect to these sales.  Therefore, in this case Commerce
ha[s] determined that for Koyo the relatively small
reduction of burden on Commerce that would result from
resorting to either of the two statutory proxy methods
under the [S]pecial [R]ule is outweighed by the potential
distortion and losses in accuracy as a consequence of
their use.  Accordingly, Commerce ha[s] rejected the use
of either of the two proxies as inappropriate and ha[s]
sought to calculate the CEP for Koyo's further
manufactured sales using another reasonable basis.

Final Results, 63 Fed. Reg. at 2561.


As another reasonable method, Commerce chose its standard

methodology under § 1677a(d)(2) to calculate the CEP of Koyo's

further manufactured merchandise and found that this methodology was

not only not burdensome but also "presented a higher probability of

accurate results than using margins calculated for non-further-

manufactured sales."  Def.'s Mem. at 103-104 (citing Final Results,

63 Fed. Reg. at 2561).  Accordingly, Commerce requested that Koyo

provide Commerce with responses to the particular section of the questionnaire.  See Koyo's Mem. Ex. 3.  Koyo refused to submit responses to the particular section and proposed that Commerce, as an alternative methodology, apply the margins on finished products to the further-manufactured products.  See Koyo's Mem. Exs. 4, 6. In particular, Koyo proposed

> that [Commerce] instead of evaluating whether the margins
> for finished over 4 [inch] A-588-604 bearings were an
> appropriate surrogate for A-588-604 further-manufactured
> merchandise, could have used the margins it calculated
> for under 4 [inch] A-588-054 bearings as a proxy for that
> A-588-604 merchandise which was further processed into
> under 4 [inch] bearings, and the margins calculated for
> over 4 [inch] bearings as a proxy for that A-588-604
> merchandise which was further processed into over 4
> [inch] bearings.

Final Results, 63 Fed. Reg. at 2562.

Koyo alternatively proposed that Commerce could have "compare[d] the value of all finished bearings [0-4 inch A-588-604 TRBs and over 4 inch A-588-604 TRBs] to the value of all further-processed components [that is, 0-4 inch A-588-054 further-manufactured TRBs and over 4 inch A-588-604 further-manufactured TRBs]."  Koyo's Mem. at 26-27.  Commerce responded that:

> [w]hile Koyo's proposal would be less burdensome than the
> use of the standard methodology, [Commerce] believe[s]
> that the standard methodology is not unduly burdensome
> and presents a higher probability of accurate results
> than using margins calculated for non-further-
> manufactured sales.  Among other things, Koyo's proposal
> relies on information concerning a different class or
> kind of merchandise and therefore in this case does not
> sufficiently allay concerns about potential inaccuracy.

> The record indicates that the use of these proxy methods would have a relatively high potential for distortion; [Commerce] believe[s] that the gains in accuracy that [Commerce] would achieve using the standard methodology would outweigh the additional burden resulting from the use of the standard calculation. The record supports [Commerce's] continued use of the standard methodology as a reasonable basis for calculating the CEP for Koyo's further-manufactured merchandise.

Final Results, 63 Fed. Reg. at 2562.

Therefore, since Koyo refused to respond to the particular section, Commerce, pursuant to § 1677e(b), "selected as adverse facts available the highest rate ever calculated for Koyo in any previous review of the TRBs at issue . . . [and applied this] rate . . . to the total entered value of Koyo's further-manufactured sales" to calculate the CEP of Koyo's further-manufactured merchandise. Def.'s Mem. at 108 (citing Final Results, 63 Fed. Reg. at 2562).

### B.   Contentions of the Parties

#### 1. Koyo's Contentions

Koyo and Commerce both agree that "Koyo met the 'substantially exceeds' qualification[29] for implementation of the [S]pecial [R]ule" under § 1677a(e). Koyo's Mem. at 19 (citing Final Results, 63 Fed.

---

[29] The "substantially exceeds" qualification is met when "the value added in the United States by the affiliated person is likely to exceed substantially the value of the [imported] merchandise." 19 U.S.C. § 1677a(e).

Reg. at 2561). Koyo does not argue that Commerce erred in not selecting one of the two proxies under § 1677a(e). See Koyo's Mem. at 17. Koyo, however contends that Commerce erred in using, as another "reasonable basis," its standard methodology pursuant to § 1677a(d) to calculate Koyo's further-manufactured merchandise. See id. at 20-26. In particular, Koyo argues that Commerce's use of its standard methodology, that is, "a full-blown further manufacturing analysis violates both the letter and the intent of the statute." Id. at 27. Koyo, therefore, maintains that since the Special Rule under § 1677a(e) applies in this case, Commerce cannot employ as an "other reasonable basis" under § 1677a(e) its standard methodology pursuant to § 1677a(d) to calculate Koyo's further manufactured merchandise.[30] See id. at 28.

Rather, Koyo asserts that Commerce should have used Koyo's proposed methodology to calculate the CEP of Koyo's further-manufactured merchandise. See Koyo's Mem. at 19-27. In particular, Koyo proposed that:

> instead of evaluating whether the margins calculated on the finished over 4 [inch A-588-604] TRBs were an appropriate proxy for the margins on imported bearing parts destined to become both 0-4 [inch A-588-604] TRBs and over 4 [inch A-588-604] TRBs, [Commerce] should have looked to the margins on finished 0-4 [inch A-588-054] TRBs as a proxy for parts further manufactured into 0-4

---

[30] Koyo argues that "any other reasonable basis [under § 1677a(e)] cannot include a reversion to the full further processing methodology." Koyo's Reply at 19.

[inch A-588-604] TRBs, and the margins on finished over
4 [inch A-588-604] as a proxy for parts further
manufactured into over 4 [inch A-588-604] TRBs.

Id. at 22.  Koyo maintains that "[s]uch a comparison conforms

closely with the statutory preference for relying on 'identical

subject merchandise,' 19 U.S.C. § 1677a(e)(1), or, as a second

choice, 'other subject merchandise,' 19 U.S.C. § 1677a(e)(2), as a

proxy for the further manufactured parts."  Id. at 22-23.  Koyo

further asserts that its proposed methodology would: (1) be less

burdensome than Commerce's selected standard methodology; (2) not

cause the possible high level of distortion in the antidumping

margin as Commerce alleges.  See id. at 23-26.

Koyo also proposed an alternative methodology to its proposed

methodology.  See id. at 26.  In particular, Koyo alleges that

Commerce could have "compare[d] the value of all finished bearings

[0-4 inch A-588-604 TRBs and over 4 inch A-588-604 TRBs] to the

value of all further-processed components [that is, 0-4 inch A-588-

054 further-manufactured TRBs and over 4 inch A-588-604 further-

manufactured TRBs]."  Id.  Koyo maintains that this proposed

methodology would qualify as "another reasonable basis" pursuant to

§ 1677a(e).  See id. at 27.  Furthermore, Koyo asserts that

regardless of which of its two proposed methodology Commerce were

to follow, there is nothing on the record that the proposed

methodologies would not provide for accurate dumping margins or

would not reduce the burden on Commerce to perform a standard further-manufactured merchandise analysis.  Id.

Koyo also contends that Commerce unlawfully applied adverse facts available to Koyo's further-manufactured merchandise.  See Koyo's Reply at 18-22.  Koyo asserts that because the statutory language under § 1677a(d)(2) provides that "the price used to establish [CEP] shall . . . be reduced by . . . the cost of any further manufacture or assembly (including additional material and labor), except in circumstances described in subsection(e) of this section," Commerce cannot revert to § 1677a(d)(2) and deduct the cost of further manufacture and assembly, that is, perform a full-blown further manufacturing analysis.  Id. at 19 (quoting § 1677a(d)(2)) (emphasis supplied).  Therefore, Koyo maintains that Commerce acted unlawfully by applying adverse facts available and had no authority to demand that Koyo provide responses to the particular section of the questionnaire.  See Koyo's Reply at 19.

Koyo alternatively argues that "if the statute did accord [Commerce] the discretion to resort to the traditional further processing analysis despite the fact that the criteria for the '[S]pecial [R]ule' are satisfied . . . , [Commerce's] justification for doing so in this case is without support on the record."  Id. at 20.  In particular, Koyo argues that Commerce did not provide any record evidence or support for its proposition that Koyo's proposed

alternative methodologies for calculating the CEP of Koyo's further-manufactured merchandise would be distortive. See id. at 20-22. Moreover, Koyo asserts that Commerce's denial of Koyo's proposed alternative methods on the basis of them being distortive is not supported by substantial evidence. See id. at 22. Koyo, therefore, requests that this Court remand to Commerce with instructions "not to apply the standard further manufacturing analysis under § 1677a(d)(2) to calculate Koyo's margins, nor to apply adverse facts available in response to Koyo's failure to submit a response to [the particular section] of the questionnaire." Koyo's Mem. at 29.

Finally, Koyo maintains if the Court finds that Commerce had the authority to apply adverse facts available to Koyo's further-manufactured merchandise, then the Court should sustain Commerce's application of adverse facts available to entered value rather than sales value of the finished TRBs as Timken argues Commerce should have used. See Koyo's Mem. Resp. Timken's Mot. J. Agency R. ("Koyo's Resp.") at 16-22. In particular, Koyo asserts that Commerce acted within 19 U.S.C. § 1677e when it "appl[ied] the facts available margin rate to [Koyo's] entered value . . ." and Commerce's approach is more reasonable than Timken's suggested approach of applying the adverse facts available margin rate to Koyo's sales value because Commerce's "methodology . . . was both reasonable and bore 'a rational relationship to the [subject] matter

at issue[,]'" id. at 18 (quoting Koenig & Bauer-Albert AG v. United

States, 22 CIT 574, 584, 15 F. Supp. 2d 834, 846 (1998)), vacated

in part on other grounds, 259 F.3d 1341 (Fed. Cir. 2001).  Koyo

further alleges that

> Timken's approach would result in the application of the
> dumping margin to manufacturing that took place in the
> United States, that is, to U.S. value-added. It would
> violate the premise of the antidumping law to apply
> duties to the value of U.S. manufacturing rather than the
> value of imported merchandise.  The entire purpose of
> [Commerce's] further-manufacturing exercise is to "back
> out" the value added in the United States to find the
> "value" of the imported subject merchandise.  Because the
> subject merchandise in this case was forgings, and
> because the statue does not contemplate imposing
> antidumping duties on manufacturing done in the United
> States, [Commerce's] reliance on the entered value of
> forgings rather than the sales value of finished bearings
> incorporating significant U.S. value-added, was
> reasonable and rationally related to the task at hand.

Koyo's Resp. at 19-20.


Koyo further contends that Timken's arguments that Commerce

erred in not calculating the highest potential uncollected dumping

duties possible and the unreliability of transfer prices (that is,

Koyo's entered value of imported forgings) are without merit.

Id. at 20-22.  Therefore, Koyo maintains that "to the extent that

any application of adverse facts available was appropriate in this

case," the Court should affirm Commerce's methodology as reasonable

and in accordance with law.  Id. at 22.

### 2. Commerce's Contentions

Commerce contends that Congress has granted to Commerce broad discretion in determining when the use of "any other reasonable basis" under § 1677a(e) is appropriate.  Def.'s Mem. at 105-08. Commerce maintains that "[n]either the statute nor the SAA prohibits Commerce from using the more burdensome standard [§ 1677a] (d)(2) methodology as an alternative reasonable method where the agency finds that neither alternative under [§§ 1677a](e)(1) or (e)(2) is appropriate."  Id. at 107.  In this case, Commerce determined that

> the record does not lead [Commerce] to conclude that the use of either of the two alternative methods described in section [1677a(e)(1) and (2)] with respect to Koyo's further-manufactured merchandise is appropriate.  The record indicates that Koyo's U.S. sales of further-manufactured subject merchandise represented a large portion of its total U.S. sales of subject merchandise during the POR.  Therefore, the use of either of the proxy methods in this case--where the proportion of further-manufactured sales is relatively high--would have a relatively high potential for inaccuracy. In addition, as noted in [Commerce's] preliminary results, the finished merchandise sold by Koyo to the first unrelated U.S. customer was still in the same class or kind as merchandise within the scope of the TRB order and finding (i.e., imported TRB components were processed into TRBs). As a result, the calculation of the precise amount of cost of further manufacturing would not be nearly as burdensome as it would be for . . . another respondent who imported TRBs for incorporation in automobiles. Furthermore, in prior reviews [Commerce has] calculated margins for Koyo's further processed sales and ha[s] extensive experience with and knowledge of Koyo's further-manufactured sales and the calculation of the cost of further manufacturing in the United States with respect to these sales.  Therefore, in this case [Commerce has] determined that for Koyo the relatively small reduction of burden on [Commerce] that would result from resorting to either of the two statutory proxy

methods under the [S]pecial [R]ule is outweighed by the potential distortion and losses in accuracy as a consequence of their use. Accordingly, [Commerce has] rejected the use of either of the two proxies as inappropriate and ha[s] sought to calculate the CEP for Koyo's further manufactured sales using another reasonable basis.

Final Results, 63 Fed. Reg. at 2561.

Commerce does agree that: (1) Koyo's proposed methodology would be less burdensome than Commerce's standard methodology under § 1677a(d)(2); and (2) "that one of the underlying purposes of section 1677a(e) was to provide a mechanism for avoiding certain complexities involved in the standard further manufacturing analysis set forth in section 1677a(d)(2)." Def.'s Mem. at 107; See Final Results, 63 Fed. Reg. at 2562. Commerce, however, cites to Bowe, 17 CIT at 340 realizing its overriding mandate to calculate accurate dumping margins and points out in the Final Results that

the standard methodology [pursuant to § 1677a(d)(2)] is not unduly burdensome and presents a higher probability of accurate results than using margins calculated for non-further-manufactured sales. . . . Koyo's proposal relies on information concerning a different class or kind of merchandise and therefore in this case does not sufficiently allay concerns about potential inaccuracy [that is, Koyo relied on information from two different dumping orders when it proposed that Commerce should have looked to the margins on finished 0-4 inch A-588-054 TRBs as a proxy for parts further manufactured into 0-4 inch A-588-604 TRBs].

Final Results, 63 Fed. Reg. at 2562.

Commerce argues that its determination, pursuant to § 1677a(e),

is limited to the scope of the order and is not permitted to include non-subject sales since the statute refers to "identical or other subject merchandise." See Final Results, 63 Fed. Reg. at 2562. Contrary to Commerce's argument, Koyo contends that "in authorizing [Commerce] to use 'other reasonable means' to calculate the margins, Congress must have envisioned that [Commerce] would use non-subject merchandise, i.e., merchandise not subject to the same order, as a proxy." Koyo's Mem. at 24. Moreover, Commerce asserts that "the greater the proportion of further-manufactured to non-further-manufactured merchandise, the greater the possibility of inaccurate results." Final Results, 63 Fed. Reg. at 2561.

Commerce also contends that it acted in accordance with 19 U.S.C. § 1677e, when it used the adverse facts available margin rate to calculate the CEP of Koyo's further-manufactured merchandise. See Def.'s Mem. at 108. In particular, Commerce argues that, since Koyo failed to act to the best of its ability by refusing to respond to the particular section of Commerce's questionnaire, Commerce properly selected the adverse facts available margin rate and applied it to the total entered value of Koyo's further-manufactured merchandise. See id. Contrary to Timken's argument that Commerce should have applied facts available to Koyo's total sales value of the further-manufactured sales rather than to the entered value of Koyo's sales, Commerce maintains that it "is not required by the

statute to select a method that is 'the most' or 'more' reasonably adverse." Id. Commerce also argues that Timken has not provided any evidence or arguments that the adverse facts available margin rate that Commerce applied was not reasonably adverse. See id. at 109.

Commerce further contends that Timken does not provide "any evidence demonstrating that the transfer prices that Koyo reported as entered values are unreliable." Id. Finally, Commerce argues that the record indicates that Koyo's transfer prices were maintained within the ordinary course of business and for purposes besides antidumping proceedings (i.e., for United States tax purposes and United States Customs' reviews). See id.

### 3. Timken's Contentions

Timken agrees with Commerce's resorting to its standard methodology under § 1677a(d)(2) as an alternative reasonable method and argues that Commerce has broad discretion as to when to use "any other reasonable basis" under § 1677a(e). See Timken's Resp. at 47-50. Moreover, Timken maintains that "[n]o court (much less Koyo) may substitute its judgment for that of the Commerce Department (absent action contrary to the statute)[.]" Id. at 48. Timken, however, disagrees with Commerce's application of the adverse facts available margin to Koyo's entered value and argues that Commerce

should have applied its facts available rate to Koyo's sales value rather than Koyo's entered value. See Timken's Mem. Supp. Rule 56.2 Mot. J. Agency R. ("Timken's Mem.") at 22-28. Timken contends that Commerce's application of the adverse facts available margin to Koyo's entered value was unlawful because: (1) transfer prices are not reliable, see id.; (2) "the [facts available] scheme presumes that the choice of 'facts available' will be not only adverse but sufficiently adverse to accomplish the purpose of encouraging a respondent's full cooperation"; and (3) Commerce "rewarded Koyo's refusal to supply requested information by applying the [facts available] rate to Koyo's entered value, rather than to its sales value, for further processed merchandise, which resulted in a lower [facts available] margin for Koyo." Timken's Reply Resp. Brs. Def., NTN, Koyo, and NSK. ("Timken Reply") at 16, 18.

### C. Analysis

The first issue is whether Commerce's use of its standard methodology pursuant to § 1677a(d)(2) constitutes another "reasonable basis" under § 1677a(e). To determine whether Commerce's interpretation and application of the antidumping statute is in accordance with law, the Court must undertake the two-step analysis prescribed by Chevron, 467 U.S. 837. Under the first step, the Court reviews Commerce's construction of a statutory provision to determine whether "Congress has directly spoken to the precise

question at issue." Chevron, 467 U.S. at 842. "To ascertain whether Congress had an intention on the precise question at issue, [the Court] employ[s] the 'traditional tools of statutory construction.'" Timex V.I., Inc. v. United States, 157 F.3d 879, 882 (Fed. Cir. 1998) (citing Chevron, 467 U.S. at 843 n.9). "The first and foremost 'tool' to be used is the statute's text, giving it its plain meaning. Because a statute's text is Congress's final expression of its intent, if the text answers the question, that is the end of the matter." Id. (citation omitted).

The end clause of 19 U.S.C. § 1677a(e) clearly provides Commerce with a great deal of discretion in adjusting CEP for the cost of further manufacture and assembly. See § 1677a(e). Under § 1677a(e), when the value added to subject merchandise in the United States is likely to substantially exceed the value of the merchandise, Commerce must use specified surrogate prices if two conditions are met. See id. The first condition in the preamble of § 1677a(e) that there be "a sufficient quantity of sales to provide a reasonable basis for comparison," is not at issue here. Id. The second condition in the preamble of § 1677a(e) requires Commerce to "determine[] that the use of such sales is appropriate." Id. Thus, Commerce is not forced to use the surrogate prices if it determines that their use is not "appropriate." Id. According to the end clause of § 1677a(e), Commerce is permitted to determine CEP

"on any other reasonable basis."  Id.

Commerce, therefore, may determine the method by which to calculate CEP, when it finds that the use of the surrogate prices is not appropriate.  This holds true even if Commerce finds that the value added in the United States "is likely to exceed substantially the value of the subject merchandise."  19 U.S.C. § 1677a(e).  Thus, even if Commerce finds that Koyo's added value substantially exceeds the value of the merchandise, Commerce still has the discretion to refuse to apply the Special Rule.[31]

> In the case at bar, Commerce determined that
>
> the record does not lead [Commerce] to conclude that the use of either of the two alternative methods described in section [1677a(e)(1) and (2)] with respect to Koyo's further-manufactured merchandise is appropriate.  The record indicates that Koyo's U.S. sales of further-manufactured subject merchandise represented a large portion of its total U.S. sales of subject merchandise during the POR.  Therefore, the use of either of the proxy methods in this case--where the proportion of further-manufactured sales is relatively high--would have a relatively high potential for inaccuracy.  In addition, as noted in [Commerce's] [P]reliminary [R]esults, the finished merchandise sold by Koyo to the first unrelated U.S. customer was still in the same class or kind as merchandise within the scope of the TRB order and finding (i.e., imported TRB components were processed into TRBs). . . .

Final Results, 63 Fed. Reg. at 2561.

---

[31]    In fact, neither Commerce nor Koyo dispute that the value added to Koyo's merchandise substantially exceeded the value of the merchandise.  See Koyo's Mem. at 19 (citing Final Results, 63 Fed. Reg. at 2561).

The Court finds that Commerce acted within the discretion afforded to it by § 1677a(e) in refusing to apply the Special Rule to Koyo in this review. The Court will not require Commerce to use the Special Rule when it finds the use of the Special Rule inappropriate, since the imposition of such a requirement would be contrary to § 1677a(e). Therefore, since Commerce found that neither alternative under §§ 1677a(e)(1) nor (e)(2) were appropriate, Commerce's resort to its standard methodology under § 1677a(d)(2) as an alternative reasonable method is affirmed.[32]

Next, the Court must determine whether Commerce's application of the adverse facts available margin rate to Koyo's entered value in order to calculate the CEP of Koyo's further-manufactured merchandise was in accordance with law. The antidumping statute mandates that Commerce use "facts otherwise available" if "necessary information is not available on the record" of an antidumping proceeding. 19 U.S.C. § 1677e(a)(1). In addition, Commerce may use facts available where an interested party or any other person: (1) withholds information that has been requested by Commerce; (2) fails

---

[32] Although Koyo proposes two alternative methodologies, the Court's "duty is not to weigh the wisdom of, or to resolve any struggle between, competing views of the public interest, but rather to respect legitimate policy choices made by the agency in interpreting and applying the statute." Suramerica de Aleaciones Laminadas, C.A. v. United States, 966 F.2d 660, 665 (Fed. Cir. 1992).

to provide the requested information by the requested date or in the form and manner requested, subject to 19 U.S.C. § 1677m(c)(1), (e) (1994); (3) significantly impedes an antidumping proceeding; and (4) provides information that cannot be verified as provided in 19 U.S.C. § 1677m(i). See id. § 1677e(a)(2)(A)-(D). Section 1677e(a) provides, however, that the use of facts available shall be subject to the limitations set forth in 19 U.S.C. § 1677m(d).

Once Commerce determines that use of facts available is warranted, § 1677e(b) permits Commerce to apply an "adverse inference" if it can find that "an interested party has failed to cooperate by not acting to the best of its ability to comply with a request for information." Such an inference may permit Commerce to rely on information derived from the petition, the final determination, a previous review or any other information placed on the record. See 19 U.S.C. § 1677e(c) (1994). When Commerce relies on information other than "information obtained in the course of the investigation or review, [Commerce] shall, to the extent practicable, corroborate that information from independent sources that are reasonably at [its] disposal." Id.

In order to find that a party "has failed to cooperate by not acting to the best of its ability" pursuant to § 1677e(b), it is not sufficient for Commerce to merely assert this legal standard as its conclusion or repeat its finding concerning the need for facts

available.  See Ferro, 23 CIT at ___, 44 F. Supp. 2d at 1329 ("Once Commerce has determined under 19 U.S.C. § 1677e(a) that it may resort to facts available, it must make additional findings prior to applying 19 U.S.C. § 1677e(b) and drawing an adverse inference"). Rather, Commerce must clearly articulate: (1) "why it concluded that a party failed to comply to the best of its ability prior to applying adverse facts," and (2) "why the absence of this information is of significance to the progress of [its] investigation."  Ferro, 23 CIT at ___, 44 F. Supp. 2d at 1331.

The Court finds that Commerce's decision to apply adverse facts available was in accordance with law.  When Commerce chose to use its standard methodology under § 1677a(d)(2) to calculate the CEP of Koyo's further-manufactured merchandise, Commerce made extensive requests that Koyo provide Commerce with responses to the particular section of the questionnaire.  Specifically, on April 10, 1997, Commerce requested that Koyo provide a response to the particular section of the questionnaire by May 1, 1997.  See Koyo's Mem. Ex. 3.  On May 6, 1997, Koyo responded by letter to Commerce urging Commerce to reconsider its position and proposed to Commerce an alternative methodology.  See Koyo's Mem. Ex. 4.  Commerce, on May 28, 1997, responded to Koyo stating that Koyo was required to submit responses to the particular section by June 9, 1997.  See Koyo's Mem. Ex. 5.  On June 10, 1997, Koyo wrote to Commerce informing

[b]ecause Koyo has no confidence that it will receive even-handed treatment from [Commerce] in the calculation of the fair value of TRBs further-processed from imported forgings, Koyo has chosen <u>not to file</u> a [particular] response in this review.

Koyo's Mem. Ex. 6 at 2 (emphasis supplied).

As a result of Koyo's refusal to provide responses to the particular section and, thereby, failing to act to the best of its ability, Commerce selected as "adverse facts available . . . the highest rate [Commerce] ever calculated for Koyo in any previous review of the [TRBs at issue]." <u>Final Results</u>, 63 Fed. Reg. at 2562. Consequently, Commerce's decision to apply the adverse facts available rate to Koyo's entered value to calculate the CEP of Koyo's further-manufactured merchandise was in accordance with law.

The Court also finds that Timken's argument that Commerce should have applied the adverse facts available rate to Koyo's sales value is without merit. As Commerce correctly argues, "[i]n choosing among the facts available, [Commerce is] not required by the statute to select a method that is 'the most' or 'more' reasonably adverse." <u>Final Results</u>, 63 Fed. Reg. at 2562. Rather, this Court affirms Commerce's application of the adverse facts available rate to Koyo's entered value since Commerce's methodology was reasonable.

Accordingly, the Court sustains Commerce's resort to its

standard methodology under § 1677a(d)(2) and its application of the adverse facts available rate to Koyo's entered value to determine the CEP of Koyo's further manufactured merchandise.

## XV.  Calculation of the Antidumping Duty Assessment Rate

### A.    Background

In the subject review, Commerce, following its usual practice in ascertaining cash deposit rates and assessment rates, stated that the "cash deposit rate has been determined on the basis of the selling price to the first unaffiliated U.S. customer.  For appraisement purposes, where information is available, [Commerce] will use the entered value of the merchandise to determine the assessment rate."  Final Results, 63 Fed. Reg. at 2585.

Any of Commerce's findings concerning assessment rates and cash deposit rates are subject to 19 U.S.C. § 1675(a)(1)(B) (1994) which provides that Commerce shall "review, and determine (in accordance with [§ 1675(a)] (2)), the amount of any antidumping duty . . . ." Section 1675(a)(2) further states that the dumping margin "shall be the basis for the assessment of . . . antidumping duties on entries of merchandise . . . ."  19 U.S.C. § 1675(a)(2)(C).

The dumping margin (equal to the amount of antidumping duty owed) is the amount by which NV exceeds the EP or CEP on the subject

merchandise sold during the POR.[33]  See 19 U.S.C. § 1677(35) (1994).

NV is the comparable price for a product like the imported merchandise when first sold (generally, to unaffiliated parties) "for consumption in the exporting country, in the usual commercial quantities and in the ordinary course of trade and, to the extent practicable, at the same level of trade as the export price or constructed export price."  19 U.S.C. § 1677b(a)(1)(B)(i).

The export price means the "price at which the subject merchandise is first sold . . . by the producer or exporter of the subject merchandise outside of the United States to an unaffiliated purchaser," while the constructed export price is the "price at which the subject merchandise is first sold . . . in the United States . . . [by] the producer or exporter . . . to a purchaser not affiliated with the producer or exporter . . . ."  19 U.S.C. § 1677a(a),(b) (1994).

Cash deposit is a provisional remedy.  When Commerce directs Customs to suspend liquidation upon a preliminary determination of dumping, the importer must make a cash deposit of estimated antidumping duties with Customs or post a bond or other security.

---

[33] Because Koyo had only CEP sales during the POR, Koyo's arguments address only the calculation of the assessment rate for CEP sales.  See Koyo's Reply at 22 n.7.  However, for the purpose of our analysis, the outcome would be identical if Koyo had both EP and CEP or only EP sales during the POR.

See 19 U.S.C. § 1675(a)(2)(B)(iii).  Commerce orders the posting of a cash deposit in an amount equal to the estimated average amount by which the foreign market value exceeds the United States price, that is, the dumping margin.  19 U.S.C. § 1673b(d)(1)(B) (1994); see also 19 U.S.C. § 1673e(b) (applying similar calculation for Commerce's final determination).  Commerce then calculates the cash deposit rate by dividing "'the aggregate dumping margins by the aggregated United States prices.'"  National Steel Corp. v. United States ("National Steel"), 20 CIT 743, 746, 929 F. Supp. 1577, 1581 (1996) (citation omitted); accord 19 U.S.C. § 1677(35)(B) (stating that "'weighted average dumping margin' is the percentage determined by dividing the aggregate dumping margins . . . by the aggregate export prices . . . .").  Commerce interprets the term "United States price" as the sale price after Commerce has made all adjustments as provided for by law.  See National Steel, 20 CIT at 746, 929 F. Supp. at 1581.

When an antidumping duty is imposed upon imported merchandise, Commerce calculates an assessment rate for each importer by dividing the dumping margin for the subject merchandise by the entered value of such merchandise for normal Customs purposes.  See 19 C.F.R. § 351.212(b).

In promulgating 19 C.F.R. § 351.212(b), Commerce reasoned as follows:

[Section] 351.212(b)(1) [deals] with the method that [Commerce] will use to assess antidumping duties upon completion of a review. . . . [Commerce] provided that it normally will calculate an "assessment rate" for each importer by dividing the absolute dumping margin found . . . by the entered value . . . . [The regulation] merely codified an assessment method that [Commerce] has come to use more and more frequently in recent years.

Historically, [Commerce] (and, before it, the Department of Treasury) used the so-called "master list" (entry-by-entry) assessment method.  Under the master list method, [Commerce] would list the appropriate amount of duties to assess for each entry of subject merchandise separately in its instructions to the Customs Service. However, in recent years, the master list method has fallen into disuse for two principal reasons.  First, in most cases, respondents have not been able to link specific entries to specific sales, particularly in CEP situations in which there is a delay between the importation of merchandise and its resale to an unaffiliated customer. Absent an ability to link entries to sales, [Commerce] cannot apply the master list method. Second, even when respondents are able to link entries to sales, there are practical difficulties in creating and using a master list if the number of entries covered by a review is large. Preparing a master list that covers hundreds or thousands of entries is a time-consuming process, and one that is prone to errors by [Commerce] and/or Customs Service staff.

Antidumping Duties; Countervailing Duties, 62 Fed. Reg. 27,296, 27,314 (May 19, 1997).

### B.    Contentions of the Parties

#### 1. Koyo's Contentions

Koyo asserts that Commerce unlawfully calculated the antidumping duty assessment rate under 19 C.F.R. § 351.212(b) because Commerce used the entered value for the subject merchandise

as the denominator in the formula.  See Koyo's Mem. at 30-32.  Koyo alleges that because 19 U.S.C. § 1675(a)(2)(A),(C) requires that the dumping margin be calculated as the difference between NV and CEP, and since NV and CEP are both price-based concepts, the logic of the statute necessitates that the denominator used in the formula must also be a price-based concept, specifically, sales value.  See id. at 30.  Koyo, therefore, concludes that Commerce's use of entered value instead of sales value as the denominator is either unreasonable or in violation of the statutory language of 19 U.S.C. §§ 1675(a)(1)(B) and 1675(a)(2).  See id. at 30-31.

Furthermore, Koyo maintains that because Commerce always uses sales value as the denominator for calculating cash deposit rates, Commerce must apply the same calculation method to the assessment rates.  See Koyo's Mem. at 30.  Koyo argues that Commerce's use of different denominators for cash deposit rates and assessment rates creates a distinction between the two that conflicts with the mandate of 19 U.S.C. § 1675(a)(2).  See Koyo's Mem. at 30-31; Koyo's Reply at 25.

Koyo also notes that Commerce's use of 19 C.F.R. § 351.212(b) is unreasonable as applied because all of Koyo's merchandise for the POR was imported solely by Koyo Corporation of U.S.A. and, therefore, Commerce's purpose of using entered value as the denominator in order to "allocate the dumping margin among different

importers that bring Koyo's merchandise into the United States" has
no relevance to Koyo's situation.  Koyo's Reply at 24 (citing Def.'s
Mem. at 112).

Although Koyo concedes that this Court upheld Commerce's
methodology for calculating the assessment rates in <u>Koyo</u>, 16 CIT
539, 796 F. Supp. 1526, <u>vacated in part on other grounds</u>, <u>Koyo 1992</u>,
806 F. Supp. 1008, Koyo asserts that the issue was not finally
resolved by a determination by the CAFC.  <u>See</u> Koyo's Mem. at 30.

Finally, Koyo asserts that the exhaustion doctrine does not
preclude Koyo from raising its claim because the futility exception
applies.  <u>See</u> Koyo's Reply at 23.  In particular, Koyo claims that
since Commerce has used the same methodology to calculate the
assessment rate in past reviews, "it simply would have been a waste
of time and effort--futile--for Koyo to raise this issue . . .
before [Commerce]."  <u>Id.</u>

### 2. Commerce's Contentions

In response, Commerce contends that the calculation of the
assessment rate, pursuant to 19 C.F.R. § 351.212(b), by dividing the
dumping margin by the entered value of the subject merchandise was
reasonable and in accordance with law.  <u>See</u> Def.'s Mem. at 110-13.

According to Commerce, the requirement of 19 U.S.C. §

1675(a)(2) that the amount by which NV exceeds CEP (or EP) "be the basis for the assessment of . . . antidumping duties" is fully satisfied by the methodology devised in 19 C.F.R. § 351.212(b) because the first step of the calculation, the computation of the dumping margin (the numerator) as the difference between NV and Koyo's CEP, supplies the statutorily-prescribed basis for the entire formula set forth in 19 C.F.R. § 351.212(b). Id. at 112 (citing Koyo, 16 CIT 539, 796 F. Supp. 1526). Commerce further asserts that "[t]he purpose of using entered value in the denominator [in the formula for an assessment rate] is to allocate the dumping margin among the importers of the merchandise produced by a respondent." Def.'s Mem. at 112.

Commerce also argues that this Court should not consider the issue because Koyo failed to exhaust its administrative remedies. See id. at 110-11. In particular, Commerce contends that Koyo was aware of Commerce's regulation concerning the filing of case briefs which are to be submitted by interested parties after the publication of the preliminary results and which must "contain all the arguments that, in the [respondent's] view, continue to be relevant to the final results of administrative review . . . ." Id. at 111 (citing 19 C.F.R. § 351.309(c)(2) (1998)). Since Koyo failed to "raise any issue with respect to Commerce's assessment methodology in its October 16, 1997 case brief[,]" Commerce requests

that this Court find that Koyo failed to exhaust its administrative remedies and uphold Commerce's assessment rate calculations. See Def.'s Mem. at 111.

### 3. Timken's Contentions

Timken generally supports Commerce and contends that contrary to Koyo, the "price-based nature of the calculation of dumping margins provides no support for any position regarding assessment." Timken's Resp. at 51. Moreover, Timken asserts that if Commerce used sales value in the denominator as Koyo argues, rather than the entered value for the subject merchandise, an under-collection of antidumping duties would result. See id. at 50. Timken also points out that, contrary to Koyo's claim, there is binding precedent by the CAFC upholding Commerce's methodology for purposes of calculating cash deposit rates and assessment rates. See id. at 51-52 (citing Torrington v. United States, 44 F.3d 1572 (Fed. Cir. 1995)).

### C. Analysis

The exhaustion doctrine requires a party to present its claims to the relevant administrative agency for the agency's consideration before raising these claims to the Court. See Unemployment Compensation Comm'n of Alaska v. Aragon, 329 U.S. 143, 155, (1946) ("A reviewing court usurps the agency's function when it sets aside

the administrative determination upon a ground not theretofore presented and deprives the [agency] of an opportunity to consider the matter, make its ruling, and state the reasons for its action").[34]

---

[34] There is however, no absolute requirement of exhaustion in the Court of International Trade in non-classification cases. See Alhambra Foundry Co. v. United States ("Alhambra"), 12 CIT 343, 346-47, 685 F. Supp. 1252, 1255-56 (1988). Section 2637(d) of Title 28 directs that "the Court of International Trade shall, where appropriate, require the exhaustion of administrative remedies." By its use of the phrase "where appropriate," Congress vested discretion in the Court to determine the circumstances under which it shall require the exhaustion of administrative remedies. See Cemex, S.A. v. United States, 133 F.3d 897, 905 (Fed. Cir. 1998). Therefore, because "each exercise of judicial discretion [does] not require litigants to exhaust administrative remedies," the Court is authorized to determine proper exceptions to the doctrine of exhaustion. Alhambra, 12 CIT at 347, 685 F. Supp. at 1256 (citing Timken Co. v. United States, 10 CIT 86, 93, 630 F. Supp. 1327, 1334 (1986), rev'd in part on other grounds, Koyo Seiko Co. v. United States, 20 F.3d 1156 (Fed. Cir. 1994)).

In the past, the Court has exercised its discretion to obviate exhaustion where: (1) requiring it would be futile, see Rhone Poulenc, S.A. v. United States ("Poulenc"), 7 CIT 133, 135, 583 F. Supp. 607, 610 (1984) ("it appears that it would have been futile for plaintiffs to argue that the agency should not apply its own regulation"), or would be "inequitable and an insistence of a useless formality" as in the case where "there is no relief which plaintiff may be granted at the administrative level," United States Cane Sugar Refiners' Ass'n v. Block, 3 CIT 196, 201, 544 F. Supp. 883, 887 (1982); (2) a subsequent court decision has interpreted existing law after the administrative determination at issue was published, and the new decision might have materially affected the agency's actions, see Timken, 10 CIT at 93, 630 F. Supp. at 1334; (3) the question is one of law and does not require further factual development and, therefore, the court does not invade the province of the agency by considering the question, see id.; R.R. Yardmasters of Am. v. Harris, 721 F.2d 1332, 1337-39 (D.C. Cir. 1983); and (4) plaintiffs had no reason to suspect that the agency would refuse to adhere to clearly applicable precedent. See Philipp Bros., Inc. v. United States, 10 CIT 76, 80, 630 F.

The purpose behind the doctrine of exhaustion is to prevent courts from premature involvement in administrative proceedings, and to protect agencies "from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties."  Abbott Labs. v. Gardner, 387 U.S. 136, 148-49, (1967); see also Public Citizen Health Research Group v. Comm'r, FDA, 740 F.2d 21, 29 (D.C. Cir. 1984) (pointing out that the "exhaustion doctrine . . . serves four primary purposes: [(1)] it ensures that persons do not flout [legally] established administrative processes . . .; [(2)] it protects the autonomy of agency decisionmaking; [(3)] it aids judicial review by permitting factual development [of issues relevant to the dispute]; and [(4)] it serves judicial economy by avoiding [repetitious] administrative and judicial factfinding and by" resolving sole claims without judicial intervention).

In this case, based on precedent, Koyo knew Commerce's position on this issue and deemed it futile for Koyo to raise this issue below.  The Court, therefore, concludes that Koyo properly exhausted its administrative remedies and is correct to raise this issue to the Court.  See Asociacion Colombiana de Exportadores de Flores v. United States, 916 F.2d 1571, 1575 (Fed. Cir. 1990)(stating that, as a general rule, courts may "'refuse to require administrative

---

Supp. 1317, 1321 (1986).

exhaustion when resort to the administrative remedy would be futile
. . . .'" and (quoting <u>Bendure v. United States</u>, 554 F.2d 427, 431
(Ct. Cl. 1977)); <u>see also</u> <u>Poulenc</u>, 7 CIT at 135, 583 F. Supp. at
610; <u>Techsnabexport, Ltd. v. United States</u>, 16 CIT 420, 425, 795 F.
Supp. 428, 434-35 (1992).

Turning to the merits of this issue, in <u>Koyo Seiko Co. v.
United States</u> ("<u>Koyo Seiko Co.</u>"), 24 CIT __, 110 F. Supp. 2d 934
(2000), <u>aff'd</u>, 258 F.3d 1340 (Fed. Cir. 2001), this Court determined
and the CAFC affirmed that Commerce's methodology for calculating
the assessment rate, that is, using the entered value of Koyo's
imported merchandise in the assessment rate formula rather than
sales value, was reasonable and in accordance with law.  <u>See</u> <u>Koyo
Seiko Co.</u>, 24 CIT at __, 110 F. Supp. 2d at 943.  The Court noted
that "neither [19 U.S.C. §§ 1675(a)(1)(B) and (a)(2)] nor its
legislative history provide[d] an 'unambiguously expressed intent'
with regard to the" issue of whether Commerce could use entered
value rather than sales value in its calculation of the assessment
rate.  <u>Id.</u> at 940.

Because Commerce's methodology of calculating the assessment
rate and the parties' arguments are practically identical to those
presented in <u>Koyo Seiko Co.</u>, 24 CIT __, 110 F. Supp. 2d 934, the
Court adheres to its reasoning in <u>Koyo Seiko Co</u>.  Therefore, the
Court affirms Commerce's methodology of calculating the assessment

rate as reasonable and in accordance with law.


**XVI.   Commerce's Treatment of Forgings as In-Scope Merchandise**

Koyo argues that Commerce erred in treating Koyo's imported forged rings as in-scope merchandise subject to the TRB antidumping duty order.  See Koyo's Mem. at 32.  Koyo acknowledges that Commerce's 1995 scope determination treating Koyo's imported forged rings as in-scope merchandise subject to the TRB antidumping duty order was upheld by the CAFC in Koyo Seiko Co. v. United States, 155 F.3d 574 (1998).  See id. at 33.  However, Koyo asserts, since Koyo "submits that the determination is unsupported by substantial evidence and otherwise contrary to law, and [Koyo] is continuing to consider the avenues available for relief from that determination[,]" the Court should remand the issue for Commerce to recalculate the determination "after excluding Koyo's sales of merchandise further processed from the imported forged rings from [Koyo's] U.S. sales database."  Id.

Commerce responds that "Commerce's scope ruling determination [is in accordance with law and] Koyo's rough forgings are within the scope of the antidumping duty order on TRBs from Japan."  Def.'s Mem. at 113-14 (citing Koyo Seiko Co. v. United States ("Koyo 1997"), 21 CIT 146, 955 F. Supp. 1532 (1997)), and Timken Co. v. United States ("Timken 1997"), 21 CIT 889, 972 F. Supp. 702 (1997),

aff'd, <u>Koyo Seiko Co. v. United States</u>, 155 F.3d 574.  Timken

generally agrees with Commerce.  <u>See</u> Timken's Resp. at 52.

Because Commerce's scope ruling determination and the parties'

arguments are practically identical to those presented in <u>Koyo 1997</u>,

21 CIT 146, 955 F. Supp. 1532, and <u>Timken 1997</u>, 21 CIT 889, 972 F.

Supp. 702, the Court adheres to its reasoning in <u>Koyo 1997</u> and

<u>Timken 1997</u>.  Therefore, the Court sustains Commerce's treatment of

Koyo's forgings.[35]


**XVII.  Commerce's Decision to Limit United States Indirect Selling Expenses to Those Expenses Specifically Associated With Commercial Activity in the United States**

**A.  Background**

The pre-URAA statute provided the reduction of exporter's sales

price ("ESP") by the amount of "expenses generally incurred by or

for the account of the exporter in the United States in selling

identical or substantially identical merchandise."  19 U.S.C. §

1677a(e)(2)(1988).  Although the statute was silent as to whether

indirect selling expenses incurred outside the United States should

be categorized as United States indirect selling expenses, Commerce

chose to adjust United States price for such expenses.  <u>See</u> 19

---

[35] Koyo states that it "is also challenging the method by which [Commerce] calculated the margins on [merchandise further manufactured] . . . ."  Koyo's Mem. at 32 n.17.  This Court affirmed Commerce's methodology regarding Koyo's further manufactured merchandise.  <u>See</u> supra Part XIV.

C.F.R. § 353.41(e)(2)(1994); ITA Antidumping Manual, § 7, at 11 (rev.
ed. 1993).

As revised by the URAA, the statute states that CEP, the post-
URAA equivalent to ESP, is to be reduced by the amount of any
"expenses generally incurred by or for the account of the producer
or exporter, or the affiliated seller in the United States[:]"
including "any selling expenses not deducted under subparagraph (A)
[commissions], (B) [direct selling expenses], or (C) [selling
expenses assumed by the seller on behalf of the purchaser]."  19
U.S.C. § 1677a (d)(1) and (d)(1)(D).  In the Final Results, Commerce
determined that

> [a]s [Commerce] stated in [Final Results of Antidumping
> Duty Administrative Reviews and Termination in Part of
> Tapered Roller Bearings and Parts Thereof, Finished and
> Unfinished, From Japan, and Tapered Roller Bearings, Four
> Inches or Less in Outside Diameter, and Components
> Thereof, From Japan, 62 Fed. Reg. 11,825, 11,834] and
> AFBs VI at 2124, [Commerce] will deduct from CEP only
> those expenses associated with economic activities in the
> United States which occurred with respect to sales to the
> unaffiliated U.S. customer. [Commerce] found no
> information on the record for this review period to
> indicate that the indirect selling expenses and ICC for
> the respondents that were incurred in their respective
> home markets were incurred on sales to the unaffiliated
> customer in the United States.

Final Results, 63 Fed. Reg. 2575.

Therefore, since NTN's, NSK's and Koyo's "reported selling
expenses at issue were not associated with commercial activity in
the United States[,] [but] [r]ather, . . . were incurred prior to

the commercial activity in the United States[,] . . . [Commerce] did not deduct these expenses from CEP for these final results." Id.

### B.    Contentions of the Parties

Timken claims that the new 19 U.S.C. § 1677a(d)(1) statutory language and the SAA, H.R. Doc. 103-316, at 823, indicate that Congress intended for Commerce to continue the practice of including in United States indirect selling expenses the home market selling expenses attributable to export sales. See Timken's Mem. at 18-20. Timken further argues that the "pre-URAA old law referred only to expenses 'incurred by or for the account of the exporter in the United States,' but the URAA broadened this language to include adjustment for expenses 'incurred by or for the account of the producer or exporter, or the affiliated seller in the United States.'" Timken's Reply at 4; see also Timken's Mem. at 19-20. Therefore, Timken maintains that Congress by referring to expenses incurred by "producers or exporters," codified Commerce's prior practice under pre-URAA. See Timken's Reply at 4.  Accordingly, Timken requests that the Court reexamine its decision in Timken Co. v. United States ("Timken 1998"), 22 CIT 621, 16 F. Supp. 2d 1102 (1998), and remand this issue to Commerce so that it may adjust CEP for indirect selling expenses incurred in the home market on account of United States sales (that is, export selling expenses reported by Koyo, NTN and NSK).

Relying on this Court's decision in <u>Timken 1998</u>, Commerce responds that it properly did not adjust CEP for indirect selling expenses reported by Koyo, NTN and NSK because the new statutory language (that is, 19 U.S.C. § 1677a(d)(1)), does not define the types of expenses to be included as United States indirect selling expenses. <u>See</u> Def.'s Mem. at 114-18. Moreover, Commerce states that "it is clear from the SAA that under the new statute Commerce should deduct from CEP only those expenses associated with economic activities in the United States." <u>Final Results</u>, 63 Fed. Reg. at 2575.

Koyo, NTN and NSK generally agree with Commerce and argue that: (1) "the SAA fully supports [Commerce's] decision not to adjust CEP to account for indirect selling expenses and ICC incurred in Japan," <u>Final Results</u>, 63 Fed. Reg. at 2575; (2) the statutory language of § 1677a(d)(1) and the statutory construction makes it clear that no adjustment should be made for indirect selling expenses incurred in Japan; and (3) Commerce has a practice of limiting indirect selling expenses to those specifically associated with commercial activity in the United States. <u>See</u> NTN's Resp. Mem. Timken's Sept. 8, 1998 Mem. Supp. Rule 56.2 Mot. J. Agency R. ("NTN's Resp.") at 2-5; NSK's Mem. Opp. Timken's Rule 56.2 Mot. J. Agency R. ("NSK's Resp.") at 5-8; Koyo's Resp. at 13-16.

C.    Analysis

In Timken 1998, 22 CIT at 625-26, 16 F. Supp. 2d at 1106, and Micron Tech., Inc. v. United States ("Micron 1999"), 23 CIT ___, ___, 40 F. Supp. 2d 481, 484-85 (1999), aff'd, 243 F.3d 1301, 1314, this Court upheld Commerce's practice of limiting United States indirect selling expenses to those expenses incurred in the United States.  The Court noted that neither the pre-URAA statute nor the newly-amended statute address whether United States indirect selling expenses incurred outside the United States should be categorized as United States indirect selling expenses.  Timken 1998, 22 CIT at 625-26, 16 F. Supp. 2d at 1106; Micron 1999, 23 CIT at ___, 40 F. Supp. 2d at 485.

Because Commerce's practice of limiting United States indirect selling expenses to those expenses incurred in the United States and the parties' arguments are practically identical to those presented in Timken 1998 and Micron 1999, the Court adheres to its reasoning in Timken 1998 and Micron 1999.  Accordingly, the Court finds that Commerce's decision to limit United States indirect selling expenses to those expenses incurred in the United States is supported by substantial evidence and in accordance with law.

XVIII.  NTN's Exclusion of Warehousing Expenses for Non-Scope
        Merchandise From United States Selling Expenses

        A. Background

In the underlying review, NTN excluded certain warehousing

expenses attributable to non-scope merchandise from its reported

United States indirect selling expenses.  See NTN's Resp. at 5.  In

particular,

> because certain of its U.S. expenses were incurred solely
> for non-scope merchandise, in order to ensure an accurate
> allocation of its U.S. expenses, NTN first removed all
> such expenses from its pool of U.S. expenses.   The
> remaining expenses which were incurred for either scope
> or non-scope merchandise, but cannot be specifically
> linked to either scope or non-scope merchandise by NTN,
> were then allocated to scope and non-scope merchandise.

Final Results, 63 Fed. Reg. at 2572.


In accepting NTN's methodology of reporting its United States

indirect selling expenses, Commerce: (1) verified NTN's United

States expenses finding no discrepancies; and (2) stated that it has

found NTN's methodology to be reasonable in past TRB and AFB cases.

Id.  Commerce also explained how it eliminated the possibility of

distortion in NTN's methodology when

> Commerce calculated a ratio of sales of scope merchandise
> to all sales.   Commerce then adjusted NTN's reported
> final indirect selling expense by adding or subtracting
> various expenses to arrive at a final indirect selling
> expense. Next, Commerce multiplied that total expense by
> the ratio of scope-to-total products.

Def.'s Mem. at 121 (citing Def.'s Ex. 1 at 18).

**B.    Contentions of the Parties**

Timken argues that Commerce improperly permitted NTN to exclude certain warehousing expenses attributable to non-scope merchandise from its reported United States indirect selling expenses. See Timken's Mem. at 21-22; Timken's Reply at 5-8; Final Results, 63 Fed. Reg. at 2572. In particular, Timken asserts that "NTN's adjustment of its allocated pool of indirect U.S. selling expenses was not reasonable and not supported by substantial evidence" because NTN excluded the warehousing expenses attributable to the non-scope merchandise for one of its subsidiaries and then allocated the remaining expenses to all of NTN's scope and non-scope United States sales thereby creating distortion. Timken's Reply at 5-6. Timken also maintains that one of NTN's subsidiaries' "warehousing expenses attributed to non-scope merchandise is disproportionate to the amount of non-scope sales . . . ."[36] Id. at 7.

Commerce responds that 19 U.S.C. § 1677a(d), "as amended by the URAA, continues to be silent on the question of allocation methods." Def.'s Mem. at 119. Commerce maintains that it found no discrepancies during its verification of NTN's United States expenses and eliminated the possibility of distortion in NTN's

---

[36] Commerce asserts that the "record does not show what non-scope merchandise was stored in the warehouse at issue. . . ." Therefore, the Court agrees with Commerce that it is "impossible to say whether the storage charges are disproportionate to the sales of the non-scope merchandise." Def.'s Mem. at 121.

methodology when Commerce: (1) calculated a pertinent ratio; (2)
"adjusted NTN's reported final indirect selling expense"; and (3)
"multiplied that total expense by the ratio of scope-to-total
products." Id. at 121.

Pointing out that NTN's allocation methodology was reasonable,
Commerce asserts that the Court should uphold NTN's reported
allocation for United States indirect selling expenses.

NTN supports Commerce's conclusion. Replying to Timken's claim
that "'the basic premise underlying NTN's allocation methodology for
its U.S. indirect selling expenses is that the sum of those expenses
may be evenly allocated to the sum of its sales[,]'" NTN contends
that Timken misunderstands the methodology at issue. NTN's Resp.
at 5 (quoting Timken's Mem. at 21). NTN asserts that it
"differentiates expenses on the basis of whether they were incurred
for merchandise within the scope of the case as the first step in
its allocation methodology." NTN's Resp. at 6. NTN maintains that
its "allocation methodology simply allocates expenses to the product
which incurred the expenses, this allocation methodology is not
distortive, and Commerce's acceptance of it is reasonable and in
accordance with law." Id.

## C.    Analysis

The Court upholds Commerce's decision to allow NTN to exclude

warehousing expenses attributable to non-scope merchandise from its

United States selling expenses since it is in accordance with law.

The Court notes that 19 U.S.C. § 1677a(d) is silent on the question

of allocation methods and thus grants Commerce considerable

discretion.  Under 19 C.F.R. § 351.401(g)(1998),

> [Commerce] may consider allocated expenses and price
> adjustments when transaction-specific reporting is not
> feasible, provided [Commerce] is satisfied that the
> allocation method used does not cause inaccuracies or
> distortions.

In addition, pursuant to 19 C.F.R. § 351.401(g)(4),

> [Commerce] will not reject an allocation method solely
> because the method includes expenses incurred, or price
> adjustments made, with respect to sales of merchandise
> that does not constitute subject merchandise or a foreign
> like product (whichever is applicable).

Based on a careful examination of the record and on the

regulatory language of 19 C.F.R. § 351.401(g) and (g)(4) that grants

Commerce considerable discretion in choosing allocation methods, the

Court sustains Commerce's decision to accept NTN's United States

selling expenses as reasonable, supported by substantial evidence

and in accordance with law.  See Skidmore v. Swift & Co., 323 U.S.

134, 139-40 (1944).

## XIX. Treatment of Certain Rebates and Billing Adjustments

### A. Background

#### 1. Koyo's Home Market Support Rebates

Koyo reported certain home market support rebates on a customer-specific basis and the allocations used by Koyo included rebates on non-scope merchandise. See Koyo's Resp. at 30-32. "Koyo calculated rebate factors by dividing the total rebates paid to a given customer by the total POR sales to that customer." Final Results, 63 Fed. Reg. at 2567. In accepting Koyo's reporting of home market support rebates on a customer-specific basis, Commerce stated the following:

> Based on information Koyo provided, [Commerce] [is] satisfied that Koyo acted to the best of its ability in reporting home market rebates. However, because Koyo's allocation methodology includes non-scope merchandise, [Commerce has] nevertheless examined Koyo's allocation to determine if it is distortive. [Commerce's] review of the record indicates that the non-scope merchandise included in Koyo's allocation are sales of bearings other than TRBs. . . . [Commerce's] review and analysis of the record give[s] [Commerce] no reason to believe that Koyo is more likely to grant rebates on sales of bearings other than TRBs than on sales of TRBs, [and Commerce] note[s] that Koyo is primarily in the business of selling bearings, some of which are within the scope of the TRB orders and others which are not. While [Commerce] recognize[s] that there are differences among bearings, [Commerce has] not found that the scope and non-scope bearings included in Koyo's allocation vary significantly in terms of value, physical characteristics, nor the manner in which they were sold such that Koyo's allocation would result in an unreasonably inaccurate or distortive allocation.

See id.

### 2.    Koyo's Home Market Billing Adjustment Two

Koyo reported home market "billing adjustment two" on a customer-specific basis and allocated these adjustments over scope and non-scope merchandise. See Koyo's Resp. at 23. "Koyo . . . calculated its lump-sum billing adjustments by multiplying the total adjustment amount paid to a customer by the ratio of its TRB sales to that customer to the total sales to that customer." Final Results, 63 Fed. Reg. at 2565. In accepting Koyo's methodology, Commerce stated the following:

> While [Commerce's] preference is for transaction-specific reporting, [Commerce] recognize[s] that this is not always possible. It is inapporpriate to reject allocations that are not unreasonably distortive where a fully cooperating respondent is unable to report the information in a more specific manner. . . . Accordingly, [Commerce has] accepted these adjustments when it was not feasible for a respondent to report these adjustments on a more specific basis, provided that the allocation method used does not cause unreasonable inaccuracies or distortions. . . . [Commerce has] not rejected an allocation method solely because the allocation includes adjustments granted on non-scope merchandise. However, such allocations are not acceptable where [Commerce has] reason to believe that respondents did not grant such adjustments in proportionate amounts with respect to sales of out-of-scope and in-scope merchandise. . . .
>
> Based on [Commerce's] examination of the record in this and in past reviews, [Commerce is] satisfied that Koyo's records do not allow it to report these billing adjustments on a transaction-specific basis and that Koyo acted to the best of its ability in calculating the reported adjustment on as narrow a basis as its records

allowed.  Therefore, for these final results [Commerce has] made a direct adjustment to NV for Koyo's lump-sum billing adjustments.

Final Results, 63 Fed. Reg. at 2566.

### 3.   NSK's Home Market Rebate

NSK reported lump-sum rebates to certain customers on a customer-specific basis and "applied the amount directly to the customer's account receivable - the amount [was] not directly linked to any specific shipment(s), part number(s), or group of part numbers, but [was] just the lump-sum amount that result[ed] from the parties' negotiations."  NSK's Resp. at 9.  Such rebates were paid on the basis of subject and non-subject merchandise.  See Final Results, 63 Fed. Reg. at 2566.  In accepting NSK's rebates, Commerce stated that:

> [Commerce has] accepted [NSK's] claims for lump-sum rebates because [Commerce is] satisfied that NSK's methodology, while it includes non-subject merchandise, does not shift rebates from non-scope to scope merchandise.  In its response, NSK submitted information demonstrating that the ratio of scope to non-scope merchandise purchased by each customer who received this rebate was relatively constant throughout the POR. Furthermore, [Commerce has] determined based on [Commerce's] review of the record that NSK acted to the best of its ability in reporting these price adjustments and that reporting on a more specific basis was not possible given the manner in which NSK maintains its records.

Id. at 2566-67.

B.    Contentions of the Parties

Timken alleges that Commerce's acceptance of Koyo's home market support rebates and home market billing adjustments, as well as NSK's lump sum rebates, are unlawful because such adjustments must always be reported on a transaction-specific basis. See Timken's Mem. at 28-32, 34-36; Timken's Reply at 9.

Timken contends that even under its new methodology, Commerce's determination was not supported by substantial evidence inasmuch as respondents failed to show that: (1) their reporting methods did not result in distortion; and (2) they put forth their best efforts to report the information on a more precise basis. See Timken's Mem. at 29-32; 34-36. Timken argues that respondents have the burden of showing non-distortion and best efforts, and having failed to carry the burden, they must not benefit from the adjustment. See Timken's Reply at 9-11.

Commerce responds that its treatment of the adjustments is consistent with current law. See Def.'s Mem. at 121-27. Even though Koyo's and NSK's billing adjustments and rebates were not reported in a transaction-specific manner, Commerce accepted them as part of its new policy to accept allocated adjustments where it is not feasible for the respondent to report them on a transaction-specific basis and the respondent has acted to the best of its ability. See id. at 123. Additionally, Commerce examines whether

the allocation method used is not unreasonably distortive pursuant to 19 U.S.C. § 1677m(e).  See id.

Commerce argues that its findings are supported by substantial evidence and in accordance with law because "Commerce used its acquired knowledge of Koyo['s] and NSK's computer systems and databases to conclude that they could not provide the information in the preferred form."  Id. at 124 (citing Timken 1998). "Moreover, . . . Commerce [states that it] scrutinized Koyo's and NSK's data before concluding that the data were reliable and that the adjustments on scope and non-scope merchandise did not result in unreasonable distortions."  Id. at 124.

With respect to Koyo's rebates and "billing adjustment two," Commerce maintains that: (1) Koyo had reported the adjustments on the most specific basis possible and, thus, had cooperated to the best of its ability; and (2) the allocation method was not distortive.  See Final Results, 63 Fed. Reg. at 2566-67.

Commerce also argues that it properly accepted NSK's home market rebates.  See Def.'s Mem. at 126.

Koyo and NSK concur with Commerce's position.  See  Koyo's Resp. at 22-32; NSK's Resp. at 8-11.

C.    Analysis

Commerce's decision to accept Koyo's and NSK's billing adjustments and rebates was in accordance with the post-URAA statutory language, as well as with the SAA that accompanied the enactment of the URAA because: (1) Commerce reasonably determined that the adjustments were reliable and could not be reported more specifically; (2) Commerce properly determined that respondents acted to the best of their abilities in reporting the adjustments; and (3) Commerce properly accepted the allocation methodologies of the respondents after carefully reviewing the differences between such merchandise and ensuring that the allocations were not unreasonably distortive.  Accord Final Results, 63 Fed. Reg. at 2566-67; Def.'s Mem. at 122-27.

After the enactment of the URAA, Commerce reevaluated its treatment of post-sale price adjustments ("PSPAs"), and since that time it treats them as adjustments to price and not as selling expenses.  Indeed, Commerce's treatment of the home market support rebates, early-payment discounts and billing adjustments as adjustments to price instead of selling expenses is the issue left unanswered by the pre-URAA cases such as Torrington Co. v. United States ("Torrington CAFC"), 82 F.3d 1039, 1048 (Fed. Cir. 1996); Koyo CAFC, 36 F.3d 1565; and Consumer Prods. Div., SCM Corp. v. Silver Reed Am., Inc., 753 F.2d 1033 (Fed. Cir. 1985).  Torrington

CAFC does not mandate that direct price adjustments may only be accepted when they are reported on a transaction-specific basis. Rather, Torrington CAFC merely overturned a prior Commerce practice of treating certain allocated price adjustments as indirect selling expenses and does not address the propriety of the allocation methods that respondents used in reporting the price adjustments in question. Although (1) "Commerce treated rebates and billing adjustments as selling expenses in preceding reviews under pre-URAA law," and (2) "previously decided that such adjustments are selling expenses and, therefore, should not be treated as adjustments to price," this did not "preclude Commerce's change in policy or this Court's reconsideration of its stance in light of the newly-amended antidumping statute [that is, 19 U.S.C. § 1677m(e)]." Timken 1998, 16 F. Supp. 2d at 1107. "Neither the pre-URAA nor the newly-amended statutory language imposes standards establishing the circumstances under which Commerce is to grant or deny adjustments to NV for PSPAs." Id. at 1108 (citing Torrington CAFC, 82 F.3d at 1048). Moreover, 19 U.S.C. § 1677m(e) "specifically directs that Commerce shall not decline to consider an interested party's submitted information if that information is necessary to the determination but does not meet all of Commerce's established requirements, if the [statute's] criteria are met." Timken 1998, 16 F. Supp. 2d at 1108.

Commerce applied its post-URAA methodology to analyze

adjustments to price, explaining that Commerce accepted PSPAs as direct adjustments to price if Commerce determined that a respondent, in reporting these adjustments, acted to the best of its ability to associate the adjustment with the sale on which the adjustment was made, rendering its reporting methodology not unreasonably distortive. See Final Results, 63 Fed. Reg. at 2566. In evaluating the degree to which an allocation over scope and non-scope merchandise may be distortive, Commerce examines "the extent to which the out-of-scope merchandise included in the allocation pool is different from the in-scope merchandise in terms of value and physical characteristics, and the manner in which it is sold." Id.

Timken argues that Commerce's methodology is inadequate, unlawful and not supported by substantial evidence. See Timken's Mem. at 29-32; 34-36. Timken is incorrect. Although the URAA does not compel Commerce's new policy on price adjustments, the statute does not prohibit Commerce's new practice. Commerce's "change in policy . . . substitutes a rigid rule with a more reasonable method that nonetheless ensures that a respondent's information is reliable and verifiable." Timken 1998, 16 F. Supp. 2d at 1108. Commerce's decision to accept Koyo's and NSK's allocated adjustments to price is acceptable, "especially . . . in light of the more lenient statutory instructions of [19 U.S.C. § ] 1677m(e)." Id.

Accordingly, "Commerce's decision to accept the PSPAs . . . is fully in accordance with the post-URAA statutory language and directions of the SAA," and the decision to accept Koyo's and NSK's adjustments was reasonable even though the adjustments were not reported on a transaction-specific basis and even though the allocations included rebates on non-scope merchandise.  Id.

Moreover, one of the goals of Congress in passing the URAA was to liberalize certain reporting requirements imposed on respondents in antidumping reviews.  Such intent is evident both in the amendments enacted by the URAA and in the SAA.  The URAA amended the antidumping law to include a new subsection, 19 U.S.C. § 1677m(e).  The provision states that:

> [i]n reaching a determination under [19 U.S.C.] section 1671b, 1671d, 1673b, 1673d, 1675, or 1675b[,] . . . [Commerce] shall not decline to consider information that is submitted by an interested party and is necessary to the determination but does not meet all the applicable requirements established by [Commerce], if—-
>
>     (1) the information is submitted by the deadline established for its submission,
>     (2) the information can be verified,
>     (3) the information is not so incomplete that it cannot serve as a reliable basis for reaching the applicable determination,
>     (4) the interested party has demonstrated that it acted to the best of its ability in providing the information and meeting the requirements established by [Commerce] with respect to the information, and
>     (5) the information can be used without undue difficulties.

19 U.S.C. § 1677m(e).

This section of the statute liberalized Commerce's general acceptance of data submitted by respondents in antidumping proceedings by directing Commerce not to reject data submissions once Commerce concludes that the specified criteria are satisfied.[37]

Next, Timken suggests that Commerce has accepted the adjustments without requiring respondents to carry the burden of proving that the adjustments are non-distortive. <u>See</u> Timken's Reply at 9-11. This argument is similarly without merit. As a routine part of its antidumping practice, Commerce accepts a range of reporting methodologies and allocations adopted by respondents. The mere acceptance of an adjustment as reported cannot be a sufficient ground for rejecting Commerce's decision. It would be anomalous indeed to expect a respondent to provide Commerce, in addition to the information on the basis of which Commerce could conclude that the respondent's reporting methods are not distortive, with proof of the validity of Commerce's determination of that sort. Such a scheme would effectively allow the respondent to bind Commerce,

---

[37] Consistent with § 1677m(e), the SAA states that the new provision "does not intend to change Commerce's current practice, sustained by the courts, of allowing companies to allocate these expenses when transaction-specific reporting is not feasible, provided that the allocation method used does not cause inaccuracies or distortions." H.R. Doc. 103-316, at 823-24. Therefore, the statute and the accompanying SAA both support Commerce's use of allocations in circumstances such as those present here.

restricting Commerce's inherent power to investigate, examine and render a decision.

In determining whether Koyo's and NSK's allocation over scope and non-scope merchandise was unreasonably distortive, Commerce reasonably has not required respondents to demonstrate the non-distortive nature of the allocation directly, for example, by compelling them to identify separately the adjustments on scope merchandise and compare them to the results of allocations over both scope and non-scope merchandise. Such a burdensome exercise would defeat the entire purpose underlying the more flexible reporting rules, by compelling the respondent to go through the enormous effort that the new rules were intended to obviate. Rather, Commerce has adopted criteria by which Commerce determines whether an allocation over scope and non-scope merchandise was likely to cause unreasonable distortions on a case-by-case basis, utilizing Commerce's administratory expertise.

In the case at hand, Commerce's determination with respect to Koyo's rebates and "billing adjustment two" was reasonable. Commerce premised its conclusion on Koyo's response to Commerce's supplemental questionnaire in which "Koyo stated that more specific reporting for a certain customer who received rebates was not possible because its records did not allow it to isolate sales of those bearings for which rebates were granted." Final Results, 63

Fed. Reg. at 2567.  Commerce also found that transaction-specific reporting was not feasible for "billing adjustment two" based on the record in this POR and past reviews.  See id. at 2566.  For both adjustments, Commerce found that the allocation methodologies used were not distortive, and that Koyo acted to the best of its ability in reporting the information inasmuch as more specific reporting was not feasible.  See id.

Commerce also properly accepted NSK's lump-sum home market rebates.  NSK's home market rebates were granted on a customer-specific basis, and "while it includes non-subject merchandise, [NSK] does not shift rebates from non-scope to scope merchandise." See id. at 2566.  Commerce also found that the method was not unreasonably distortive and that NSK acted to the best of its ability.  See id. at 2566-67.

Timken asserts that Commerce improperly determined that Koyo and NSK acted to the best of their ability in reporting adjustments. See Timken Mem. at 31-32, 36.  Timken's assertion is without merit. When respondents' adjustments were granted over both scope and non-scope merchandise without reference to any particular model or transaction, Commerce could not have reasonably expected them to be recorded or reported to Commerce in a manner more specific than that which was used.  It was equally appropriate for Commerce to consider, as a part of its decision whether respondents acted to the

best of their ability in reporting the adjustments, its acquired

knowledge of Koyo's and NSK's computer systems and databases to

conclude that they could not provide the information in the

preferred form. See Def.'s Mem. at 124.[38]

In sum, the Court finds that Commerce's decision to accept

Koyo's and NSK's reported home market adjustments was in accordance

with the post-URAA statutory language and the SAA.  The record

demonstrates that the requirements of 19 U.S.C. § 1677m(e) were

---

[38] The Court finds that Commerce reasonably determined that Koyo and NSK acted to the best of their ability in reporting billing adjustments and rebates.  First, with regards to Koyo's "billing adjustment two," some of Koyo's adjustments reported in "billing adjustment two"

> were "true lump-sum adjustments," granted over both scope and non-scope merchandise[] . . . without reference to any particular model or transaction. . . .  The other type of adjustment included in billing adjustment 2 is an adjustment that may have been granted on a model-specific basis, but was recorded in Koyo's computer database as a customer-specific amount without reference to specific models or transactions. To identify the models or transaction to which these adjustments applied, Koyo would have had to review manually thousands of paper receipts regarding individual original transactions in the hopes of finding explanatory notes by the salesmen.

Koyo's Resp. at 29.

Second, with regards to Koyo's rebates, "the record does not show that Koyo could alter its computer program to identify the sales on which the rebates were paid." Id. at 31.  Finally, with regards to NSK's lump-sum rebates, "NSK's lump-sum PSPAs did not relate to specific part numbers, but, . . . constituted a single lump sum applied to a customer's account receivable." NSK's Resp. at 11.

satisfied by the respondents in that: (1) the reported adjustments were submitted in a timely fashion, see 19 U.S.C. § 1677m(e)(1); (2) the information submitted can be verified by Commerce, see 19 U.S.C. § 1677m(e)(2); (3) the respondents' information was not so incomplete that it could not serve as a basis for reaching a determination, see 19 U.S.C. § 1677m(e)(3); (4) respondents demonstrated that they acted to the best of their abilities in providing the information and meeting Commerce's new reporting requirements, see 19 U.S.C. § 1677m(e)(4); and (5) there was no indication that the information was incapable of being used without undue difficulties. See 19 U.S.C. § 1677m(e)(5).

Commerce's determinations with respect to Koyo and NSK were also consistent with the SAA. The Court agrees with Commerce's finding in the Final Results that given Koyo's and NSK's computer systems and databases and time constraints imposed by the statute, the reporting and allocation methodologies were reasonable. This is consistent with the SAA directive under 19 U.S.C. § 1677m(e), which provides that Commerce "may take into account the circumstances of the party, including (but not limited to) the party's size, its accounting systems, and computer capabilities." H.R. Doc. 103-316, at 865. Thus, the Court holds that Commerce properly considered the ability of Koyo and NSK to report their billing adjustments and rebates on a more specific basis.

Accordingly, the Court concludes that Commerce's acceptance of Koyo's and NSK's reported adjustments was in accordance with law.

## XX. Commerce's Acceptance of Home Market Average Short-Term Interest Rate

Timken contends that Commerce's acceptance of Koyo's home market average short-term interest rate is not supported by substantial evidence because there are two loan entries whose "interest amounts . . . are aberrational and unsupported by the record . . . [since the two loan entries] do not list certain relevant information regarding the terms and details of these loans for which the reported interest was incurred."[39] Final Results, 63 Fed. Reg. at 2569. In particular, Timken argues that "Koyo has calculated the home market interest rate which it has used for various adjustments by dividing the amount of interest it paid by the principal amount it has borrowed" and about half of the total interest used in Koyo's calculation was composed of two loan entries that were a different type of loan arrangement than the other loan entries. Timken's Mem. at 32-33. Timken maintains that Commerce's verification of selected Koyo interest expenses should not serve as

---

[39] Commerce points out that Timken's argument is misleading because on one of the pages "of its brief, Timken argues that the aberrations are in the hundreds . . . [while] it is clear from Timken's own calculations on [another page] of its brief that the alleged aberrations are one-hundreth of the amounts alleged." Def.'s Mem. at 127-28.

"a basis for finding that all of Koyo's interest expenses were accurate." Timken's Reply at 12-13. Accordingly, Timken asserts that it is unreasonable for Commerce to verify one loan category and deduce from this that the other loan arrangement's interest and loan amounts are accurate, that is, "Commerce is effectively claiming that verification of 'apples' . . . suffices to find that 'oranges' . . . are accurate." Id. at 13. Timken, therefore, requests that this Court reverse Commerce's acceptance of Koyo's home market interest rate and remand with instructions that Commerce recalculate Koyo's interest rate excluding the interest amounts of the two loan entries at issue.

Commerce, in turn argues that it properly accepted Koyo's reported home market average short-term interest rate in its calculation of NV because

> [d]uring verification [Commerce] carefully reviewed the manner in which Koyo calculated its short-term interest rate and its credit expense ratios. After reviewing supporting documentation for each of several loans [Commerce] selected from Koyo's credit calculation worksheets, [Commerce was] . . . satisfied that Koyo had accurately reported its credit expense.

Final Results, 63 Fed. Reg. at 2569; Def.'s Mem. at 127.

In regards to the two interest amounts that are at issue, Commerce maintains that

> [Commerce is] generally satisfied with Koyo's explanation of and the reliability of those interest amounts which Timken claims should be removed from the interest rate

calculation and can find no evidence on the record that indicates these interest amounts should be excluded from the calculation of credit; accordingly, [Commerce has] not done so for these final results.

Final Results, 63 Fed. Reg. at 2569.

Commerce also argues that although the two entries were not among the data selected for verification, a verification is intended to serve as a spot check and not an exhaustive review of a response. See Def.'s Mem. at 128 (citing Bomont Indus. v. United States, 14 CIT 208, 209, 733 F. Supp. 1507, 1508 (1990)). Since the two entries at issue were interest payments incurred during a normal business arrangement and not payments on a specific loan and "Commerce had no basis upon which to challenge Koyo's explanation [regarding the two entries at issue]," Commerce asserts that Commerce's acceptance of Koyo's home market credit expense calculation was in accordance with law. Def.'s Mem. at 128-29.

Koyo generally agrees with Commerce, emphasizing that

Timken's assertions are misplaced because they are based on a misunderstanding of the credit verification exhibit. Koyo argues that the interest amounts Timken identified as aberrational do not constitute payments on specific loans, but rather reflected interest paid by Koyo Seiko under some other arrangement.

Final Results, 63 Fed. Reg. at 2569; see Koyo's Resp. at 33-35.

Koyo maintains that "Timken points to nothing in the record to suggest that Koyo did not in fact incur or pay these costs[;]

[g]iven that Koyo had to pay those amounts to the bank during the period of review, it legitimately included them in its interest calculation as part of the cost of borrowing money." Koyo's Resp. at 34. Relying on <u>Micron Tech.</u>, 117 F.3d at 1396, Koyo asserts the fact that Commerce did not verify the two entries at issue does not mean that the home market credit calculation is not accurate. <u>See id.</u> at 35.

The Court disagrees with Timken that Commerce's acceptance of Koyo's home market average short-term interest rate is not in accordance with law. Timken fails to acknowledge the appropriate level of deference owed to Commerce's verifications. A "'[v]erification is a spot check and is not intended to be an exhaustive examination of the respondent's business. [Commerce] has considerable latitude in picking and choosing which items it will examine in detail.'" <u>PMC</u>, 20 CIT at 1134 (quoting <u>Monsanto</u>, 12 CIT at 944, 698 F. Supp. at 281). In fact, "Commerce enjoys 'wide latitude' in its verification procedures." <u>Pohang</u>, 1999 Ct. Intl. Trade LEXIS 105, *1, Slip Op. 99-112; <u>see also</u> <u>American Alloys</u>, 30 F.3d at 1475; <u>Carlisle</u>, 9 CIT at 532, 622 F. Supp. at 1082 ("It is within the discretion of Commerce to determine how to verify" and "due deference will be given to the expertise of the agency." The Court defers to the agency's sensibility as to the depth of the inquiry needed. In the absence of evidence in the record suggesting

the need to examine further the supporting evidence itself, the agency may accept the credibility of the document at face value. See Pohang, 1999 Ct. Intl. Trade LEXIS 105, Slip Op. 99-112. "To conclude otherwise would leave every verification effort vulnerable to successive subsequent attacks, no matter how credible the evidence and no matter how burdensome on the agency further inquiry would be." Id. at *54 n.32, Slip Op. 99-112, (relying on PPG Indus., Inc. v. United States, 15 CIT 615, 620, 781 F. Supp. 781, 787 (1991)); see also Micron Tech., 117 F.3d at 1396 ("declin[ing] to impose a requirement on Commerce to trace every figure it chooses to verify back to financial statements prepared in the ordinary course of business"). Timken may not usurp Commerce's role as fact finder and substitute Timken's analysis of the data for the result reached by Commerce in the verification report. The Court will not supersede Commerce's conclusions so long as it applies a reasonable standard to verify material submitted and the verification is supported by such relevant evidence as a reasonable mind might accept.

Commerce's verification of the data underlying Koyo's home market interest rate falls within Commerce's discretion. In this review, Commerce conducted the verification and concluded that Commerce was satisfied with Koyo's reported home market interest rate. See Final Results, 63 Fed. Reg. at 2569. Since Commerce

properly acted within its discretion when verifying Koyo's reported home market interest rate, the Court concludes that Commerce's acceptance of Koyo's home market interest rate was in accordance with law.

## CONCLUSION

This case is remanded to Commerce to: (1) annul all findings and conclusions made pursuant to the duty-absorption inquiry conducted for the subject review in accordance with this opinion; and (2) exclude any transactions that were not supported by consideration from NTN's United States sales database and to adjust the dumping margins accordingly. All other issues are affirmed.

_____
NICHOLAS TSOUCALAS
SENIOR JUDGE

Dated:     January 24, 2002
           New York, New York